No. 22-1795 & 22-1796

## In The United States Court of Appeals for the First Circuit

AMERICAN TRUCKING ASSOCIATIONS, INC.; Cumberland Farms, Inc.; M&M Transport Services, Inc.,

*Plaintiffs-Appellees*,

New England Motor Freight, Inc.,

*Plaintiff*,

v.

RHODE ISLAND TURNPIKE AND BRIDGE AUTHORITY,

*Defendant-Appellant*,

PETER ALVITI, JR., IN HIS OFFICIAL CAPACITY AS DIRECTOR OF RHODE ISLAND DEPARTMENT OF TRANSPORTATION,

*Defendant-Appellant*.

On Appeal from the United States District Court for the District of Rhode Island, Case No. 1:18-cv-00378-WES-PAS

## BRIEF OF DEFENDANTS-APPELLANTS RHODE ISLAND TURNPIKE AND BRIDGE AUTHORITY AND PETER ALVITI, JR., IN HIS OFFICIAL CAPACITY

Peter F. Neronha
*Attorney General*
Michael W. Field
*Assistant Attorney General*
Keith Hoffmann
*Special Assistant Attorney General*
RHODE ISLAND OFFICE OF
ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903
mfield@riag.ri.gov
401-274-4400, ext. 2380
*Counsel for Defendant-Appellant Peter Alviti, Jr., in his Official Capacity*

Ian Heath Gershengorn
Adam G. Unikowsky
Michelle S. Kallen
Elizabeth B. Deutsch
Maura E. Smyles
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, DC 20001
igershengorn@jenner.com
202-639-6000
*Counsel for Defendants-Appellants Rhode Island Turnpike and Bridge Authority and Peter Alviti, Jr., in his Official Capacity*

*Additional counsel listed on inside cover*

John A. Tarantino
R. Bart Totten
Nicole J. Benjamin
ADLER POLLOCK & SHEEHAN PC
One Citizens Plaza, 8th Floor
Providence, RI 02903
jtarantino@apslaw.com
btotten@apslaw.com
nbenjamin@apslaw.com
401-274-7200
*Counsel for Defendant-Appellant*
*Rhode Island Turnpike and Bridge*
*Authority*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD .............. vii

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 6

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .............. 7

STATEMENT OF THE CASE .............................................................. 8

I.    RhodeWorks ................................................................................ 8

II.   Procedural History .................................................................... 12

SUMMARY OF ARGUMENT ............................................................ 16

STANDARD OF REVIEW ................................................................ 17

ARGUMENT ...................................................................................... 17

I.    When States Enact Nondiscriminatory Laws, The Dormant
      Commerce Clause Requires Deference To Their Policy
      Judgments ................................................................................ 19

II.   RhodeWorks Is Not Unconstitutionally Discriminatory. ................... 22

      A.    Rhode Island Did Not Enact RhodeWorks With A
            Discriminatory Purpose. ........................................................ 22

      B.    RhodeWorks Is Not Discriminatory In Effect. .......................... 26

            1.    Declining to toll Classes 4–7 is not discriminatory. ........... 27

            2.    The toll caps—alone or in combination with the
                  choice of tolled vehicles—lack a discriminatory
                  effect ........................................................................ 32

3.    The district court applied strict scrutiny to decide whether to apply strict scrutiny. ..........................................43

C.    If The Court Concludes RhodeWorks' Caps Discriminate, It Should Sever Them...............................................44

III.   RhodeWorks Tolls Fairly Approximate Bridge Use...........................46

A.    Per-Use Tolls Fairly Approximate Use. .......................................46

B.    RhodeWorks' Distinction Between Tractor-Trailers And Single-Unit Trucks Does Not Create A Fair-Approximation Problem...................................................50

1.    The Constitution permits Rhode Island to toll only the vehicle classes that cause the most damage...............51

2.    The Constitution permits Rhode Island to draw a line between tractor-trailers and single-unit trucks. ...................................................................57

3.    ISTEA permits Rhode Island to toll vehicles beyond the share of damage they impose on bridges. ...................................................................61

CONCLUSION ...................................................................................64

# TABLE OF AUTHORITIES

CASES

*Alamo Rent-A-Car, Inc. v. Sarasota Manatee Airport Authority,*
906 F.2d 516 (11th Cir. 1990) ...................................................53, 55

*Alliance of Automobile Manufacturers v. Gwadosky,* 430 F.3d 30
(1st Cir. 2005).................................................................20, 23, 35, 46

*American Trucking Ass'ns v. Alviti,* 14 F.4th 76 (1st Cir.
2021) ........................................................................4, 13, 16, 23, 25

*American Trucking Ass'ns v. Alviti,* 944 F.3d 45 (1st Cir. 2019) .................12

*American Trucking Ass'ns v. Alviti,* C.A. No. 18–378, 2020 WL
5443551 (D.R.I. Sept. 10, 2020) ..........................................................13

*American Trucking Ass'ns v. New York State Thruway Authority,*
886 F.3d 238 (2d Cir. 2018).........................................................37, 62

*American Trucking Ass'ns v. Michigan Public Service
Commission,* 545 U.S. 429 (2005) .................................38, 40, 42, 43

*American Trucking Ass'ns v. Scheiner,* 483 U.S. 266 (1987).......38, 39, 40, 60

*Angus Partners LLC v. Walder,* 52 F. Supp. 3d 546 (S.D.N.Y. 2014) ..........55

*Automobile Club of New York, Inc. v. Port Authority of New York
& New Jersey,* 887 F.2d 417 (2d Cir. 1989)....................................55

*Barr v. American Ass'n of Political Consultants, Inc.,* 140 S. Ct.
2335 (2020).........................................................................................45

*Bouchard v. Price,* 694 A.2d 670 (R.I. 1997) ......................................45

*Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port
Authority,* 567 F.3d 79 (2d Cir. 2009).........................................56

*Capitol Greyhound Lines v. Brice,* 339 U.S. 542 (1950)............................60, 61

*Cherry Hill Vineyard, LLC v. Baldacci,* 505 F.3d 28 (1st Cir. 2007) ..........27

*Clark v. Paul Gray, Inc.*, 306 U.S. 583 (1939) ...................................................60

*Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542 (2015)..........................................................................................................23, 27, 44

*Continental Baking Co. v. Woodring*, 286 U.S. 352 (1932)..................6, 50, 59

*Cranston Firefighters, IAFF Local 1363, AFL-CIO v. Raimondo*, 880 F.3d 44 (1st Cir. 2018) ................................................................26

*Department of Revenue of Kentucky v. Davis*, 553 U.S. 328 (2008) .......19, 20

*Doran v. Massachusetts Turnpike Authority*, 348 F.3d 315 (1st Cir. 2003) ................................................................ 3, 16, 25, 26, 29, 34, 35, 36, 40, 44, 47, 48

*Doughty v. State Employees' Ass'n of New Hampshire, SEIU Local 1984, CTW, CLC*, 981 F.3d 128 (1st Cir. 2020)................................................18

*Enterprise Leasing Co. of Detroit v. County of Wayne*, 191 F.3d 451, 1999 WL 777678 (6th Cir. 1999) (unpublished table decision)..................55

*Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.*, 405 U.S. 707 (1972) ................................... 4, 5, 6, 7, 21, 22, 29, 47, 50, 51, 52, 54, 59, 60

*Family Winemakers of California v. Jenkins*, 592 F.3d 1 (1st Cir. 2010) ................................................................................................19, 28

*FCC v. Beach Communications, Inc.*, 508 U.S. 307 (1993) ...........................30

*General Motors Corp. v. Tracy*, 519 U.S. 278 (1997) ...........................27, 28, 64

*Grant's Dairy-Maine, LLC v. Commissioner of Maine Department of Agriculture, Food & Rural Resources*, 232 F.3d 8 (1st Cir. 2000) ................................................................................................3, 7, 19, 64

*Industria y Distribution de Alimentos v. Trailer Bridge*, 797 F.3d 141 (1st Cir. 2015)..............................................................................5, 17, 51, 52

*International Harvester Co. v. Evatt*, 329 U.S. 416 (1947)..............................59

iv

*Janes v. Triborough Bridge & Tunnel Authority*, 977 F. Supp. 2d 320 (E.D.N.Y. 2013), *aff'd*, 774 F.3d 1052 (2d Cir. 2014) ............................56

*Janes v. Triborough Bridge & Tunnel Authority*, 774 F.3d 1052 (2d Cir. 2014) ................................................................................48

*Jorling v. United States Department of Energy*, 218 F.3d 96, 103 (2d Cir. 2000) ................................................................................59

*Landrigan v. McElroy*, 457 A.2d 1056 (R.I. 1983) ...................................45, 46

*Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047 (7th Cir. 2018) ..................20

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) ................26, 58

*Moreau v. Flanders*, 15 A.3d 565 (R.I. 2011) .......................................45

*New Hampshire Motor Transport Ass'n v. Flynn*, 751 F.2d 43 (1st Cir. 1984) ................................................................................52

*Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355 (1994) .... 4-5, 21, 52

*Owner Operator Independent Drivers' Ass'n v. Pennsylvania Turnpike Commission*, 934 F.3d 283 (3d Cir. 2019) ..............................37, 62

*Owner-Operator Independent Drivers Ass'n v. Holcomb*, 990 F.3d 565 (7th Cir.), *cert. denied*, 142 S. Ct. 351 (2021) ..................................48, 60

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ....................................20, 64

*Plumley v. Southern Container, Inc.*, 303 F.3d 364 (1st Cir. 2002) ................................................................................37

*Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685 (1st Cir. 1994) ................................................................................25

*South Carolina State Highway Department v. Barnwell Brothers*, 303 U.S. 177 (1938) ................................................................................33

*South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018) ..................19, 20, 46, 63

*Selevan v. New York Thruway Authority*, 711 F.3d 253 (2d Cir. 2013) ................................................................................48

*Such v. State*, 950 A.2d 1150 (R.I. 2008)............................................24

*Trailer Marine Transport Corp. v. Rivera Vazquez*, 977 F.2d 1 (1st Cir. 1992) ............................................................................41

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997) .............58, 59

*White v. Mass. Council of Construction Employers, Inc.*, 460 U.S. 204 (1983) ...........................................................................63

*Yerger v. Massachusetts Turnpike Authority*, 395 F. App'x 878 (3d Cir. 2010) ............................................................................48

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. art. I, § 8, cl. 3 ................................................................19

23 U.S.C. § 129(a)(1)(E)........................................................................9

23 U.S.C. § 129(a)(3)...............................................................9, 47, 62

28 U.S.C. § 1291 ....................................................................................6

28 U.S.C. § 1331 ....................................................................................6

R.I. Gen. Laws § 28–5–6(8)(i) ...........................................................31

R.I. Gen. Laws § 42–13.1–1, *et seq.* ...................................................1

R.I. Gen. Laws § 42–13.1–1..................................................................9

R.I. Gen. Laws § 42–13.1–2......................................... 1, 8, 10, 11, 45, 56, 58

R.I. Gen. Laws § 42–13.1–4.................................................9, 11, 12, 44

R.I. Gen. Laws § 42–13.1–14..............................................................45

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The Court should grant oral argument because the district court struck down a state statute on federal constitutional grounds and because this case presents important questions relating to federalism and the dormant Commerce Clause.

## INTRODUCTION

The district court held that the dormant Commerce Clause forecloses Rhode Island's effort to fix its crumbling bridges by imposing a facially neutral toll on the classes of trucks that cause the lion's share of the damage yet contribute a disproportionately small share to infrastructure maintenance. In so doing, the district court transformed the dormant Commerce Clause into a mechanism for federal courts to displace the reasoned judgments of state legislatures seeking to solve complex infrastructure problems. The decision below must be reversed.

Rhode Island faces an infrastructure crisis. Nearly a quarter of the State's bridges are structurally deficient, and many more are functionally obsolete. Existing revenue sources—principally federal funds, state bonds, and fuel taxes—generate "insufficient revenue" to "fund the maintenance and improvement of Rhode Island transportation infrastructure." R.I. Gen. Laws § 42–13.1–2(4). So, the legislature took action. After efforts to make up the shortfall via increased license and registration fees failed to close the "funding gap," *id.* § 42–13.1–2(7), the State enacted "The Rhode Island Bridge Replacement, Reconstruction, and Maintenance Fund Act of 2016," or "RhodeWorks." R.I. Gen. Laws § 42–13.1–1, *et seq.*

RhodeWorks has two basic components. First, it imposes tolls on the largest classes of trucks, namely, tractor-trailers. RhodeWorks does not distinguish between out-of-state and local trucks. Instead, it leverages the Federal Highway Administration's vehicle classification schedule, imposing tolls on tractor-trailers (Class 8–13 vehicles), while excluding motorcycles, cars, and single-unit trucks (Class 1–7 vehicles). Tractor-trailers, the legislature found, impose "in excess of seventy percent (70%)" of the damage to the State's transportation infrastructure, yet contribute less than 20% of the revenues used to keep that infrastructure in good repair.

Second, the legislature blunted the tolls' burden on the tractor-trailers that, because of their frequency of use, would otherwise pay the most, or else—to avoid paying—divert from highways onto residential roadways. For each tractor-trailer, the tolls are capped at $40 per day total; $20 for a one-way border-to-border trip along Interstate 95; and one toll per day in each direction for each toll facility. The caps are available to all tractor-trailers regardless of where they are registered.

As the district court saw it, these careful legislative judgments are unconstitutional for two reasons. *First*, the court believed that RhodeWorks discriminates against out-of-state vehicles. It recognized that RhodeWorks,

by its terms, does not give competitive benefits to in-state vehicles that it withholds from out-of-state vehicles. Instead, the court's reasoning was that Rhode Islanders are more likely to benefit from RhodeWorks' daily caps and from the legislature's decision to toll only tractor-trailers. The court also credited stray public statements by two officials, one of whom was not even a legislator, as evidence of the legislature's discriminatory intent.

This reasoning was misguided. RhodeWorks is not discriminatory. Discrimination, for dormant Commerce Clause purposes, requires *similarly situated* "out-of-state competitors" to be treated worse than their in-state competition. *Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 18 (1st Cir. 2000). Under RhodeWorks, that never happens. An un-tolled Class 6 cement mixer does not compete with a tolled Class 8 tractor-trailer that hauls goods. And the daily discounts provided by the caps are open to all tolled tractor-trailers, regardless of their State of registration. As this Court observed in *Doran v. Massachusetts Turnpike Authority*, 348 F.3d 315 (1st Cir. 2003), frequency-based toll discounts that are open to in-state and out-of-state vehicles but in practice disproportionately benefit in-state drivers do not "discriminate" in the constitutional sense.

3

Nor can the statements cited by the district court salvage its discrimination finding. As this Court cautioned when this case was last on appeal, the dormant Commerce Clause focuses on discriminatory effect, not intent, given the "inherent challenges of using evidence of individual lawmakers' motives to establish" the motives of the "legislature as a whole." *Am. Trucking Ass'ns v. Alviti*, 14 F.4th 76, 90 (1st Cir. 2021). The district court ignored this Court's warning.

*Second*, the district court held that RhodeWorks is unconstitutional because it fails to "fairly approximate" tractor-trailers' use of bridges. That holding sharply diverged from settled law. States have long employed use-based tolls to raise infrastructure-repair revenues. While the Supreme Court has struggled mightily with (though upheld many) flat annual taxes that bear no relationship to vehicles' use of the roads, it has never suggested—and no Circuit has ever held—that a road or bridge toll that varies based on miles driven or bridges crossed is unconstitutional.

Under a proper application of the deferential test for nondiscriminatory fees, RhodeWorks poses no dormant Commerce Clause problem. *See Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 713 (1972); *Nw. Airlines, Inc. v. Cnty. of Kent*, 510 U.S.

355, 369 (1994). The tolls fairly approximate use: they charge the largest vehicle classes per crossing (with caps that reset daily). That arrangement is a far cry from the "wholly unreasonable" flat annual fees that have flunked "fair approximation" for charging sums "unrelated to road use." *Evansville*, 405 U.S. at 715–17.

The district court was wrong that charging only the heaviest users creates a constitutional problem. In this Court's words, "the government has reasonably drawn a line between those it is charging and those it is not." *Industria y Distribution de Alimentos v. Trailer Bridge*, 797 F.3d 141, 145 (1st Cir. 2015). What's more, contrary to the district court's view, Rhode Island does not force tractor-trailers to pay all bridge maintenance costs. RhodeWorks revenue collected from tractor-trailers represents a fraction of the revenue used to repair tolled bridges, and a smaller fraction of the revenue used to repair the State's highway system.

The district court's decision rested on its own views about where Rhode Island should have drawn the tolling line. The court seemed convinced that larger single-unit trucks in Classes 6–7 were more like tractor-trailers in Class 8 than single-unit trucks in Class 5. Thus, after delving into engineering and mathematics, the court concluded that the

5

legislature's decision to begin tolling at Class 8 violates the dormant Commerce Clause.

The district court's dalliance into vehicle classification contravenes Supreme Court precedent "concerning highway tolls," which "establish[es] that the States are empowered to develop 'uniform, fair and practical' standards for this type of fee," and that States may "exempt … users" from those fees so long as the lines they draw are "not wholly unreasonable." *Evansville*, 405 U.S. at 715, 718. Any effort by a State to charge some users and not others will involve drawing a line somewhere. State legislatures are "entitled" to "adapt [their tolling] regulations to the classes" of vehicles whose use of the highways "created the necessity" for repair. *Cont'l Baking Co. v. Woodring*, 286 U.S. 352, 373 (1932). The Constitution reserves these judgments for Rhode Island's General Assembly, not a federal court.

The decision below should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. The final judgment was entered on September 21, 2022. Notices of Appeal were timely filed on October 19, 2022.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether RhodeWorks, which subjects all tractor-trailers—both in- and out-of-state—to identical tolls and identical daily-resetting caps, discriminates against similarly-situated "out-of-state competitors." *Grant's Dairy-Me.*, 232 F.3d at 18.

2. Whether RhodeWorks, by levying user-based tolls on the classes of vehicles that overall cause the most damage to the State's bridges and otherwise under-contribute to repair funds, represents a "fair approximation" of bridge use by tolling in a manner that is not "wholly unreasonable." *Evansville*, 405 U.S. at 715–18.

# STATEMENT OF THE CASE

## I.    RhodeWorks

Rhode Island's bridges have been deteriorating for decades. Home to some of the country's oldest bridges, the State has the single worst record for structural deficiencies nationwide. App.__(May 25, 2022 Tr. 58:18–59:14; PX30). Twenty-three percent—nearly 200 bridges in total—are "classified as structurally deficient." R.I. Gen. Laws § 42–13.1–2(2). Many more are functionally obsolete. App.__(PX30).

In 2011, to address this infrastructure crisis, Rhode Island's General Assembly increased license and registration fees to fund a new highway maintenance account. R.I. Gen. Laws § 42–13.1–2(5). By 2014, money remained lacking. *Id.* § 42–13.1–2(6). So, the legislature modified the fund to allocate additional revenue. *Id.* Even still, the legislature identified an ongoing "funding gap between the revenue needed to maintain all bridges in structurally sound and good condition and the annual amounts generated by current dedicated revenue sources." *Id.* § 42–13.1–2(7).

In response, the State began exploring levying tolls on its bridges. The Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA") empowers States to undertake "reconstruction or replacement of a toll-free

8

bridge or tunnel and conversion of the bridge or tunnel to a toll facility." 23 U.S.C. § 129(a)(1)(E). Pursuant to this authorization, the legislature decided to convert several bridges into toll facilities.

On February 11, 2016, the General Assembly enacted "The Rhode Island Bridge Replacement, Reconstruction, and Maintenance Fund Act of 2016," or "RhodeWorks." R.I. Gen. Laws § 42–13.1–1. The statute directs the Rhode Island Department of Transportation ("RIDOT") to set and collect tolls "for the privilege of traveling on Rhode Island bridges to provide for replacement, reconstruction, maintenance, and operation of Rhode Island bridges." *Id.* § 42–13.1–4(a). Consistent with ISTEA, *see* 23 U.S.C. § 129(a)(3), revenue generated at each toll facility is first used to reimburse reconstruction costs for the associated bridge, at a rate reflecting a calculation by RIDOT engineers that measures the share of damage attributable to the tolled classes of vehicles. Remaining reconstruction costs are covered using 80% federal funding and 20% state funding (comprising license fees, registration fees, and gas taxes). App.__(June 10, 2022 Tr. at 105:3–108:1; DX329 at 8). Once a toll facility is fully repaired, toll revenue can be used for annual maintenance and non-toll infrastructure projects permitted under ISTEA. App.__(June 10, 2022 Tr. at 111:16–114:1). (No

bridge was ever certified as repaired under RhodeWorks, so no excess tolls were used for other purposes. App.__(*Id.* at 112:24–113:5).)

In designing RhodeWorks, the legislature weighed which vehicles to toll and how to structure the tolls. Initially, in 2015, it considered a proposal to toll all vehicles classified by the Federal Highway Administration ("FHWA") as Class 6 and above. App.__(PX83; PX101). Under this scheme, tolls would have applied to single-unit trucks in Classes 6–7, like garbage trucks and dump trucks, as well as tractor-trailers (Classes 8–13). Add.7 n.5. But constituents voiced concerns, pointing to the financial strain on small businesses. App.___(May 23, 2022 Tr. at 128–29).

The legislature ultimately opted to toll only tractor-trailers (Classes 8–13), based on several key findings. *See* R.I. Gen. Laws § 42–13.1–2. The legislature found that "just one, fully-loaded five-axle …tractor trailer has the same impact on the interstate as nine thousand six hundred … automobiles." *Id.* § 42–13.1–2(8). The legislature determined that, in total, tractor-trailers cause over "seventy percent (70%) of the damage to the state's transportation infrastructure, including Rhode Island bridges." *Id.* Notwithstanding the heavy damage they do, the legislature observed that tractor-trailers contribute "less than twenty percent (20%) of the state's

total annual revenues to fund transportation infrastructure." *Id.* The legislature thus determined that tractor-trailers should pay tolls because, by class, they do the most harm but contribute comparatively less to fund repairs.

Tolling only tractor-trailers made administrative sense, too. Rhode Island collects RhodeWorks tolls using specialized technology. Each tolled bridge is associated with a nearby gantry, which deploys a laser to detect the telltale gap between a Class 8–13 vehicle's tractor and its trailer. App.__(Verducci Dep. Tr. at 143:21–24). Where a gap is detected, the vehicle can be classed and tolled accordingly. App.__(*Id.* at 143:25–144:2). Class 4–7 trucks lack this gap; they are single-unit. App.__(*Id.* at 143:21–144:2).

The legislature was also careful to mitigate the financial burden on vehicles that would be the most affected by the new tolls. It set several caps on the total sum tolled in a single day. The first cap limits the tolling of a particular tractor-trailer to once per day, per toll facility in each direction. R.I. Gen. Laws § 42–13.1–4(b). The second sets a maximum total charge of $20 for a "border-to-border through trip on Route 95 Connecticut to Route 95 Massachusetts," to reduce the costs to truckers traveling interstate and to disincentivize rerouting onto residential streets. *Id.* § 42–13.1–4(c). The

11

third caps total charges, irrespective of route traveled, at $40 per day per truck. *Id.* § 42–13.1–4(d).

To implement RhodeWorks, RIDOT established twelve toll facilities, with tolls ranging from $2.25–$9.50 per crossing. At gantries positioned along the border-to-border I-95 route, RIDOT set tolls at lower rates to effectuate RhodeWorks' $20 cap. App.__(June 3, 2022 Tr. 126:15–127:15, 137:5–21; DX327 at 12; DX301 at § 6.3). In its operation before the decision below, the tolls contributed $61,412,531.75 to the State's highway fund—100% went to bridge improvements. App.__(PX632; June 10, 2022 Tr. at 111:16–113:5). The toll revenue projected for 2022 was $42 million. App.__(June 10, 2022 Tr. at 102:22–24).

## II.   Procedural History

In 2018, the American Trucking Associations and three companies sued RIDOT's Director in his official capacity, alleging RhodeWorks violates the dormant Commerce Clause. The Rhode Island Turnpike and Bridge Authority ("RITBA") intervened to defend the statute.

The district court initially dismissed the case for want of jurisdiction under the Tax Injunction Act, but this Court reversed. *Am. Trucking Ass'ns v. Alviti*, 944 F.3d 45, 56 (1st Cir. 2019).

On remand, the district court declined to enter a preliminary injunction, finding Plaintiffs had not established a likelihood of success. *Am. Trucking Ass'ns v. Alviti*, 2020 WL 5443551, at *7–8 (D.R.I. Sept. 10, 2020). The parties proceeded to discovery. The case reached this Court again in 2021, this time challenging the district court's refusal to quash subpoenas of individual public officials and a consultant—discovery Plaintiffs sought to establish discriminatory intent. 14 F.4th at 83.

This Court issued a writ of advisory mandamus reversing the district court's decision to allow the discovery from the public officials. *Id*. at 91. This Court assigned little relevance to evidence of allegedly discriminatory legislative intent, given that "[t]he Supreme Court has repeatedly focused its Commerce Clause analysis on whether a challenged scheme is discriminatory in effect." *Id.* at 89 (cleaned up). The discovery would carry little probative value due to "the inherent challenges of using evidence of individual lawmakers' motives to establish that the legislature as a whole enacted RhodeWorks with any particular purpose." *Id.* at 90.

The district court conducted a twelve-day bench trial in May and June, 2022. At its conclusion, the court held that RhodeWorks violates the dormant Commerce Clause because it discriminates against out-of-state commerce in

13

purpose and effect and fails to fairly approximate tractor-trailers' use of the tolled bridges. Add.90.

On discriminatory purpose, the district court viewed the decision to toll only vehicles in Classes 8–13 as "compelling evidence that the General Assembly sought to protect local businesses," given that 80% of tractor-trailers hail from out of state. Add.69. Meanwhile, the court said, in-state tractor-trailers stand to benefit disproportionately from RhodeWorks' toll caps. Add.71. The court also pointed to public comments by two officials— one of whom was not a legislator—as proof of discriminatory intent. Add.69–70.

The district court additionally said that two aspects of RhodeWorks render it discriminatory in effect: the daily caps, and the decision to toll vehicles beginning at Class 8 (which the court called an "exemption" for Class 4–7 single-unit trucks). Add.83–86. First, the court concluded that the daily toll caps discriminate because they tend to benefit local tractor-trailers. Add.75. Second, the court concluded that the decision not to toll single-unit trucks was discriminatory because it shifted the tolling burden away from vehicle classes that are owned in higher percentages by in-staters (single-

unit trucks) onto those more likely to be owned by out-of-staters (tractor-trailers). Add.86.

Because the court held that RhodeWorks is discriminatory, it applied strict scrutiny and (after less than a page of analysis, *see* Add.89) held that the State "fail[ed] to meet this high bar." Add.5.

The district court also held that RhodeWorks is not a "fair approximation" of bridge use. The court said that, by not tolling single-unit trucks, the legislature had "failed to reasonably draw a line between those it is charging and those it is not." Add.58 (cleaned up). The court excluded from its fairness analysis (1) all non-toll sources of revenue for tolled bridges; and (2) all infrastructure costs and revenue contributions beyond the tolled bridges. Add.47, 49. Viewed through that narrowed lens, the court concluded that "large commercial trucks should not bear the entire tolling burden associated with defraying the costs of the tolled bridges." Add.63.

The district court entered judgment for Plaintiffs and enjoined further tolling under the RhodeWorks statute. RIDOT's Director and RITBA now appeal.

## SUMMARY OF ARGUMENT

RhodeWorks easily survives dormant Commerce Clause review. First, it is not discriminatory. The district court gleaned discriminatory intent from stray statements by two officials. But this Court has cautioned against precisely that error. *See Alviti*, 14 F.4th at 90 ("warn[ing] against relying too heavily on such evidence"). As for discriminatory effect, the tolls apply even-handedly to the vehicle classes that tend to do the most damage to bridges, regardless of the vehicles' registration. Charging all tractor-trailers does not disadvantage any similarly-situated out-of-state businesses. And, as this Court held in *Doran*, frequency-based discounts open to all tolled vehicles (like RhodeWorks' daily caps) are not discriminatory, even if they disproportionately benefit in-state drivers. 348 F.3d at 321. RhodeWorks' facially-neutral, per-crossing tolls are nothing like the flat annual fees struck down for their discriminatory effects against out-of-state competition. If this Court nevertheless finds that the toll caps are discriminatory, it should sever them and uphold the remainder of RhodeWorks, consistent with RhodeWorks' severability clause.

Second, RhodeWorks does not unduly burden interstate commerce—its per-crossing tolls on the heaviest vehicle classes represent a "fair

approximation" of bridge use. The district court could cite no case holding a per-use road toll unconstitutional for failing "fair approximation" because, fundamentally, tolls estimate use: they charge vehicles when, and only when, they drive on roads or bridges. Here, RhodeWorks tolls only the vehicle classes that generally do the most damage to bridges. Moreover, the toll revenue collected from tractor-trailers represents only a share of how bridge repairs are actually funded, and a still smaller share of how Rhode Island's infrastructure system is bankrolled. As the Supreme Court and Courts of Appeals have made clear, user fees must be viewed in this broader funding context. Analyzed that way, RhodeWorks' line-drawing is constitutional.

## STANDARD OF REVIEW

This case arises from a bench trial. The district court's factual findings are reviewed for clear error, and its legal conclusions are reviewed *de novo*. *Trailer Bridge*, 797 F.3d at 144.

## ARGUMENT

The district court was wrong to strike down a use-based road toll in the name of the dormant Commerce Clause. That unprecedented second-guessing of a State's effort to solve its complex infrastructure problems requires reversal.

RhodeWorks does not violate the dormant Commerce Clause. It requires all tractor-trailers, in- and out-of-state alike, to pay a toll when they cross a bridge. The legislature decided to toll the classes of vehicles that, on average, cause the most damage. It chose to mitigate (though not eliminate) the tolls' impact on the most frequent users (who otherwise would bear the highest toll burdens) to avoid incentivizing them to divert onto residential streets or causing them financial strain. The resulting tolls are nondiscriminatory and fairly approximate the tolled vehicles' bridge use.

The district court nonetheless struck down RhodeWorks based on its disagreement with the legislature's policy decisions to enact a per-day cap and to distinguish between tractor-trailers and single-unit trucks. But the dormant Commerce Clause does not greenlight the district court's brand of micromanagement. The doctrine protects interstate commerce. It does not give federal judges free-ranging authority to iron out every perceived unfairness in the brass tacks of States' revenues collection measures.

The district court overreached, ignoring "one of the first principles of constitutional adjudication": "the basic presumption of the constitutional validity of a duly enacted state [] law." *Doughty v. State Emps.' Ass'n of N.H., SEIU Loc. 1984, CTW, CLC*, 981 F.3d 128, 134 (1st Cir. 2020) (quoting

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 60 (1973) (Stewart, J., concurring)). The decision below should be reversed.

## I.   When States Enact Nondiscriminatory Laws, The Dormant Commerce Clause Requires Deference To Their Policy Judgments.

The Commerce Clause empowers Congress "[t]o regulate Commerce … among the several States." U.S. Const. art. I, § 8, cl. 3. Although the text does not expressly restrain States, the Supreme Court has "sensed a negative implication in th[is] provision." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008).[1]

The so-called "dormant" Commerce Clause "is driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* at 337–38 (quotation marks omitted). The doctrine "prohibits protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." *Grant's Dairy-Me.*, 232 F.3d at 18; *see also Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 10–11 (1st Cir. 2010)

---

[1] Appellants preserve the argument that the "dormant" Commerce Clause cannot strip the States of powers. *See South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2100–01 (2018) (Gorsuch, J., concurring); *id.* at 2100 (Thomas, J., concurring).

(explaining the doctrine polices "[s]tate laws" that "alter conditions of competition to favor in-state interests over out-of-state competitors").

"Modern precedents rest upon two primary principles that mark the boundaries of a State's authority to regulate interstate commerce. First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *Wayfair*, 138 S. Ct. at 2090–91.

Consistent with the doctrine's core anti-protectionism interest, "State laws that discriminate against interstate commerce face 'a virtually *per se* rule of invalidity.'" *Id.* at 2091. Such statutes are subjected to strict scrutiny. *All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 35 (1st Cir. 2005).

By contrast, when a law is nondiscriminatory, deference is due to state prerogatives. State laws that "'regulat[e] even-handedly to effectuate a legitimate local public interest … will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). The latter test—"*Pike* balancing"—is highly deferential. *Davis*, 553 U.S. at 339 ("State laws frequently survive this *Pike* scrutiny."); *Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047, 1059 (7th Cir. 2018) ("If the state law affects

20

commerce without any reallocation among jurisdictions and does not give local firms any competitive advantage over those located elsewhere, we apply the normal rational-basis standard." (cleaned up)).

In cases addressing the constitutionality of user fees like tolls, the Supreme Court has long "regard[ed] it as settled that a charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance may constitutionally be imposed on interstate and domestic users alike." *Evansville*, 405 U.S. at 714. Courts apply a three-part test: a fee is "reasonable" if "it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Nw. Airlines*, 510 U.S. at 369. The third prong reflects the dormant Commerce Clause's nondiscrimination principle, while the first and second prongs implement the requirement that state laws not impose an "undue burden" on interstate commerce.

As explained below, all parties agree that the test's second prong— excessiveness—is not relevant here. As for the first prong, consistent with principles of deference to nondiscriminatory state laws, the Supreme Court has recognized that a "fair, if imperfect, approximation" will "pass

constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users." *Evansville*, 405 U.S. at 716–17. Legislative judgments must be upheld unless the fees are "wholly unrelated" to use. *Id.* at 715.

The Court should hold that RhodeWorks is nondiscriminatory. It should further hold that RhodeWorks tolls pass the lenient "fair approximation" test.

## II.    RhodeWorks Is Not Unconstitutionally Discriminatory.

The district court ruled that RhodeWorks is unconstitutional because it was "enacted with a discriminatory purpose" and "discriminate[s] against interstate commerce in effect." Add.90, 88–89. Both holdings are wrong. Public statements by individual officials expressing concern about protecting small businesses do not establish a legislature's discriminatory purpose. And a program that subjects all tractor-trailers—both in-state and out-of-state—to identical tolls (with daily caps) is not discriminatory in effect.

### A.    Rhode Island Did Not Enact RhodeWorks With A Discriminatory Purpose.

The district court struck down RhodeWorks in part because it perceived the legislature's "intent" to be "clearly protectionist." Add.72.

22

That was error. Courts should rarely, if ever, invalidate statutes based on the perceived intent of the legislature. The purported evidence here cannot suffice to invalidate RhodeWorks.

To begin, "[t]he Commerce Clause regulates effects, not motives, and it does not require courts to inquire into … legislators' reasons for enacting a law that has a discriminatory effect." *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 561 n.4 (2015). As this Court observed on this case's last appeal, "it is difficult to conceive of a case in which a toll that does not discriminate in effect could be struck down based on discriminatory purpose." 14 F.4th at 89; *see Gwadosky*, 430 F.3d at 36 n.3 (similar). If RhodeWorks has an unconstitutionally discriminatory effect, it may be invalidated without analysis of purpose. If RhodeWorks lacks an unconstitutionally discriminatory effect, it should not be invalidated merely because the court thinks some legislators *wanted* (but apparently failed) to create such an effect. Combing the legislative process for clues of "intent" adds nothing.

Even if discriminatory purpose were ever enough to invalidate a statute, Plaintiffs' evidence fell well short. After correctly rejecting most of Plaintiffs' evidence on this point, the district court deemed public statements

by two individuals to be "compelling evidence that the General Assembly sought to protect local businesses with its decision to toll only Class 8+ trucks." Add.66–69. As the court recounted, an earlier draft of RhodeWorks would have tolled all trucks Class 6 and above, but the final bill tolled Class 8 and above with a per-day cap. *Id.* Addressing these changes, then-Senate Majority Leader Ruggerio stated the trucks to be tolled are "larger commercial trucks, not your local landscaper truck or not your local, the usual pick-up trucks." Add.70. RIDOT Director Alviti said he had been "listening to the various stakeholders and transportation industries in Rhode Island," and the bill was changed to address its "impact on various industries." *Id.*

Ruggerio's and Alviti's statements shed no light on the intent of the legislature. These remarks were not "legislative history" akin to federal Senate or House Reports: "There is no recorded legislative history in Rhode Island from which to ascertain legislative intent." *Such v. State*, 950 A.2d 1150, 1158 (R.I. 2008) (quotation marks omitted).

The district court nonetheless relied on these statements because then-Leader Ruggerio and Director Alviti were "key officials." Add.70. That was wrong. As for Ruggerio, this Court's prior decision noted "the inherent

challenges of using evidence of individual lawmakers' "—here, a single lawmaker's—"motives to establish that the legislature as a whole enacted RhodeWorks with any particular purpose." 14 F.4th at 90; *see Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 697–99 (1st Cir. 1994) (rejecting floor statements by bill sponsor as insufficient to establish legislative purpose). Statements from *non-legislators* like Alviti are even less probative. *See Gwadosky*, 430 F.3d at 39. The Court should not use such statements to infer the intent of the legislature as a body—especially when the legislature articulated its intent in legislative findings. Add.8–9.

Even taken for all they are worth, these statements cannot establish discriminatory intent. The district court was troubled that Ruggerio referred to "local landscaper truck[s]" and "pick-up trucks" and Alviti to "industries in Rhode Island." If legislation were deemed "discriminatory" every time a legislator declared she had heard her constituents' concerns, few laws would survive.

This Court's decision in *Doran* makes that plain. Evidence there showed the toll program had been adopted "in response to political pressure to benefit commuters." 348 F.3d at 321. Yet this Court rejected the argument that such evidence established "discriminatory intent and

purpose," noting that legislating to benefit local commuters was "surely a constitutionally valid purpose." *Id.*

More to the point, the Supreme Court and this Court have recognized that legislators who note the concerns of local constituents do not prove discriminatory intent. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7, 471 n.15 (1981); *Cranston Firefighters, IAFF Loc. 1363, AFL-CIO v. Raimondo*, 880 F.3d 44, 50 (1st Cir. 2018). Neither Ruggerio, nor Alviti, nor anyone else expressed desire to treat differently *similarly situated* in-staters and out-of-staters. No one suggested, for example, that out-of-state pick-up trucks or landscapers should be tolled, but similar in-state vehicles should be exempt. Trial testimony showed that constituents opposed tolling Class 6–7 trucks to protect small businesses, not to discriminate against out-of-state competitors. *See, e.g.*, App.___(May 23, 2022 Tr. at 128:1–129:11). No evidence hinted at a desire to discriminate against interstate competition.

### B.   RhodeWorks Is Not Discriminatory In Effect.

Lacking proof of discriminatory intent, the district court identified two aspects of RhodeWorks that purportedly were discriminatory in effect: the fact that single-unit trucks are not tolled, and the daily caps. Add.83–84, 88–

26

89. Neither feature—alone or together—supplies "substantial evidence of an actual discriminatory effect." *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 37 (1st Cir. 2007). The tolls do not "inherently discriminate" against out-of-state competition. *Wynne*, 575 U.S. at 562.

### 1.    *Declining to toll Classes 4–7 is not discriminatory.*

The district court erred in holding that the decision to toll tractor-trailers but not single-unit trucks is discriminatory in effect. As the district court recognized, "RhodeWorks does not discriminate on its face." Add.64 n.43. It draws the line based on truck class, not State of registration. In-state tractor-trailers pay identical tolls to out-of-state tractor-trailers. In-state single-unit trucks are not tolled, just as out-of-state single-unit trucks are not. Within any industry, the playing field is level.

The district court found that the statute was "discriminatory" because a larger percentage of Class 4–7 trucks are in-state. Add.85–86. According to the court, that statistical disparity was enough to trigger strict scrutiny. Add.89. No precedent supports this broad understanding of discrimination.

"Conceptually, … any notion of discrimination assumes a comparison of substantially similar entities." *General Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997). When "the different entities serve different markets," then

27

"eliminating the tax or other regulatory differential would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Id.* at 299. Thus, strict scrutiny applies only when "[s]tate laws … alter conditions of competition to favor in-state interests over out-of-state competitors." *Family Winemakers*, 592 F.3d at 10–11.

Here, there is no "discrimination" pertinent to the dormant Commerce Clause. RhodeWorks neither discriminates among "substantially similar entities," nor favors in-state over out-of-state competitors. To be sure, tractor-trailers are treated differently than motorcycles, cars, and single-unit trucks, but, as the district court acknowledged, there was no "evidence that in-state competitors have gained a competitive advantage at the expense of out-of-state competitors that use Class 8+ trucks." Add.88. No one would seriously contend that an in-state cement truck and an out-of-state tractor-trailer compete; wet cement is not poured into tractor-trailers, and pallets of consumer goods are not hauled on cement trucks. That should have ended the analysis. The fact that the ratio of in-state to out-of-state landscapers may exceed the ratio of in-state to out-of-state tractor-trailers

does not wrest from States the constitutional authority to draw reasonable lines.

This Court said the same in *Doran*. There, plaintiffs contended that Massachusetts' toll program discriminated because it "invariably results in a significant degree of permanent cost exporting onto the interstate traveler, non-resident and/or nonparticipant." 348 F.3d at 321 (cleaned up). This Court rejected that argument, noting that "interstate travelers pay the same tolls as resident travelers." *Id.* Even though "it is expected that nonparticipants will pay higher tolls," this Court found, "it does not follow that interstate commerce will be burdened, much less that it will suffer discrimination." *Id.* And the Supreme Court made the same point in *Evansville*: the mere fact that the "vast majority" of individuals subject to a user fee are out-of-staters is not enough to establish unconstitutional discrimination. 405 U.S. at 717.

The district court's bare focus on a degree of disparate impact is particularly inappropriate given that the legislature enacted aspects of RhodeWorks to protect interstate tractor-trailers. The $20 limit on total border-to-border I-95 tolls lowered the burden on the precise route traveled disproportionately by out-of-staters. *Supra* 11–12. It cannot be the case that

29

because Rhode Island is geographically small, with fewer tractor-trailers registered in-state than some of its neighbors, the dormant Commerce Clause *forbids* Rhode Island, and Rhode Island uniquely, from tolling tractor-trailers no matter how solicitous the legislature is to preventing interstate disruption.

Plus, there were obvious justifications for the lines the legislature drew. As noted, tractor-trailers, on average, cause the most damage to bridges but pay a disproportionately small share of repair costs. That tractor-trailers do not cause *all* the damage, or that some individual trucks in Class 6 or 7 may cause damage comparable to some tractor-trailers in Class 8, does not undermine the basic rationality of—or render constitutionally suspect—the legislative judgment about where to begin tolling. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315–16 (1993) ("[T]he fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." (cleaned up)).

Finally, administrative considerations supported structuring the tolls as the legislature did. Rhode Island confirms the accuracy of tolls using lasers to detect the telltale gap between the tractor and trailer that marks a vehicle in Class 8–13. *Supra* 11. Class 1–7 vehicles lack this gap because they

30

are single-unit. With non-discriminatory rationales for the legislative line-drawing at hand, in addition to measures aimed at protecting interstate traffic, the district court's leap from disparate impact to unconstitutional discrimination was indefensible.

The district court's reasoning, if upheld, would cannibalize States' authority. Every day, legislatures enact statutes that have disparate impacts on in-state and out-of-state businesses. For example, in many States, non-discrimination or disability-accessibility laws exempt small businesses with fewer than a threshold number of employees. In Rhode Island, state anti-discrimination laws apply only to employers with four or more employees. R.I. Gen. Laws § 28–5–6(8)(i). This exemption disproportionately benefits local businesses, because, if a business employs three or fewer people and operates in Rhode Island, it is almost certainly based there, whereas larger businesses may be based out of state. Thus, the ratio of in-state to out-of-state exempt businesses exceeds the ratio of in-state to out-of-state non-exempt businesses. Likewise, progressive income taxes disproportionately benefit local businesses: the ratio of in-state to out-of-state small businesses exceeds the ratio of in-state to out-of-state big businesses. The district court's reasoning implies that such laws are

31

"discriminatory," requiring strict scrutiny. No Circuit has hinted at that outcome.

        2.    *The toll caps—alone or in combination with the choice of tolled vehicles—lack a discriminatory effect.*

The discrimination analysis does not change just because Rhode Island adopted daily toll caps to blunt the tolls' impact on tractor-trailers that, because of their frequency of use, would otherwise pay the most. The district court found these caps "discriminate against interstate commerce in effect," and applied strict scrutiny. Add.83–84, 89. That was wrong.

Two points should be made clear at the start. First, tractor-trailers that trigger the toll caps are not exempt from tolls. Instead, the caps function as frequency-based discounts, lowering the effective rate of tolls paid on a particular day. Second, the caps are facially neutral. Both in-state and out-of-state tractor-trailers can—and do—benefit.

That arrangement does not discriminate "in effect" to favor Rhode Islanders. To the contrary, while the tolls were operational, the percentage of out-of-state tractor-trailers benefitting from the caps was consistently higher than the percentage of in-state tractor-trailers benefitting. App.___(DX327 at 14; June 3, 2022 Tr. at 141:6–143:1); *see* Add.80. Many local

trucks never benefited and will never benefit from the caps. App.___(DX327 at 13; June 3, 2022 Tr. at 120:21–121:12, 140:4–141:5).

The toll caps offer clear policy benefits, including for health and safety. They prevent tolls from being so high as to incentivize heavy vehicles to travel instead on residential streets ill-equipped to handle them—such diversion would harm local infrastructure, air quality, pedestrian and cyclist mobility, conservation land, and community recreation areas. App.__(DX041 at 6-6–6-7; DX041 at 6-7–6-24; DX063 at 6-36–6-63). The Supreme Court has afforded particular deference to state regulation aimed at the "safe and economic administration" of "state highways." *S.C. State Highway Dep't v. Barnwell Bros.*, 303 U.S. 177, 187 (1938) (approving highway regulations that "applied alike to interstate and intrastate traffic"). The caps also ease the burden on businesses with garages next to gantries; they would otherwise pay exorbitant sums due to their location. App.___(June 2, 2022 Tr. at 60:16–61:20).

The district court nonetheless found discrimination because although "in-state and out-of-state vehicles can benefit from the caps," it suggested, "Rhode Island-plated vehicles benefit to a significantly greater degree based on their traffic share than out-of-state vehicles." Add.81; *see* Add.80 (in-state

33

vehicles accrued 39.9% of discounts, but amounted to 18.6% of transactions). That reasoning contradicts *Doran*.

In *Doran*, this Circuit upheld a strikingly similar toll program. Drivers who participated in the program—"FAST LANE"—got toll discounts at Massachusetts toll plazas: $0.25 at the $1 toll plazas and $0.50 at the $3 toll plazas. 348 F.3d at 317. To participate, drivers purchased a transponder for $27.50. *Id*. The inevitable effect was that drivers who frequently used these roads paid lower tolls, per trip, than occasional drivers. Anyone (in- or out-of-state) could participate, but the fixed cost of the transponder made the program uneconomical for low-frequency drivers. That meant the benefits flowed naturally—by design—to in-state vehicles. *Id*.

This Court upheld FAST LANE as not "discriminatory." The Court's reasoning could have been written for this case:

> The FLDP [(FAST LANE Discount Program)] is available on identical terms to drivers without regard to their residence; the program incorporates no distinctions or classifications based on residence and participation is open to anyone. The benefits of the discount program accrue simply on account of a driver's frequency of use.

*Id.* at 319. Here, likewise, tolls are imposed "on identical terms to drivers without regard to residence." The "benefits" of the toll caps accrue "by a driver's frequency of use."

The *Doran* Court continued:

> The right to purchase [a transponder] is not restricted to residents, but is open to all. The decision whether to do so turns on one's anticipated frequency of use. The distance a driver lives from Boston will be a factor, but not the only factor, affecting the frequency with which he or she is likely to drive through the toll plazas or the tunnels. But the frequency calculus creates no resident versus nonresident classification.

*Id.* The same is true here. Everyone can benefit from the toll caps. A driver's residence "will be a factor, but not the only factor," in determining whether the driver uses the bridges with sufficient frequency that the caps are reached, but that involves "no resident versus nonresident classification."

The *Doran* Court further noted:

> The toll is higher for nonparticipants than for participants, regardless of where they live. Thus, many infrequent nonparticipating drivers living in and around Boston will pay a higher toll for whatever distances they may drive than commuters from, say, Manchester, Providence or Portland who have chosen to participate.

*Id.* Here, again, the toll is lower for frequent drivers than for infrequent drivers, regardless of where they live. Indeed, as the district court noted, as to the $40 daily cap, *most* of the discounts—64%—accrue to out-of-state vehicles. Add.80. That is not "discrimination," even if a small number of very-high-frequency drivers who work near toll gantries cause in-state drivers to have a higher average discount. *Id.*

The district court attempted to distinguish *Doran* by suggesting RhodeWorks' "caps sever" the "pivotal connection to actual use of the bridges." Add.82. "After the caps kick in," the court expounded, "a driver pays nothing no matter how many times they drive through the gantries, unlike the discount in *Doran* where the tolls remained tied to gantry use." *Id.* Not so. The toll caps do not "sever" the "connection to actual use." They lower the effective rate paid by frequent users. And they reset every day. So the tolls are and remain tied to bridge use. As such, *Doran* applies with full force here. *Doran* teaches that a statute is not discriminatory if it is open to all but gives volume discounts to high-frequency drivers. That reasoning stands whether the discount is structured as a per-day cap or a per-ride percent-off.

36

Additionally, the district court's focus on caps' supposedly "severing" the tolls' connection to use highlights the court's overreach. Legislation often advances multiple goals. *See, e.g.*, *Plumley v. S. Container, Inc.*, 303 F.3d 364, 372 (1st Cir. 2002) (noting that there is "nothing odd" in a legislature's balancing competing interests). Implementing caps evinces that, in RhodeWorks, the legislature sought to achieve multiple—at times in tension—policy goals. The State needed to raise repair funds, but it did not want to divert tractor-trailer traffic into residential neighborhoods, *see* App.__(DX041 at 6-6–6-7), or cause economic hardship to the truckers who would otherwise pay the most.

Moreover, the caps allay industry concern about *over*-tolling. Plaintiff American Trucking Associations has leveled dormant Commerce Clause challenges against other States' ISTEA-authorized tolls, arguing those States burden interstate commerce because they charge truckers too much. *See, e.g.*, *Am. Trucking Ass'ns v. N.Y.S. Thruway Auth.*, 886 F.3d 238, 246–47 (2d Cir. 2018); *Owner Operator Indep. Drivers' Ass'n v. Pa. Tpk. Comm'n*, 934 F.3d 283, 292 (3d Cir. 2019). Rhode Island's tolls are not unconstitutional because they blunt that very impact—particularly since the $20 cap on the border-to-border I-95 route is structured to benefit interstate vehicles.

*American Trucking Associations v. Michigan Public Service Commission*, 545 U.S. 429 (2005), resolves any doubt that RhodeWorks is "discriminatory" in dormant Commerce Clause terms. There, the Supreme Court upheld a $100 flat fee on trucks engaged in intrastate commercial hauling. The statute had a clear disparate impact: in-state trucks tend to have more intrastate deliveries than out-of-state trucks, so, in effect, in-staters received a significant volume discount. Still, the Court upheld the statute, reasoning it "does not facially discriminate against interstate or out-of-state activities or enterprises" and "applies evenhandedly to all carriers that make domestic journeys." *Id.* at 434. Identical reasoning applies: RhodeWorks is "uniformly assessed upon all those who engage in local business, interstate and domestic firms alike." *Id.* at 438.

In reaching a contrary conclusion, the district court relied principally on two pre-*Michigan* cases involving flat annual taxes. But flat taxes (which are untied to actual use) present dormant Commerce Clause issues that road and bridge tolls (which are charged based on use) do not.

*American Trucking Associations v. Scheiner*, 483 U.S. 266 (1987), involved a flat annual tax paid by all out-of-state trucks. For in-state trucks, the tax was deemed already paid as part of the State's registration fee. *Id.*

at 271. Dividing 5–4, the Supreme Court found Pennsylvania's law discriminatory: "Although out-of-state carriers obtain a privilege to use Pennsylvania's highways that is nominally equivalent to that which local carriers receive, imposition of the flat taxes for a privilege that is several times more valuable to a local business than to its out-of-state competitors is unquestionably discriminatory and thus offends the Commerce Clause." *Id.* at 296.

*Scheiner* differs from this case in three key ways. *First*, by operation, Pennsylvania's flat tax functioned as a discriminatory statute: in virtually every case, in-state commerce was privileged over out-of-state commerce. For one thing, because the flat tax was offset against Pennsylvania registration fees, in-state truckers effectively never paid. For another, an in-state trucker would almost always use Pennsylvania's roads more often in a given year than a similarly situated out-of-state trucker, so face a lower per-mile tax. That is a far cry from this case, where many Rhode Islanders never benefit from the toll caps and the percentage of out-of-state trucks benefitting is higher than that of in-state trucks. App.__(DX327 at 14). As *Doran* observed, *Scheiner* "rests on the premise that the imposition of the

39

Pennsylvania tax did not treat interstate and intrastate interests evenhandedly." 348 F.3d at 319–20.

*Second*, in *Scheiner*, the disparate impact of the flat tax on in-state versus out-of-state interests was much more dramatic. "On the average, the Pennsylvania-based vehicles subject to the flat taxes travel about five times as many miles on Pennsylvania roads as do the out-of-state vehicles; correspondingly, the cost per mile of each of the flat taxes is approximately five times as high for out-of-state vehicles as for local vehicles." 483 U.S. at 276. There is nothing close here: as the court noted, out-of-state vehicles received 60.1% of the discounts (on 81.4% of transactions). *See* Add.80.

*Third*, *Scheiner* emphasized the practical effect of the flat tax on interstate commerce: "If each State imposed flat taxes for the privilege of making commercial entrances into its territory, there is no conceivable doubt that commerce among the States would be deterred." 483 U.S. at 284. The Court noted that over a dozen States had adopted similar flat taxes for the benefit of crossing state lines, which "can obviously divide and disrupt the market for interstate transportation services." *Id.* at 285. By contrast, the Court upheld the tax at issue in *Michigan*, explaining it did not "significantly deter[] interstate trade." 545 U.S. at 435. Here, as in *Michigan*, there is no

evidence that the capped tolls deter interstate trade. (Indeed, the legislature established the $20 cap—and RIDOT set the resulting toll rates—on the border-to-border I-95 route to avoid this result. *See supra* 11–12.).

Nor does *Trailer Marine Transport Corp. v. Rivera Vazquez*, 977 F.2d 1 (1st Cir. 1992), support the district court. *Trailer Marine*, like *Scheiner*, involved a flat $35 tax that "Puerto Rico charges each vehicle … per year as a contribution to the accident compensation fund, offering an optional reduction to $15 for those trailers that remain in Puerto Rico for 30 days or less." *Id.* at 10. Applying *Scheiner*, this Court found the law discriminated in effect. "A transitory trailer that stays only 30 days in Puerto Rico, and so qualifies for the $15 fee, is likely … to cause only 1/12th as many accidents as a trailer that is based in Puerto Rico twelve months a year. Yet the transient trailer pays almost half the ordinary flat fee, effectively paying five or six times as much per accident." *Id.* As in *Scheiner*, Puerto Rico's tax made virtually all non-local vehicles worse off than local vehicles and resulted in dramatic disparities. As explained, RhodeWorks does not.

The district court also held that RhodeWorks is invalid under *Scheiner*'s "internal consistency" test. That test asks "whether, if the same system was applied in every jurisdiction, it would cause an 'impermissible

41

interference with free trade.'" Add.78. But the "internal consistency test" cares about flat fees—a State's effectively collecting $200 to pass "GO," irrespective of what the driver does in the State. The problem with that kind of flat fee is that, if fifty States were to adopt it, there would be massive taxes on interstate commerce levied for the very privilege of moving between States—stepping a toe or turning a wheel over the line from Ohio to Pennsylvania. Those concerns are not present where, as here, fees are tethered to use.

In any event, the Supreme Court has pared back the "internal consistency" test. In *Michigan*, the Court "concede[d] that here, … if all States did the same, an interstate truck would have to pay fees totaling several hundred dollars, or even several thousand dollars, were it to 'top off' its business by carrying local loads in many (or even all) other States." 545 U.S. at 438. The Court still upheld the tax, reasoning that "[a]n interstate firm with local outlets normally expects to pay local fees that are uniformly assessed upon all those who engage in local business, interstate and domestic firms alike." *Id.* As *Michigan* makes clear, if a State imposes "local fees" that a driver "normally expects to pay," the fee is constitutional, even if a driver operating in multiple States would pay higher fees than a driver operating

42

in one. *Id.* Interstate trucks expect to pay nondiscriminatory tolls, *see supra* 37; this expectation does not change because a State caps daily tolls.

The district court attempted to distinguish *Michigan* on the ground that "the burden of a widely applied RhodeWorks toll program would fall on interstate commerce, whereas the burden in *Michigan* falls on increased intrastate commerce." Add.82–83. That distinction is illusory. In both cases, the fees had a disproportionate impact on out-of-state vehicles. Particularly under *Michigan*'s articulation of the "internal consistency" test, RhodeWorks survives.

> ### 3. *The district court applied strict scrutiny to decide whether to apply strict scrutiny.*

The structure of the district court's opinion illustrates the fundamental problem with its approach. To assess compliance with the dormant Commerce Clause, a court makes a threshold determination whether a law is discriminatory. If so, strict scrutiny applies.

But here the court applied strict scrutiny *as part of that threshold determination*. The court spent sixteen pages closely scrutinizing the potentially discriminatory impact of the tolls and Rhode Island's justifications for enacting them. Add.73–89. The court critiqued the "robustness" of the legislative process; probed the minds of officials to divine

the intent of the legislature; construed the legislature's pursuit of multiple objectives as pretext; and second-guessed legislative line-drawing to determine for itself whether Class 6 trucks are more like tolled Class 8 tractor-trailers or un-tolled Class 4 trucks. Having concluded the tolls were "discriminatory," the district court then purported to apply strict scrutiny. Add.89. But because it had effectively *already* applied strict scrutiny, there was nothing left to do—the strict scrutiny analysis took less than a page. *Id.*

Dormant Commerce Clause analysis should not work that way. As *Doran* shows, the "discrimination" determination is straightforward. 348 F.3d at 321. Under Supreme Court precedent, a toll is "discriminatory" if it facially discriminates or "inherently" functions just like a discriminatory statute. *Wynne*, 575 U.S. at 562. There is no discrimination if a State's line-drawing treats in-state and out-of-state vehicles alike. The district court should have made that threshold finding and stopped there.

## C.    If The Court Concludes RhodeWorks' Caps Discriminate, It Should Sever Them.

RhodeWorks is nondiscriminatory. But if this Court disagrees and believes that its caps discriminate, the Court should sever the caps. The toll caps appear in standalone sections of RhodeWorks. R.I. Gen. Laws § 42–13.1–4(b)–(d). And the law has a severability clause, which reads: "If a part

44

of this chapter is held unconstitutional or invalid, all valid parts that are severable from the invalid or unconstitutional part remain in effect." *Id.* § 42–13.1–14. Hence, if the Court holds the caps unconstitutional, it should ensure the "valid parts" of the statute—*i.e.*, the tolls and every other aspect of RhodeWorks—"remain in effect." *Id.* The severability clause makes clear the "legislative purpose and intent," *Landrigan v. McElroy*, 457 A.2d 1056, 1061 (R.I. 1983); the Court should respect that judgment. *See Moreau v. Flanders*, 15 A.3d 565, 586 (R.I. 2011); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2349 (2020) ("[A]bsent extraordinary circumstances," courts "adhere to the text of the severability or nonseverability clause.").

A court may disregard a severability clause where severance would "destroy[] legislative intent," *Bouchard v. Price*, 694 A.2d 670, 678 (R.I. 1997), but that is not this case. Without the caps, RhodeWorks would still fulfill the legislature's aim: raising revenues from otherwise under-contributing tractor-trailers to fill the State's "funding gap." *See* R.I. Gen. Laws § 42–13.1–2(7), (8). (The caps appear nowhere in the legislative findings.) "[S]everance of the unconstitutional portion … is consistent with

45

the underlying purpose of the statute and intent of the Legislature."
*Landrigan*, 457 A.2d at 1061.

## III.   RhodeWorks Tolls Fairly Approximate Bridge Use.

Because RhodeWorks is not discriminatory, the only remaining
question is whether its tolls represent a "fair approximation" of use.
RhodeWorks' brand of per-use charge is a classic method of ensuring a "fair
approximation": the district court could point to *no* federal case that has
struck down a per-use (as opposed to flat) road or bridge toll for failing to
fairly approximate use. Nor is the result different because RhodeWorks tolls
only those vehicle classes that cause the most damage. There is no dormant
Commerce Clause problem from charging only the heaviest users, especially
given that un-tolled users contribute to the upkeep of bridges and
infrastructure through myriad taxes and fees. Particularly under the "lower
level of scrutiny" applicable to nondiscriminatory statutes, RhodeWorks is
constitutional. *Gwadosky*, 430 F.3d at 35.

### A.    Per-Use Tolls Fairly Approximate Use.

A nondiscriminatory statute complies with the dormant Commerce
Clause unless it imposes "undue burdens on interstate commerce." *Wayfair*,
138 S. Ct. at 2090–91. In the context of user fees, courts ordinarily consider

whether the challenged fees are "excessive in comparison with the governmental benefit conferred" and "based on some fair approximation of use." *Doran*, 348 F.3d at 320–21 (quotation marks omitted). In this case, however, all agree that "excessiveness" is not at issue given ISTEA's authorization for States to toll vehicles beyond the costs they impose on toll facilities. 23 U.S.C. § 129(a)(3)(A)(v) ("if the public authority certifies annually that the tolled facility is being adequately maintained, [toll revenue may be used for] any other purpose for which Federal funds may be obligated by a State under title [23]"); Add.35 (noting Plaintiffs' concession). Thus, the sole remaining inquiry trains on the method of calculating revenue collection: whether the tolls are based on a "fair, if imperfect, approximation" of use. *Evansville*, 405 U.S. at 716–17.

Deference is the touchstone: a state law should be upheld unless it is "wholly unreasonable," "even though some other formula might reflect more exactly the relative use of the state facilities by individual users." *Id.* at 717–18. The Supreme Court's cases "concerning highway tolls," "establish that the States are empowered to develop 'uniform, fair and practical' standards" to recoup road repair costs. *Id.* at 715.

47

Under the Supreme Court's deferential approach, a user fee like a road or bridge toll that charges vehicles when—and only when—they use toll facilities should survive. No Circuit has struck down such a toll for failure to fairly approximate; they are nothing like the flat annual taxes that have troubled federal courts. Meanwhile, the Circuits, including this one, have consistently upheld road tolls as fair approximations of use: this Court in *Doran*, 348 F.3d at 320–21; the Second Circuit in *Selevan v. New York Thruway Authority*, 711 F.3d 253, 259–60 (2d Cir. 2013), and *Janes v. Triborough Bridge & Tunnel Authority*, 774 F.3d 1052, 1055 (2d Cir. 2014); and other Circuits in, *e.g.*, *Owner-Operator Independent Drivers Ass'n v. Holcomb*, 990 F.3d 565, 568 (7th Cir.), *cert. denied*, 142 S. Ct. 351 (2021), and *Yerger v. Mass. Tpk. Auth.*, 395 F. App'x 878, 884 n.3 (3d Cir. 2010) (tolls are assessed "in direct proportion to the use of the toll facilities").

Applying these precedents, RhodeWorks tolls are "fair" because they, like all per-use road tolls, charge only those trucks that use Rhode Island bridges. If a truck does not cross a bridge, it is not charged. If a truck crosses one bridge, it is charged one toll. If it crosses two bridges, it is charged two. If a truck crosses the same bridge every day, it is charged the same toll every

48

day. Hence, RhodeWorks fairly approximates use. This case is as simple as that.

In concluding to the contrary, the court recognized that Rhode Island designed its tolls to charge vehicles that generally "do most of the damage to bridges, in effect 'consuming' the useful life of the bridge over time." Add.52. The court promptly veered off course by rejecting the idea of "useful life," suggesting this Econ-101 concept was "unusual" and off the table. *Id.* It insisted instead that "a 'user' of a tolled bridge" must be defined as "a vehicle that crosses the bridge"—and hence a "use" must be a crossing. *Id.* Thus, under the district court's view, the proper starting point was not the legislature's conclusion that tractor-trailers cause 70% of the damage, but the court's perspective that they constitute 3% of the bridge-crossers. As the court put it, "97% of the vehicles making use of the tolled bridges— vehicles in Classes 1–7—are not tolled." Add.54. "Without looking much deeper, a system that places the entire toll burden on an extreme minority of users is inherently unfair and fails the test." *Id.*

The district court's approach stands alone. The Supreme Court long ago made clear that, in classifying vehicles to collect road-repair revenue, a state legislature is "entitled" to "adapt its regulations to the classes" whose

49

use of the highways "created the necessity" for reconstruction. *Woodring*, 286 U.S. at 373. This deferential approach has allowed States flexibility to effectively recoup the costs of their "highways [that were] being pounded to pieces by … great trucks which, combining weight with speed, [had been] making the problem of maintenance well-nigh insoluble." *Id.* at 364. The Supreme Court has "sustained numerous tolls based on a variety of measures of actual use, including": the "manufacturer's rated capacity and weight of trailers"; "carrying capacity"; "capacity of vehicles"; and "gross-ton mileage." *Evansville*, 405 U.S. at 715 (collecting cases). As these examples show, the Supreme Court has respected States' choice to toll based on a concept of "use" that goes beyond mere miles driven—or bridges crossed—and approximates the wear and tear that big, heavy vehicles do to roads and bridges. This Circuit should not be the first to doubt the States' role.

### B.  RhodeWorks' Distinction Between Tractor-Trailers And Single-Unit Trucks Does Not Create A Fair-Approximation Problem.

Starting from its mistaken premise that Rhode Island lacked leeway to toll based on the wear and tear that heavy vehicles cause, the district court faulted the legislature's decision to toll tractor-trailers. In the court's

50

view, RhodeWorks fails to fairly approximate use because other vehicles, especially single-unit trucks, also cross bridges, so should also pay tolls. Add.54.

But Rhode Island's choice to toll only some vehicles does not violate "fair approximation." The question is whether "the government has reasonably drawn a line between those it is charging and those it is not." *Trailer Bridge*, 797 F.3d at 145. And the answer here is yes. The legislature imposed tolls on the vehicle classes that cause 70% of the damage, while contributing 20% of the revenue.

> 1.   *The Constitution permits Rhode Island to toll only the vehicle classes that cause the most damage.*

The district court believed that placing the "entire tolling burden" on tractor-trailers was unconstitutional. Add.63. That was error.

To start, the court was wrong to conclude that tolling some users and not others is constitutionally suspect. Precedent makes clear that a State may charge the heaviest users and elect not to toll everyone else. In *Evansville*, the Supreme Court considered a flat $1 fee imposed by Indiana and New Hampshire on a subset of airport users: enplaning commercial airline passengers. 405 U.S. at 709. The fees exempted numerous passenger classes, such as "active members of the military and temporary layovers,

51

deplaning commercial passengers, and passengers on noncommercial flights, nonscheduled commercial flights, and commercial flights on light aircraft." *Id.* at 717–18. The Supreme Court found that the fees satisfied the lenient "fair approximation" test because the line between those who paid and those who did not, while "imperfect," was "not wholly unreasonable." *Id.* at 716–18. The Court explained that "[c]ommercial air traffic requires more elaborate navigation and terminal facilities, as well as longer and more costly runway systems, than do flights by smaller private planes," so it was acceptable for commercial passengers to pay the fees and those on noncommercial planes not to. *Id.* at 718. The same reasoning applies here.

Since *Evansville*, the Supreme Court and Courts of Appeals, including this one, have heeded its lesson: a user fee can "represent[] a reasonably fair allocation" of "costs among users" even when it charges only some of them, *N.H. Motor Transport Ass'n v. Flynn*, 751 F.2d 43, 49 (1st Cir. 1984), so long as "the government has reasonably drawn a line between those it is charging and those it is not." *Trailer Bridge*, 797 F.3d at 145 (approving as a "fair approximation" cargo fees that did not charge unscanned cargo (quotation marks omitted)); *accord Nw. Airlines*, 510 U.S. at 369–70 (approving as fair approximation fees that did not allocate some aircraft costs to airport

concessionaires); *Alamo Rent-A-Car, Inc. v. Sarasota Manatee Airport Auth.*, 906 F.2d 516, 519–21 (11th Cir. 1990) (upholding as fair approximation fees for passenger pickup at airports that did not charge all vehicles using the access roads). In light of that wall of precedent, Rhode Island was entitled to toll Classes 8–13 and not 1–7.

Moreover, even if the district court were correct that vehicles in Classes 1–7 had to contribute to repairs, the court was wrong to suggest they do not. The court reached that conclusion by disregarding two sets of substantial non-toll contributions by those vehicles.

*First*, the district court deemed "irrelevant" all non-toll sources of revenue to fund bridge repairs. Add.50. As a result, the court analyzed the tolls under the fiction that tractor-trailers pay for all bridge repairs and un-tolled vehicles pay nothing. In the real world, that is not the case. Only a fraction of bridge repair costs are funded through tolls. Add.51 n.33 (citing June 10, 2022 Tr. at 109:25–110:16). The federal government pays for 80% of remaining bridge repair costs, while the State covers the final 20% with non-toll revenue sources like registration fees and gas taxes assessed only on residents. Add.50 (citing June 10, 2022 Tr. at 105:12–108:1, 109:25–110:10). A

53

court cannot reasonably assess whether a toll is a "fair" way of paying for a bridge if it ignores how the bridge was actually paid for.

The district court's myopic approach also broke from Supreme Court precedent. In *Evansville*, the Court examined the fairness of the airport fees—levied on only some users—by looking to the broader funding picture. 405 U.S. at 718–19. Because "business users, like shops, restaurants, and private parking concessions, do contribute to airport upkeep" in other ways, such as "through rent, a cost that is passed on in part at least to their patrons," the Court found it fair that not all passengers paid the challenged fees. *Id.* at 718. Considering other revenue streams is integral to evaluating fair approximation; the district court was not free to ignore that context.

The district court asserted that "[e]ven if [it] considered other contributions tolled and un-tolled users make toward the costs of the bridge, it would make no difference to the outcome." Add.51 n.33. As the court saw it, tolled Class 8–13 users *also* pay other taxes, and out-of-state un-tolled Class 1–7 vehicles do not pay at all. *Id.* True enough, but it remains the case that in-state un-tolled vehicles *do* contribute to repair funds by paying gas taxes and registration fees, as well as federal taxes. App.__(DX328 at 5) (in-state Class 4–7 vehicles pay RIDOT surcharge, RI license fees, RI

54

registration fees, IRP registration fees, RI title fees, and RI light duty inspection fees). It is not true that Rhode Island burdens tractor-trailers with all bridge repair costs.

*Second*, the district court ignored another reality: a bridge is useless without a highway on both sides of the bridge. Trucks benefit from roads and associated state services up and down the highway—all funded by un-tolled vehicles. Yet, in the district court's mind, these substantial contributions were irrelevant. Add.47–51.

Again, the court erred. Courts consider users' benefits from the broader infrastructure system. *See Alamo*, 906 F.2d 516, 521 (rental car company benefitted from existence of airport, not just roads it used); *Enter. Leasing Co. of Detroit v. Cnty. of Wayne*, 191 F.3d 451, 1999 WL 777678, at *2 (6th Cir. 1999) (similar); *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546 (S.D.N.Y. 2014) (considering costs associated with infrastructure facilities that support bridges and tunnels in evaluating tolls' "fair approximation"); *see also Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 887 F.2d 417 (2d Cir. 1989) (expenses for PATH train included in evaluating bridge and tunnel tolls because the train was part of an integrated infrastructure system that reduced load on bridges and tunnels, thus

55

benefitting toll-payers); *Janes v. Triborough Bridge & Tunnel Auth.*, 977 F. Supp. 2d 320, 341 (E.D.N.Y. 2013) (in approving road tolls, weighing "the value of mass transit" and the benefits of "a smoothly functioning mass transit system"), *aff'd*, 774 F.3d 1052 (2d Cir. 2014).

*Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Authority*, cannot save the district court's framing error. 567 F.3d 79 (2d Cir. 2009). There, the Second Circuit invalidated a fee on ferry passengers for funding "virtually the entirety of the [transportation agency's] operating budget," *id.* at 86, including "all salaries, health benefits, [and] pension payments." *Id.* at 83. This case presents two key differences. For one, tolled vehicles do *not* bear the entire funding burdens in light of un-tolled users' substantial contributions. *Supra* 53–55. For another, the legislature made findings supporting the reasonableness of the toll structure: tractor-trailers cause the most damage but underfund repairs. R.I. Gen. Laws § 42–13.1–2(8). There were no such findings justifying the ferry fee arrangement in *Bridgeport*.

Viewed in the proper funding context, there is no "fair approximation" problem with tolling only tractor-trailers.

2.    *The Constitution permits Rhode Island to draw a line between tractor-trailers and single-unit trucks.*

Further delving into the province of the State, the district court found a constitutional problem with where the legislature drew tolling lines. The district court apparently accepted that Rhode Island need not toll passenger vehicles (Class 1–3); thought small single-unit trucks (Class 4–5) were marginal; and saw medium-size single-unit trucks (Class 6–7) as more akin to tractor-trailers, so, the court believed, they must be tolled. Add.60. Because the legislature did not draw the line at the district court's preferred location, the court deemed RhodeWorks unconstitutional. *Id.* The court's *de novo* line-drawing exercise shows just how much it overstepped.

Rhode Island offered, in its legislative findings, reasoned justifications for its decision to begin tolling at Class 8 tractor-trailers: the GAO study finding that "just one, fully-loaded five-axle (5) tractor trailer has the same impact on the interstate as nine thousand six hundred (9,600) automobiles," as well as RIDOT's analysis that tractor-trailers cause more than 70% of the damage while contributing less than 20% of the revenue. Add.9.

The district court disregarded the legislature's factual determinations. The court deemed the GAO study "inapplicable" because it examined pavement generally, not bridges specifically. Add.56. The court made that

57

finding notwithstanding expert testimony that studying pavement makes no difference; the damage to bridges is equivalent. *Compare* R.I. Gen. Laws § 42–13.1–2(8), *with* App.__(DX326 at 15; June 3, 2022 Tr. at 3:3–11:5 (concluding tractor-trailers cause 70-80% of bridge damage)). The court also did not like that the legislature had estimated vehicle volume by class using a particular calculation method ("equivalent single-axle load"). *See* Add.56.

Everything about the district court's reasoning was wrong. The district court gave far too little deference to the State's legislative findings. "States are not required to convince the courts of the correctness of their legislative judgments. Rather, those challenging the legislative judgment must convince the court that the legislative facts … could not reasonably be conceived to be true by the governmental decisionmaker." *Clover Leaf Creamery*, 449 U.S. at 464 (cleaned up)); *see also Turner Broad. Sys. v. FCC*, 520 U.S. 180, 195–96 (1997) (courts review legislative findings under "a standard more deferential than [they] accord to judgments of an administrative agency," *inter alia*, "out of respect for its authority to exercise the legislative power"). Even considering constitutional challenges to statutes, "deference must be accorded to [the legislature's] findings as to the harm to be avoided and to the remedial measures adopted for that end."

*Turner Broad.*, 520 U.S. at 196. The legislature here made precisely those findings, as to the harm tractor-trailers cause and the tolling measures to cure the repair funding gap. The district court should have deferred.

Even setting aside the legislative findings, the legislature's policy judgment to draw the line at Class 8 was reasonable. The legislature simply borrowed the FHWA's classification scheme and concluded that bigger trucks tend to cause more damage than smaller ones. *Cf. Woodring*, 286 U.S. at 364. While the State could have created a more finely reticulated tolling scheme, it was not constitutionally compelled to do so. *See Int'l Harvester Co. v. Evatt*, 329 U.S. 416, 422 (1947) (the Court "has long realized the practical impossibility of a state's achieving a perfect apportionment of expansive, complex business activities …, and has declared that 'rough approximation rather than precision' is sufficient"); *Jorling v. U.S. Dep't of Energy*, 218 F.3d 96, 103 (2d Cir. 2000) (rejecting the "alternative" to fair approximation's deferential approach, which would force courts "to engage in a detailed cost accounting analysis that endeavors to determine the cost, properly allocated to each payer, of every person, product, and facility involved in providing the service"). The difference between tractor-trailers and single-unit vehicles is "rational." *Evansville*, 405 U.S. at 718–19. And

that is enough. *See Clark v. Paul Gray, Inc.*, 306 U.S. 583, 594 (1939) ("The classification of the traffic for the purposes of regulation and fixing fees is a legislative, not a judicial function. Its merits are not to be weighed in the judicial balance and the classification rejected merely because the weight of the evidence in court appears to favor a different standard.").

At a basic level, RhodeWorks tolls are miles from the taxes the Supreme Court has struck in the name of "fair approximation": flat annual fees charging sums "wholly unrelated to road use." *Evansville*, 405 U.S. at 715. In *Scheiner*, the Supreme Court invalidated a flat annual tax that did "not even purport to approximate fairly the cost or value of the use of Pennsylvania's roads." 483 U.S. at 290. The Court made clear: "[s]o long as a State bases its tax on a relevant measure of actual road use, obviously both interstate and intrastate carriers pay according to the facilities in fact provided by the State," so there is no "fair approximation" problem. *Id.* at 291. That is true here. Other Circuits upholding use-based road tolls have distinguished *Scheiner* on this basis. *E.g.*, *Holcomb*, 990 F.3d at 568 (*Scheiner* "do[es] not affect the validity of a per-mile toll").

Were there remaining doubt, *Capitol Greyhound Lines v. Brice*, 339 U.S. 542 (1950), confirms that RhodeWorks tolls pass "fair approximation."

There, the Supreme Court upheld a tax of "2% upon the fair market value of motor vehicles" used in Maryland; the tax was levied not only when the vehicle was purchased, but also anytime ownership transferred. *Id.* at 543 (quotation marks omitted). This tax, as the dissent observed, bore "at best a most tenuous relationship" to use, "since differences in value are due to a vehicle's appointments or its age or to other factors which have no bearing on highway use," and the fee was tethered to "shift in … ownership" not "road use." *Id.* at 553–54 (Frankfurter, J., dissenting). Still, the Supreme Court upheld it as a "rough approximation." *Id.* at 546–47 (quotation marks omitted). Were courts to demand "precision," they would "add[] to administrative burdens of enforcement, which fall alike on taxpayers and government." *Id.* That was reason enough "to justify states in ignoring even such a key factor as mileage, although the result may be a tax which on its face appears to bear with unequal weight upon different carriers." *Id.* at 547. If the *Capitol Greyhound* toll is constitutional, then so is RhodeWorks.

### 3. *ISTEA permits Rhode Island to toll vehicles beyond the share of damage they impose on bridges.*

The district court still seemed convinced that tractor-trailers were harmed by Rhode Island's decision not to toll single-unit trucks (especially Classes 6–7) because if single-unit trucks pay nothing, then tractor-trailers

must pay more than their fair share. Add.63 ("large commercial trucks should not bear the entire tolling burden associated with defraying the costs of the tolled bridges"). Of course, as discussed, smaller vehicles *do* contribute to bridge and infrastructure maintenance. Even setting that reality aside, the court overlooked a crucial point. Under federal law, it is *irrelevant* whether tractor-trailers pay more than the exact share of the damage they cause to bridges because ISTEA authorizes exactly that. *See* 23 U.S.C. § 129(a)(3)(A)(v); *supra* 47. Federal courts have recognized this point in blessing tolls that the trucking industry complained were unconstitutionally high—that is, that charged trucks more than the damage they imposed. *See N.Y.S. Thruway*, 886 F.3d at 246–47; *Pa. Tpk.*, 934 F.3d at 292.

The district court paid lip service to ISTEA's "displace[ment]" of the "'excessiveness' part of the *Evansville/Northwest Airlines* analysis." Add.34–35. But the court missed the upshot. As a result of ISTEA, Rhode Island is free, under federal law, to toll vehicles and use toll revenues to fund not only the tolled bridges but also other, unrelated highway maintenance, construction, and repair. Hence, even if Rhode Island's decision not to toll lower-class vehicles meant that tolled tractor-trailers paid an amount greater than the share of costs they impose on bridges, this is not a

constitutional problem: ISTEA authorizes it. *See White v. Mass. Council of Constr. Emps., Inc.*, 460 U.S. 204, 213 (1983) ("Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce.")*; accord Wayfair*, 138 S. Ct. at 2089 ("when Congress exercises its power to regulate commerce by enacting legislation, the legislation controls").

The district court's decision boils down to its doubt that Rhode Island could draw the tolling line at tractor-trailers (Classes 8–13), while declining to toll medium single-unit trucks (Classes 6–7). The court's perception that single-unit trucks were getting too sweet a deal is no basis to strike down RhodeWorks under the dormant Commerce Clause. The doctrine serves a narrow purpose: it safeguards "interstate commerce" by policing discrimination and "undue burdens on interstate commerce." *Wayfair*, 138 S. Ct. at 2090–91. Rhode Island's decision *not* to toll single-unit trucks does not discriminate against interstate commerce. *Supra* 22–44. It does not place tractor-trailers at a competitive disadvantage because tractor-trailers and single-unit trucks do not compete. Nor does Rhode Island's decision *not* to toll single-unit trucks burden interstate commerce. The fact that single-unit trucks do not pay these tolls does not impact tractor-trailers' access to

interstate highways whatsoever. If Rhode Island had drawn the line at the district court's preferred location and begun tolling at Class 6, that would not (in light of ISTEA's authorization) change what Class 8–13 vehicles would pay to cross Rhode Island's bridges or move between States. Plaintiffs have an even steeper hill to climb because RhodeWorks caps total border-to-border tolls at $20 to *protect* interstate commerce. *Supra* 11–12.

The district court should have deferred to the legislature's policy judgments. RhodeWorks involves ordinary line-drawing that the Constitution leaves to the sound judgment of the States.[2]

## CONCLUSION

For the foregoing reasons, the judgment should be reversed.

---

[2] *Pike* balancing asks whether a state law imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefit." *Pike*, 397 U.S. at 142. As described, the "undue burden" test implements *Pike* balancing. *Supra* 21. Even were *Pike* a separate test, RhodeWorks satisfies it. As the foregoing analysis makes plain, RhodeWorks has clear benefits: raising needed bridge-repair revenue from the trucks that tend to do the most damage while under-contributing to repair funds. Any "modest burdens" Plaintiffs perceive "are outweighed by the benefits [Rhode Island] seeks to secure[.]" *Grant's Dairy-Me.*, 232 F.3d at 24. RhodeWorks is nothing like the "small number of … cases" invalidating legislation under *Pike*. *Tracy*, 519 U.S. at 298 n.12.

Dated: February 10, 2023

Peter F. Neronha
*Attorney General*
Michael W. Field (#91695)
*Assistant Attorney General*
Keith Hoffmann (#1190318)
*Special Assistant Attorney General*
RHODE ISLAND OFFICE OF
ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903
mfield@riag.ri.gov
401-274-4400, ext. 2380

*Counsel for Defendant-Appellant*
*Peter Alviti, Jr., in his Official*
*Capacity as Director of*
*Rhode Island Department of*
*Transportation*

John A. Tarantino (#35607)
R. Bart Totten (#41951)
Nicole J. Benjamin (#143353)
ADLER POLLOCK & SHEEHAN PC
One Citizens Plaza, 8th Floor
Providence, RI 02903
jtarantino@apslaw.com
btotten@apslaw.com
nbenjamin@apslaw.com
401-274-7200

*Counsel for Defendant-Appellant*
*Rhode Island Turnpike and Bridge*
*Authority*

Respectfully submitted,

/s/ *Ian Heath Gershengorn*
Ian Heath Gershengorn (#97676)
Adam G. Unikowsky (#1164431)
Michelle S. Kallen (#1206062)
Elizabeth B. Deutsch (#1194729)
Maura E. Smyles (#1206549)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, DC 20001
igershengorn@jenner.com
202-639-6000 (telephone)
202-639-6066 (fax)

*Counsel for Defendants-*
*Appellants Rhode Island*
*Turnpike and Bridge Authority*
*and Peter Alviti, Jr., in his*
*Official Capacity as Director of*
*Rhode Island Department of*
*Transportation*

65

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7), I certify that the foregoing brief has been prepared in Microsoft Word 2016 using 14-point Century Expanded typeface and is double-spaced (except for headings, footnotes, and block quotations). I further certify that the brief is proportionally spaced and contains 12,936 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). Microsoft Word 2016 was used to compute the word count.

Dated: February 10, 2023

/s/ *Ian H. Gershengorn*
Ian H. Gershengorn (#97676)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington DC 20001
igershengorn@jenner.com
202-639-6000 (telephone)
202-639-6066 (fax)

## CERTIFICATE OF SERVICE

I certify that, on February 10, 2023, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the First Circuit via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Dated: February 10, 2023

/s/ *Ian H. Gershengorn*
Ian H. Gershengorn (#97676)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington DC 20001
igershengorn@jenner.com
202-639-6000 (telephone)
202-639-6066 (fax)

ADDENDUM

## TABLE OF CONTENTS

Findings of Fact and Conclusions of Law, *American Trucking Ass'ns v. Alviti*, C.A. No. 18–378 (D.R.I. Sept. 21, 2022), ECF No. 245 ............................................................................ Add.1

Judgment, *American Trucking Ass'ns v. Alviti*, C.A. No. 18–378 (D.R.I. Sept. 21, 2022), ECF No. 246 .................................. Add.92

R.I. Gen. Laws, § 42-13.1-1 ......................................................... Add.93

R.I. Gen. Laws, § 42-13.1-2 ......................................................... Add.93

R.I. Gen. Laws, § 42-13.1-3 ......................................................... Add.95

R.I. Gen. Laws, § 42-13.1-4 ......................................................... Add.96

R.I. Gen. Laws, § 42-13.1-5 ......................................................... Add.97

R.I. Gen. Laws, § 42-13.1-6 ......................................................... Add.97

R.I. Gen. Laws, § 42-13.1-7 ......................................................... Add.98

R.I. Gen. Laws, § 42-13.1-8 ......................................................... Add.98

R.I. Gen. Laws, § 42-13.1-9 ......................................................... Add.99

R.I. Gen. Laws, § 42-13.1-10 ....................................................... Add.99

R.I. Gen. Laws, § 42-13.1-11 ....................................................... Add.99

R.I. Gen. Laws, § 42-13.1-12 ..................................................... Add.100

R.I. Gen. Laws, § 42-13.1-13 ..................................................... Add.100

R.I. Gen. Laws, § 42-13.1-14 ..................................................... Add.101

R.I. Gen. Laws, § 42-13.1-15 ..................................................... Add.101

R.I. Gen. Laws, § 42-13.1-16 ..................................................... Add.102

R.I. Gen. Laws, § 42-13.1-17 ..................................................... Add.103

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                       )
AMERICAN TRUCKING ASSOCIATIONS,        )
INC.; CUMBERLAND FARMS, INC.;          )
M&M TRANSPORT SERVICES, INC.;          )
NEW ENGLAND MOTOR FREIGHT, INC.,       )
                                       )
        Plaintiffs,                    )
                                       )
            v.                         )     C.A. No. 18-378 WES
                                       )
PETER ALVITI, JR., in his              )
Official Capacity as Director of       )
The Rhode Island Department of         )
Transportation; RHODE ISLAND           )
TURNPIKE AND BRIDGE                     )
AUTHORITY,                             )
                                       )
        Defendants.                    )
_____)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

WILLIAM E. SMITH, District Judge.

In the early 1980s, an article appeared in the Wall Street Journal that described the State of Rhode Island as "little more than a smudge on the fast lane to Cape Cod."  Leon Daniel, <u>Poor Little Rhode Island, Maligned but Fighting Back</u>, UPI, Sept. 11, 1983.  That fast lane runs from the state's southern border with Connecticut on I-95 North, to Providence about forty-five miles distant, then to I-195 into Massachusetts and on to the Cape.  (I-95 continues north into Massachusetts as well.)  The governor at the time, J. Joseph Garrahy, was less than amused with the tongue-in-cheek comment.  "With friends like that, who needs enemies?" he

was quoted as saying about the Rhode Islander who penned the piece. Milly McLean, Rhode Island: Even the Natives Poke Fun at It, UPI, Dec. 10, 1984.  The remark struck a nerve: Rhode Islanders have always been a little sensitive that their state's diminutive size garners it less respect than it deserves for its history, culture, beautiful beaches, and diversity.[1]  That lack of respect is exacerbated by the fact that the busiest highway in the United States – the I-95 North/South corridor – effectively bisects the state.  More than 250,000 cars and trucks speed through the state on I-95 every day, many never stopping to appreciate the charms of the Ocean State.

While governors and business owners and tourism officials have grumbled for decades about this reality, in 2015 then-governor Gina Raimondo and her compatriots in the General Assembly figured out a way finally to monetize the "fast lane to Cape Cod" – by tolling the bridges along the major interstate and state highway corridors that connect "little Rhody" to its larger neighbors and states beyond.

But tolling highways is tricky and controversial business. The need to raise money to fund construction and repairs of bridges must be balanced against the political reality that many local

---

[1] Articles like "Good-Bye, Rhode Island," advocating that Rhode Island should not even be a state, but rather subsumed into one of its neighbors, don't help.  See Donald Dale Jackson, Good-Bye, Rhode Island, Smithsonian Magazine, Jan. 2000.

2

Add.2

residents and business owners use those same corridors daily to get around the state. The solution they contrived – dubbed "RhodeWorks," the first and only of its kind in the United States – was to toll only large commercial trucks (or tractor trailers) at various bridge locations along these major corridors. This plan had the obvious appeal of raising tens of millions of needed dollars from tractor trailers while leaving locals largely unaffected.

Until now. In 2018, the trucking industry represented by its association, the American Trucking Associations, Inc. ("ATA"), and two companies,[2] M&M Transport Services, Inc. and Cumberland Farms, Inc., filed suit to block the RhodeWorks tolls. This Court denied the requested injunction, and litigation proceeded. A couple trips to the Court of Appeals stalled the process,[3] but in May and June of 2022, the Court conducted a twelve-day bench trial featuring fine lawyers and numerous national experts in transportation economics and highway engineering. This decision decides the fate of the RhodeWorks tolling program.

As the Court describes in detail below, the RhodeWorks tolling program violates the Commerce Clause of the United States Constitution. For this reason, the State is permanently enjoined

---

[2] A third is no longer an active party.

[3] For a full procedural history, those interested can review both this Court's and the First Circuit's previous decisions.

3

from further tolling under the law.

This decision, consistent with Federal Rule of Civil Procedure 52, sets forth the Court's findings of fact and conclusions of law. But this decision is one largely grounded in legal analysis, turning on data analytics and expert testimony; for that reason, and to make this decision more readable, the Court's initial findings of fact section is sparse relative to its conclusions of law, and is best understood as an overview. Within the legal analysis, the Court finds many additional facts, and these are specifically incorporated as additional findings of fact.

The Court begins its conclusions of law – where it also rules on several lingering evidentiary motions – with three issues antecedent to the merits. First, a surprise trial motion necessitates a lengthy standing analysis, and the Court finds standing does exist for all Plaintiffs. Next, the familiar issue of congressional authorization is addressed, followed by a discussion of the burden of proof. Moving then to the heart of the case, the Court considers the trial evidence under dormant Commerce Clause principles. That analysis starts with fair approximation, holding that the RhodeWorks tolling program does not fairly approximate use of the facilities under any relevant measurement. Next, the Court analyzes the discrimination issue. It concludes that the General Assembly enacted the program with a

discriminatory purpose and that the program indeed does discriminate in effect. With that, the Court applies strict scrutiny, and finds the State fails to meet this high bar.

I.  Findings of Fact

A.  RhodeWorks Background

Rhode Island is home to more than 700 bridges listed on the National Bridge Inventory System. May 25 Tr. 58:18-24, ECF No. 235 (analyzing PX30, and indicating the number is 772); June 1 Tr. 198:12-22, ECF No. 238 (testifying that the number is 779); PX419 at 1 (reflecting the number is 766). For decades, its bridges ranked among the worst in the country, with more than 100 rated as being in poor condition. PX419 at 1. This deterioration was in part due to historic underfunding of the state's infrastructure. Id.; PX30 at 7. Of the 611 state-owned bridges on the National Bridge Inventory, 142 were structurally deficient as of 2015.[4] June 1 Tr. 87:1-9.

Seeking a cure, the Rhode Island Department of Transportation ("RIDOT") began studying options for investing in its transportation assets, including bridges, as early as 2008. See PX30. By 2015, RIDOT had begun to lay the foundation for the legislation that became known as RhodeWorks. See June 1 Tr. 72:8-15. With RhodeWorks, RIDOT hoped to address funding deficiencies,

---

[4] Many bridges were also designated as functionally obsolete. June 1 Tr. 87:10-13, ECF No. 238.

reorganize financing, and better execute project planning.  Id. 74:12-75:5.  But its primary goal was to fix Rhode Island's deficient bridges.  Id. 74:19-23.

Part of the RhodeWorks proposal was a tolling system designed to fund bridge repairs.  From early on, the program aimed at tolling only trucks, not passenger vehicles.  See Peter Garino Dep. 15:10-16:3; see June 1 Tr. 72:8-15.  This limitation stemmed from the belief that trucks cause more damage to bridges than do other vehicles.  Garino Dep. 15:22-16:3.  In their research, RIDOT employees found support for this approach in a 1979 Government Accounting Office ("GAO") study concerning truck damage.  Id. 39:1-9; May 24 Tr. 96:19-98:22, ECF No. 234.

In the leadup to the first draft of the legislation, RIDOT commissioned several studies to assess potential toll corridors and bridges.  See, e.g., PX65.  The process looked to several factors, some of which included volume of traffic and damage to bridges.  June 1 Tr. 78:15-25.  RIDOT was interested in determining where it would be most "cost effective" to toll, id. 89:15-25; Garino Dep. 26:15-25, and also how the toll system would impact in-state and out-of-state registered vehicles, see PX190; PX208 at 6; PX217.

RIDOT set a projected revenue goal from the RhodeWorks program at approximately $45 million per year.  June 1 Tr. 82:16-84:17. The Department estimated that it would use RhodeWorks to fund about

6

Add.6

ten percent of the total cost of bridge repairs needed throughout the state.  Id.

In 2015, the General Assembly considered two versions of the RhodeWorks bill.  See PX83; PX101.  The first would have tolled Class 6+ vehicles.[5]  See PX83 at 9-10.  After objections from local businesses, the legislation was modified to toll only Class 8+ vehicles with a limitation on toll charges for multiple trips over the same bridge.  See PX101 at 11-12.

On February 11, 2016, the Rhode Island General Assembly

---

[5] Throughout this decision, various vehicle classifications are discussed.  A "Large Commercial Truck," pursuant to Rhode Island General Laws § 42-13.1-3(3), "shall be defined pursuant to the Federal Highway Administration (FHWA) vehicle classification schedule as any vehicle within Class 8 – single trailer, three (3) or four (4) axles, up to and including Class 13 – seven (7) or more axle multi-trailer trucks, as such classifications may be revised from time to time by the FHWA."  Class 8+ vehicles are known as "combination trucks," which have two or three separate parts.  May 25 Tr. 106:13-19, ECF No. 235.  Lower classes — 5-7 — are commonly known as straight trucks (the truck consists of a single unit).  Id. 106:6-13.  These vehicles may include dump trucks, cement mixers, and garbage trucks.  Id. 106:7-11.  Class 5 vehicles include tow trucks and may also include single-unit trucks.  Id. 106:6-7; see also PX653 at 8-9.  Class 4 vehicles are buses.  May 25 Tr. 106:5-6.  Finally, Classes 1-3 are typically passenger vehicles, including motorcycles, cars, pickup trucks, or ambulances.  Id. at 105:24-106:5; see also PX653 at 8-9.  The record inconsistently defines straight trucks as Classes 4-7 and Classes 5-7.  May 26 Tr. 31:13-17 (defining straight trucks as Classes 4-7), 153:23-25 (defining straight trucks as Classes 5-7).  The Court understands it to be category error to include Class 4 vehicles (buses) in this definition, and so it does not.  Most record evidence focuses on Classes 6 and 7 as compared to Class 8+, and so the Court does, too; however, where warranted, it expands its analysis to Classes 4-7, and other times to Classes 5-7.

7

Add.7

enacted "The Rhode Island Bridge Replacement, Reconstruction, and Maintenance Fund Act of 2016" ("RhodeWorks").  See R.I. Gen. Laws § 42-13.1-1.  The General Assembly made the following legislative findings, included in the statute:

(1) The state of Rhode Island, through the Rhode Island department of transportation ("the department"), funds the reconstruction, replacement, and maintenance of all bridges in Rhode Island, except the Newport Bridge, the Mount Hope Bridge, the Jamestown-Verrazano Bridge, and the Sakonnet River Bridge.

(2) According to the Federal Highway Administration (FHWA) 2015 National Bridge Inventory (NBI) data, there are seven hundred sixty-four (764) bridges in Rhode Island greater than twenty feet (20') in length.  Of these NBI bridges, one hundred seventy-seven (177) bridges, or twenty-three percent (23%), are classified as structurally deficient.

(3) For the past several decades, Rhode Island has depended on three (3) primary sources for funding all transportation infrastructure construction, maintenance, and operations: federal funds, state bond funds, and motor fuel tax revenue.  Of these sources, two (2), federal funds and motor fuel tax revenue, are mutable.

(4) The 2008 governor's blue ribbon panel on transportation funding, the 2011 senate special commission on sustainable transportation funding, and the 2013 special legislative commission to study the funding for East Bay bridges determined that there is insufficient revenue available from all existing sources to fund the maintenance and improvement of Rhode Island transportation infrastructure.

(5) In 2011, the general assembly adopted a component of the recommended systemic change to transportation funding by dedicating increased resources from the Rhode Island capital plan fund and creating the Rhode Island highway maintenance account, to be funded by an increase

8

Add.8

in license and registration fees, beginning in FY2014.

(6) In 2014, the general assembly adopted changes to the Rhode Island highway maintenance account to provide additional state revenue for transportation infrastructure in future years.

(7) Although the state is shifting from long-term borrowing to reliance upon annual revenues to fund transportation infrastructure on a pay-as-you go basis, and although a recurring state source of capital funds has been established, there is still a funding gap between the revenue needed to maintain all bridges in structurally sound and good condition and the annual amounts generated by current dedicated revenue sources.

(8) According to the U.S. General Accounting Office, just one, fully-loaded five-axle (5) tractor trailer has the same impact on the interstate as nine thousand six hundred (9,600) automobiles.  The department estimates that tractor trailers cause in excess of seventy percent (70%) of the damage to the state's transportation infrastructure, including Rhode Island bridges, on an annual basis.  However, revenue contributions attributable to tractor trailers account for less than twenty percent (20%) of the state's total annual revenues to fund transportation infrastructure.

(9) The United States Congress, consistent with its power to regulate interstate commerce and pursuant to 23 U.S.C. § 129, has authorized states to implement reconstruction or replacement of a toll-free bridge and conversion of the bridge to a toll facility, provided that the state:

> (i) Has in effect a law that permits tolling on a bridge prior to commencing any such activity; and

> (ii) Otherwise complies with the requirements of 23 U.S.C. § 129.

Id. § 42-13.1-2.

In its final form, RhodeWorks directs RIDOT to set and collect tolls from large commercial trucks "for the privilege of traveling

on Rhode Island bridges to provide for replacement, reconstruction, maintenance, and operation of Rhode Island bridges." Id. § 42-13.1-4(a).  It expressly prohibits tolling vehicles defined as Federal Highway Administration ("FHWA") Classes 1-7. Id. § 42-13.1-5. The director of RIDOT is authorized to "designate any Rhode Island bridge on the National Highway System as a toll bridge" and to determine the toll amount charged at each location.[6] Id. §§ 42-13.1-7, 8.  The revenue generated from tolling is collected in a special fund, id. § 42-13.1-6, to be "used to pay the costs associated with the operation and maintenance of the toll facility, and the replacement, reconstruction, maintenance, and operation of Rhode Island bridges on the National Highway System or any other use permitted under 23 U.S.C. § 129," id. § 42-13.1-9.

Built in to the RhodeWorks program are several limitations on tolling, known as "toll caps." See id. §§ 42-13.1-4(b)-(d).  The first tasks RIDOT with establishing a program that "limit[s] the assessment of the tolls upon the same individual large commercial truck using a [radio frequency identification transponder ("RFID")] to once per toll facility, per day in each direction, or an equivalent frequency use program based upon individual large

---

[6] The National Highway System includes major roads and encompasses approximately 13.8% of the roads in Rhode Island. May 25 Tr. 131:25-132:6.

commercial truck use." Id. § 42-13.1-4(b). The second sets the maximum total charge at $20 for large commercial trucks making a "border-to-border through trip on Route 95 Connecticut to Route 95 Massachusetts" using an RFID. Id. § 42-13.1-4(c). The final restriction caps the amount a single large commercial truck using an RFID can be charged daily at $40. Id. § 42-13.1-4(d).

Nearly all vehicles driving over the RhodeWorks bridges do not pay any tolls.[7] In fact, large commercial vehicles only account for approximately 3% of the total vehicle traffic on those bridges. May 25 Tr. 114:12-13. Passenger vehicles, Classes 1-3, account for more than 90% of the traffic. Id. 147:6-12. Transaction data demonstrate that approximately 19% of tolled vehicles are registered in Rhode Island, compared to about 81% of tolled vehicles registered outside the state.[8] May 26 Tr. 25:5-22.

By all accounts, the RhodeWorks tolling system is unique. See id. 105:19-106:7, ECF No. 236 (Plaintiffs' expert, Dr. Jonathan Peters, testifying that RhodeWorks is "unprecedented and well

---

[7] The parties introduced extensive data and statistics at trial. The Kapsch data record vehicles passing through RhodeWorks toll gantries and sort those vehicles into tollable and un-tollable vehicle classes. The Emovis data capture transaction-level data. That is, those data show billing information for tolled vehicles under the RhodeWorks program. Several pre-implementation sets of data were also introduced, including from studies conducted by two state consultants, CDM Smith and Louis Berger.

[8] These data are based on a one-month sample in July 2020. Id. 149:25-150:6.

Add.11

outside the norm[]"); June 2 Tr. 76:2-77:13, ECF No. 239 (Defendants' expert, Dr. Kenneth A. Small, testifying that he is not aware of other tolling agencies that toll only Class 8+ trucks); June 1 Tr. 124:16-125:20 (Director Peter Alviti, Jr., Director of the Rhode Island Department of Transportation,[9] testifying that he "underst[ood] that no one had done truck only [tolling], but . . . that there were a large number of tolling agencies that were differentiating large commercial vehicles from smaller vehicles and charging them [disproportionately] more than they were charging other vehicles.").

On cue, RIDOT implemented tolls at locations across the state. See DX250. Each reconstructed bridge or group of bridges is linked to a nearby toll gantry. See, e.g., DX41 § 1.1; DX63 § 1.1. Five of the tolls are located on the I-95 corridor, three on I-295 (a beltway around Providence), one on I-195 (which travels to Southeastern Massachusetts), and three on U.S. Route 6 or Rhode Island Route 146. See DX250; DX63 § 1.1. Toll locations have incrementally gone live (though at least one is not yet active).[10]

---

[9] In his testimony, Director Alviti recalled being told that one other turnpike in New York tolled only large commercial vehicles. June 1 Tr. 125:6-20. Aside from RhodeWorks, no other record evidence reveals a tolling system targeting only large commercial trucks.

[10] Evidence in the record shows that Location 5 is connected to the I-95 Viaduct in Providence. June 6 Tr. 22:19-22, ECF No. 241. This location has not yet gone live. See DX250.

See DX250, DX44, DX67, DX86, DX107. The toll amounts range from $2.25 to $9.50,[11] and the five tolls on the I-95 corridor total $17.75. See DX250.

RIDOT created separate accounts for each location. June 10 Tr. 108:4-25, ECF No. 242. The revenue collected from each location is first used to reimburse funds to reconstruct the tolled bridge, id. 110:6-10, and is allocated to reimburse these at a rate that corresponds to a damage calculation done by RIDOT engineers specific to each bridge, id. 109:1-111:23. The costs to rebuild the bridge above and beyond that damage allocation are generally paid according to an 80/20 split between federal and state funds.[12] Id. 109:25-111:3. Once the bridge reconstruction costs have been repaid, RIDOT will allocate a certain amount of toll revenue for yearly maintenance costs and then use the remaining revenue for other permissible projects.[13] Id. 111:21-

---

[11] RIDOT set the following toll rates for each location: Location 1-$3.25; Location 2-$3.50; Location 3-$6.25; Location 4-$2.25; Location 6-$2.50; Location 7-$6.50; Location 8-$8.50; Location 9-$7.50; Location 10-$9.50; Location 11-$3.50; Location 12-$6.75; Location 13-$5.00. DX250. (This skips Location 5.)

[12] Most of the bridges were paid for by federal funds (80%) and state funds (20%). June 10 Tr. 109:25-110:10, ECF No. 242. One bridge in the program will not be paid for using state funds, only toll revenue and federal funds. Id. 122:7-123:2.

[13] RIDOT's Acting Chief Operating Officer testified that RIDOT intended to use the excess funds to repair other bridges but also acknowledged that excess revenue could be used for other projects permitted by federal legislation. Id. 97:19-21, 113:6-19.

13

Add.13

114:6.

    B.    ISTEA

    The RhodeWorks tolling program would not be permissible
absent authorization from Congress in the Intermodal Surface
Transportation Efficiency Act of 1991 ("ISTEA").[14]  This is because
states may not toll interstate highways.   23 U.S.C. § 301.   An
exception to this general prohibition is 23 U.S.C. § 129, which
permits "reconstruction or replacement of a toll-free bridge or
tunnel and conversion of the bridge or tunnel to a toll facility."
Id. § 129(a)(1)(E).   A public authority may use revenues generated
from such tolling for any purpose listed under § 129(a)(3),
including repayment of debt and maintenance and improvement of
"the facility."  See id. § 129(a)(3).  Additionally, "if the public
authority certifies annually that the tolled facility is being
adequately maintained," it may use excess revenue for "any other
purpose for which Federal funds may be obligated by a State under
this title."   Id. § 129(a)(3)(A)(v).

    Prior to implementation of the RhodeWorks tolls, RIDOT and
FHWA executed separate Memoranda of Understanding ("MOU") for each
proposed toll location.  See DX34; DX99.  Before the toll gantries

---

    [14]  ISTEA was enacted to "develop a National Intermodal
Transportation System that is economically efficient and
environmentally sound[.]"  Pub. L. 102-240.

Add.14

went live, FHWA approval was required.[15]  See June 10 Tr. 159:23-160:2, ECF No. 242.  These MOUs set forth RIDOT's intent to reconstruct specified bridges and toll them in accordance with 23 U.S.C. § 129(a).  See DX34; DX99.  The MOUs also stated that "RIDOT desires to implement tolls on large commercial vehicles or 'tractor trailers' using an open road tolling structure using one or more gantries to collect tolls" on those bridges.  See DX34; DX99. Lastly, RIDOT and FHWA agreed that the "Toll Project[s] m[et] the toll eligibility requirements of 23 U.S.C. 129(a)(1)" and that RIDOT must comply with all other requirements set forth in that statute.  See DX34; DX99.

II. Conclusions of Law

    A.   Preliminary Matters

        1.   Standing

Standing exists to keep courts within their constitutional limits, ensuring they exercise "the Judicial Power of the United States" only over "Cases" and "Controversies."  Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016) (cleaned up).  Thus, before a federal court can reach the merits of any dispute, the party asserting jurisdiction must meet the familiar, three-part "irreducible constitutional minimum of standing:" injury in fact,

---

[15] Each location was also required to have an environmental assessment.  June 10 Tr. 159:23-160:2, ECF No. 242.

causation, and redressability. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992).

By its canonical definition, an injury in fact is the "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." <u>Id.</u> (internal citations and quotation marks omitted). "Financial loss," even in small amounts, "is a paradigmatic example of an injury in fact." <u>Pincus v. Am. Traffic Sols., Inc</u>, 986 F.3d 1305, 1310 n.7 (11th Cir. 2021) (concluding allegedly wrongful payment of $7.90 gave standing). The amount of pecuniary loss is generally irrelevant because money unlawfully taken is a clear legal injury that is actual, particularized, concrete, and redressable.[16] <u>See Bacchus Imps., Ltd. v. Dias</u>, 468 U.S. 263, 267 (1984) (liability for a tax alone gave standing in dormant Commerce Clause challenge, even if that cost was passed on to customers); <u>All. of Auto. Mfrs. v. Gwadosky</u>, 430 F.3d 30, 37

---

[16] Some financial losses may be "too trifling of an injury to support constitutional standing." <u>Santos v. TWC Admin. LLC</u>, No. CV 13-04799 MMM (CWx), 2014 WL 12558009, at *18 (C.D. Cal. Aug. 4, 2014) (quoting <u>Skaff v. Meridien N. Am. Beverly Hills, LLC</u>, 506 F.3d 832, 840 (9th Cir. 2007)). But the financial losses courts have found to be <u>de minimis</u> are typically smaller than even a single toll here. <u>See id.</u> at *19 ("[A]n error of less than one cent appears to be the type of <u>de minimis</u> injury that does not suffice to support Article III standing."); <u>Epstein v. J.P. Morgan Chase & Co.</u>, No. 13 Civ. 4744(KPF), 2014 WL 1133567, *2 (S.D.N.Y. Mar. 21, 2014) (finding loss of interest accruing on $0.67 over seven weeks to be <u>de minimis</u> injury insufficient for standing). The losses alleged and proven at trial are not <u>de minimis</u>.

16

(1st Cir. 2005) (recognizing "concrete pecuniary injury" sufficient to give standing without analyzing amount).

As a case progresses, all three elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, _i.e._, with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561. "[A]t the final stage, those facts [that establish jurisdiction] (if controverted) must be 'supported adequately by the evidence adduced at trial.'" Id. (quoting Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 115 n.31 (1979)). Jurisdiction is so foundational that it is a question "the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (internal quotation marks omitted).

Because Plaintiffs' claimed loss is financial, the individual Plaintiffs must prove that one of their interstate trucks paid an allegedly unconstitutional RhodeWorks toll. And ATA can show standing on associational grounds if it proves one of its members paid an unconstitutional toll.[17] What evidence the Court may look to in evaluating those showings here, however, is more fraught.

---

[17] For associational standing, ATA must prove that one of its "members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires

17

Add.17

At the close of Plaintiffs' case, they hit a speed bump. Defendants surprised them by moving for Judgment on Partial Findings under Rule 52(c), ECF No. 222, arguing Plaintiffs failed to prove an injury in fact during their case-in-chief. Defendants pointed out that none of Plaintiffs' witnesses mentioned M&M Transport or Cumberland Farms, nor did Plaintiffs offer evidence that any member of ATA drove a Class 8+ truck through a Rhode Island toll gantry. Because of these failures, Defendants contend that when Plaintiffs rested their case, the Court lost jurisdiction and was powerless to reach the merits or reopen the case.

Plaintiffs' response is twofold: ATA has associational standing, which suffices on its own; and, in any event, evidence of standing existed in the trial record – both in a deposition designation they believed Defendants submitted and in objected-to testimony solicited from a witness in Defendants' case. To top it off, Plaintiffs cry sandbagging because Defendants never questioned standing up to this point.

Adhering to caution, Plaintiffs moved for the Court to reopen the record to receive additional evidence of standing, Mot. to Reopen Case, ECF No. 221. They argued reopening was both permissible and proper because standing had not been controverted

the participation of individual members in the lawsuit." <u>Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.</u>, 528 U.S. 167, 181 (2000). There is little question the latter two requirements are met.

18

Add.18

at any time before Defendants' Motion, save for some pro forma language in Defendants' Answer nearly four years ago. Along with their contention that the Court has jurisdiction to reopen, Plaintiffs argue that refusal to reopen would unfairly reward Defendants' trial-by-ambush tactics and waste the copious resources poured into this litigation from all sides. Nothing would prevent Plaintiffs from walking downstairs and refiling their suit the same day it was dismissed.[18] The Court conditionally denied the 52(c) Motion and conditionally reopened the record to allow Plaintiffs to present additional evidence of standing. June 13 Tr. 2:12-15, ECF No. 243.

The Court must answer three distinct questions: (1) May the Court reopen the record?; (2) If yes, should it do so as a matter of discretion?; and (3) Have Plaintiffs proven standing on whatever part of the record is appropriate to consider? The answer to each is yes. Plaintiffs' Motion to Reopen is GRANTED and Defendants' Motion for Judgment on Partial Findings is DENIED.

---

[18] Defendants make the peculiar claim that the Court is powerless to render any judgment or to reopen the record because it lacks jurisdiction and that a dismissal would act as a judgment on the merits worthy of res judicata effect in their favor. This argument confuses cases in which damages are a necessary but unproven element at trial and jurisdictional challenges, like that mounted here. See Am. C.L. Union of Ill. v. City of St. Charles, 794 F.2d 265, 269 (7th Cir. 1986) (distinguishing between injury that "goes to damages (or in an equity case like this, to the right to obtain an injunction)" and "a dismissal on jurisdictional grounds that might allow the plaintiff to start the suit over again").

19

Add.19

a.   May the Court reopen the record?

Defendants' argument that the Court lost jurisdiction at the close of Plaintiffs' case rests on two venerable principles: a plaintiff bears the burden of proving jurisdiction at trial, see Lujan, 504 U.S. at 561, and a court may not adjudicate a dispute without jurisdiction, Steel Co., 523 U.S. at 94.  Defendants argue that even though jurisdiction was never seriously questioned, Plaintiffs' evidentiary failure at trial suddenly and permanently deprived the Court of jurisdiction, preventing the Court from reopening the record.  This is plainly wrong.

The Court obviously cannot reach the merits or render any judgment without jurisdiction.  But its evaluation of its jurisdiction is not confined to the evidence submitted by Plaintiffs in their case-in-chief, especially when standing was not in dispute.  Instead, "it is familiar law that a federal court always has jurisdiction to determine its own jurisdiction." United States v. Ruiz, 536 U.S. 622, 628 (2002).  This hoary rule has always included the power to take in evidence of standing appropriate to the stage of the proceeding, both before and after trial.  See Rivera-Flores v. P.R. Tel. Co., 64 F.3d 742, 748 (1st Cir. 1995) ("[E]ven where the claim is set for jury trial, the court has great latitude to direct limited discovery and to make such factual findings as are necessary to determine its subject matter jurisdiction."); see also Parents Involved in Cmty. Sch. v.

20

Add.20

Seattle Sch. Dist. No. 1, 551 U.S. 701, 718 (2007) (relying, in part, on facts asserted in new affidavit submitted under Supreme Court Rule 32.3 to assure itself of jurisdiction after new circumstances resulted in jurisdiction being questioned); Warth v. Seldin, 422 U.S. 490, 501 (1975) (noting that, at the motion-to-dismiss stage, "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing").

The Supreme Court's seminal standing cases place the burden on plaintiffs to prove standing at trial, but only "if controverted." Lujan, 504 U.S. at 561. For example, in Alabama Legislative Black Caucus v. Alabama, after a bench trial, the district court found that one of the plaintiffs had failed to prove standing because the record did "not clearly identify the districts in which the individual members of the [Conference] reside." 989 F. Supp. 2d 1227, 1292 (M.D. Ala. 2013), vacated and remanded, 575 U.S. 254 (2015). On review, the Supreme Court decided it was reasonable for the Conference to believe standing was not at issue, and thus "elementary principles of procedural fairness required that the District Court, rather than acting sua sponte, give the Conference an opportunity to provide evidence of member residence." Ala. Leg. Black Caucus v. Alabama, 575 U.S. 254, 271 (2015) (emphasis added). Neither the close of the plaintiffs'

21

Add.21

case-in-chief nor the completion of trial altered the Supreme Court's conclusion that the district court could properly accept such evidence; indeed, the Court went further, directing it to do so. Id.

Similarly, in Gill v. Whitford, 138 S. Ct. 1916 (2018), the Court found the district court lacked jurisdiction because the plaintiffs had failed to produce evidence at trial of sufficiently individualized harm. Id. at 1932-33.[19] Despite this failing, the Court remanded to give the plaintiffs "an opportunity to prove concrete and particularized injuries." Id. at 1934. It is telling that Defendants do not point to a single case in which a court has held it was constitutionally powerless to reopen a case to hear jurisdictional evidence after a plaintiff failed to prove standing at trial (which, of course, is different from declining to do so under ordinary principles guiding a court's discretion to reopen), without having notice that it was at issue.[20] Instead, many courts

---

[19] Gill v. Whitford, 138 S. Ct. 1916 (2018) effectively guts Defendants' attempt to distinguish Alabama Black Legislative Caucus from this case on the grounds that in the latter case, the Court found standing for at least some members and therefore had not completely "lost" jurisdiction. See Defs.' Obj. Pl.'s Mot. Reopen 10-11, ECF No. 225. In Whitford, the Court found none of the plaintiffs had standing but still remanded so they could "attempt to demonstrate standing in accord with the analysis in this opinion." 128 S. Ct. at 1923.

[20] Nor do the cases Defendants rely on support their conclusion. Although a court "lacks the power to create jurisdiction by embellishing a deficient allegation of injury," Elend v. Basham, 471 F.3d 1199, 1206 (11th Cir. 2006) (internal

22

Add.22

have concluded they have this power and then received new standing evidence. See, e.g., Pub. Emps. for Envt'l Resp. v. Bright, No.: 3:18-CV-13-TAV-HBG, 2021 WL 1220928, at *4 (E.D. Tenn. Mar. 31, 2021) (reopening case to accept affidavits when the defendants challenged Article III standing after trial but standing was not controverted before trial); see also Cranpark, Inc. v. Rogers Grp., Inc., 821 F.3d 723, 733-35 (6th Cir. 2016) (holding district court erred in refusing to consider evidence of standing which was not "adduced at trial," where the plaintiff's mistake was reasonable).

---

quotation marks omitted), this admonition does not apply to the question of whether it has the power to reopen the record. Reopening to receive new jurisdictional evidence when the Court's jurisdiction has suddenly been cast into doubt is different from "embellishing" the record by stretching inferences or assuming harms where they are insufficiently pleaded, "wholly inchoate," or "entirely conjectural." Id. at 1209.

Defendants also cite Steel Co. for the proposition that "[w]ithout jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." 523 U.S. at 94 (quoting Ex parte McCardle, 7 Wall. 506, 514 (1868)). True enough. But applying this directive here requires the Court to beg the question by assuming that jurisdiction has "ceased to exist," rather than merely having been cast into doubt by Defendants' surprise motion. The broader point of Steel Co. was to rebuke a practice brewing in the lower courts of assuming hypothetical jurisdiction when the merits were clear, the jurisdictional question thorny, and the merits favored the party challenging jurisdiction, such that that party would win anyways. Id. at 93-94, 101. The case says nothing about what to do with a surprise jurisdictional attack or what part of the trial record a court should use in determining jurisdiction (for good reason, Steel Co. was decided on appeal of a motion to dismiss). Rather, it holds that the jurisdictional question must be answered before a court addresses the merits. Id. at 101.

23

Add.23

Thus, the Court concludes it has constitutional power to resolve doubts about its jurisdiction and take evidence to determine those facts which would support the exercise of its jurisdiction, even after the close of Plaintiffs' case-in-chief. Thus, having concluded the Court may reopen the record, it turns to whether it should exercise its discretion to do so here.

> b.    Should the Court exercise its discretion to reopen the record?

"[T]he particular criteria that guide a trial court's decision to reopen are necessarily flexible and case-specific." Rivera-Flores, 64 F.3d at 746.  That said, the First Circuit has directed courts to non-exclusively consider "whether: (1) the evidence sought to be introduced is especially important and probative; (2) the moving party's explanation for failing to introduce the evidence earlier is bona fide; and (3) reopening will cause no undue prejudice to the nonmoving party."  Id.

Here, there is no question the evidence is important and probative.  Without it, M&M Transport and Cumberland Farms would likely be dismissed.

Similarly, Plaintiffs have shown a bona fide reason for their failure to introduce more evidence of standing in their case-in-chief.  No dispute over standing was raised in the long history of this case outside of Defendants' now-dusty Answer.  It was not mentioned in two appeals to the Court of Appeals, nor in the

pretrial memoranda, nor in Defendants' opening statement.  See
Cranpark, 821 F.3d at 730, 733 (concluding standing was a foregone
conclusion, despite boilerplate objection in the defendants'
answer).  In any event, Plaintiffs had a good-faith reason to
believe as recently as two days before trial that Defendants would
be submitting a deposition designation containing clear evidence
of standing.  Defendants did not submit that deposition.  The Court
need not decide whether this last-minute decision was entirely
innocent, a wily litigation tactic, or something more nefarious;
whatever the reason, this shift supports a finding that Plaintiffs'
reasons for not submitting this deposition were bona fide.  And
given the obviously concrete and particularized harm associated
with paying an allegedly unconstitutional toll, there was good
reason to think standing was so patently obvious that it was not
a genuine dispute.  See Ala. Leg. Black Caucus, 575 U.S. at 270
(noting "common sense inference" of standing, absent specific
challenge, led the plaintiffs to reasonably believe their evidence
of standing was sufficient); Rivera-Flores, 64 F.3d at 747 ("[I]t
may amount to an abuse of discretion for a trial court to decline
to reopen in circumstances where the movant has demonstrated
reasonably genuine surprise.") (internal quotation marks omitted).
The Court finds Plaintiffs' surprise to be both genuine and
reasonable and their explanation for the limited evidence of
standing bona fide.

Add.25

Finally, there is no undue prejudice to Defendants in reaching the merits of this dispute now.  Litigation is not a game, and although some cases no doubt hinge on mistakes of counsel or technical errors, the orientation of the Court is "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.  Refusal to sanction a procedural ambush is not prejudicial, especially if it merely allows Defendants to defend the law on the merits.[21]

For all these reasons the Court holds it both can and should accept the evidence offered conditionally in reopening. Plaintiffs' Motion to Reopen, ECF No. 221, is GRANTED.

> c.  Is Plaintiffs' evidence of standing sufficient?

Having granted Plaintiffs' Motion to Reopen, the Court next considers whether the evidence introduced on reopening is enough to prove standing.  It is.  Then, in order to produce a thorough record, the Court makes additional holdings on the independent adequacy of two other potential bodies of standing evidence.  It considers the propriety of standing evidence adduced in

---

[21] One might even go so far as to say that the State should want a ruling on the constitutionality of RhodeWorks and ought to be reluctant to use procedural sleights of hand to deflect or delay such a ruling.  After all, if the RhodeWorks scheme violates the Commerce Clause, as it does, the State should want to stop the improper tolling and fix the problem.

26

Defendants' case and then decides whether the evidence admitted in
Plaintiffs' case-in-chief is itself sufficient to prove standing.

i.    Plaintiffs' Evidence on Reopening

Defendants argue that even considering the evidence on
reopening, Plaintiffs still failed to prove standing.   Some of
these arguments border on the frivolous.[22]    Considering the
evidence on reopening, each Plaintiff has easily proven an injury
in fact sufficient for standing.

First, the evidence showed that Plaintiff Cumberland Farms
maintains a fleet of 120 trucks Classes 8 or above, which service
gas stations and convenience stores throughout New England,
including Rhode Island.  June 13 Tr. 11:15-12:7, 13:5-13:17.  Since
RhodeWorks went into effect, the company's operating costs have
increased by about $100,000 because of the tolls.  Id. 16:4-16:20.
Given testimony that its headquarters is in Massachusetts, id.
11:21-22, its business is spread across New England, and its trucks
regularly use bridges tolled by RhodeWorks, the Court has no
trouble finding by a preponderance of the evidence that Cumberland
Farms has paid significant RhodeWorks tolls while in interstate
commerce.  This evidence proves injury in fact.  And because
Cumberland Farms continues to operate in Rhode Island, the Court

---

[22] See, e.g., Defs.' Post-Trial Br. ("Defs.' Br.") 15 n.14,
ECF No. 229 (arguing $100,000 in tolls is a de minimis injury for
standing purposes because Cumberland Farms is a large company).

27

Add.27

finds that future harm is more than speculative, justifying prospective injunctive relief.

Second, the evidence showed that Plaintiff M&M Transport is a trucking company headquartered in Massachusetts and uses a fleet of roughly 500 Class 8+ trucks to ship goods across the country, from warehouses to retail locations, including into Rhode Island and Connecticut.  Id. 27:16-30:8.  It has been subject to RhodeWorks tolls each day since the program began, increasing its operating costs.  Id. 30:15-31:7.  Thus, for M&M Transport, the Court finds by a preponderance of the evidence that the company has suffered pecuniary loss from paying RhodeWorks tolls in interstate commerce and will continue to do so in the future.  It therefore has standing to sue based on the evidence admitted on reopening.

Finally, for associational standing, ATA must prove that its "members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v Laidlaw Env't Servs. (TOC), Inc, 528 U.S. 167, 181 (2000).  The constitutionality of RhodeWorks, the first truck-only tolling system in the country, is an interest germane to ATA's purpose, and nothing about this suit requires participation of individual members.  And because Cumberland Farms

has standing and is a member of ATA, ATA too has standing.  See June 13 Tr. 12:18-22; PX759.  Separate from this, ATA's general counsel testified to personally witnessing various ATA members' trucks (UPS, Walmart, C.R. England, NFI Industries, Signature Transport, and DJ Cronin) driving on the RhodeWorks toll corridors, including moments before and after they passed through gantries. June 13 Tr. 46:1-47:9.  The Court therefore finds it more likely than not these members paid a RhodeWorks toll in interstate commerce and this testimony independently supports ATA's standing.

ii.  Evidence from Defendants' Case

On cross-examination, Plaintiffs elicited testimony from Dr. Vijay K. Saraf, a defense expert, showing that some data he used to form his expert opinions also proved that M&M Transport and Cumberland Farms paid RhodeWorks tolls.  June 6 Tr. 68:17-72:19, 73:15-75:4, ECF No. 241.  Defendants objected to this testimony and moved to strike, arguing that they had carefully avoided soliciting any opinion that relied on a Plaintiff-specific analysis of the underlying data and thus this testimony exceeded the proper scope of cross-examination by asking about the basis for an opinion Dr. Saraf never gave.  Id. 64:10-65:21, 69:24-70:1, 72:22-23.  The Court took the objection under advisement.

Now, after careful review of the record, the Court agrees with Defendants.  Although opinions in Dr. Saraf's direct testimony relied on Emovis and Kapcha data, none of his direct testimony

29

relied on searching or collating these data by E-Z Pass transponders known to belong to Plaintiffs M&M Transport or Cumberland Farms. Questions about a Plaintiff-specific analysis were therefore questions about an analysis that did not form the basis of any opinion given in his direct testimony and thus were beyond the permissible scope of cross-examination. Defendants' objection is sustained, and Dr. Saraf's testimony about M&M Transport and Cumberland Farms, id. 68:17-72:19, 73:15-75:4, is stricken from the trial record.[23] For this reason, the Court need not decide whether a deferred Rule 52(c) motion should be decided based on the entire trial record or the record at the time the motion is made – an issue the parties debate but that is rendered academic by the exclusion of this portion of Dr. Saraf's testimony.

### iii. Evidence in Plaintiffs' Case-in-Chief

If limited only to their case-in-chief, Plaintiffs argue that a deposition designation they believed Defendants submitted shows M&M Transport has standing and that ATA has both associational and organizational standing. But the deposition designation Plaintiffs believed was submitted, was not. Whether this was a foul trick or a benign trial decision, the relevant portions of

---

[23] For the same reason, the Court sustains Defendants' objection to the admission of Exhibit DX236. See June 6 Tr. 72:20-23. The clerk is directed to revise the Exhibit and Witness List, ECF No. 227, accordingly.

Shawn Sanford's deposition may not be considered as part of Plaintiffs' case-in-chief, and Plaintiffs cannot rely on that deposition to prove M&M Transport's standing.

The question of ATA's associational standing based on evidence in Plaintiffs' case-in-chief is a close call. As noted earlier, associational standing here depends on whether ATA has proven that one of its members has standing. To this end, Plaintiffs rely on the testimony of John Lynch, an ATA executive, stating that ATA has member companies in all fifty states. May 24 Tr. 11:4-5. Their argument proceeds again from Alabama Black Legislative Caucus, in which the trial court faulted the plaintiffs for failing to identify the legislative districts where individual members resided. 575 U.S. at 269. The Supreme Court reversed, holding most plaintiffs' proof on standing was adequate because they had members in every county, their purpose was to help those less fortunate, and these facts together supported an inference that it was "highly likely" it had members in each majority-minority district. Id. at 269-270. Plaintiffs argue that because ATA, an organization dedicated to advancing national trucking interests, has 2,000 members spread across the fifty states (including Rhode Island and every surrounding state) it is extremely likely that its members have paid a RhodeWorks toll.

The Court agrees. Following the logic of Alabama Black Legislative Caucus, the Court finds that it is more likely than

31

Add.31

not that at least one ATA member paid a RhodeWorks toll in interstate travel. Indeed, this is a near certainty. As the Court did in that case, this Court finds it is so highly likely that an ATA member paid a toll in interstate travel that ATA has standing based solely on the evidence in Plaintiffs' case-in-chief.

But the Court rejects ATA's argument that it has organizational standing to sue. Organizational standing exists on proof of "concrete and demonstrable injury to the organization's activities — with the consequent drain on the organization's resources — [which] constitutes far more than simply a setback to the organization's abstract social interests." Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982). ATA may have an interest in preventing truck-only tolling systems from spreading beyond Rhode Island, but expenditures solely for litigation of the matter at hand and lobbying cannot support organizational standing on a diversion of resources theory. See Equal Means Equal v. Ferriero, 3 F.4th 24, 30 (1st Cir. 2021).

In sum, the Court determines that it both may and should reopen the record to admit additional evidence of Plaintiffs' standing. The evidence produced in the reopened record proves all three Plaintiffs have a real stake in this litigation and would be injured by a constitutional infirmity in RhodeWorks. The Court therefore has jurisdiction. Although the evidence solicited in Defendants' case is excluded, the Court also finds that ATA

successfully demonstrated associational standing based solely on the evidence in its case-in-chief.

### 2.   Congressional Authorization

Another of Defendants' threshold arguments involves congressional authorization; this, the Court has addressed at an earlier stage of this litigation. See Am. Trucking Ass'n, Inc. v. Alviti ("ATA I"), No. 18-378, 2020 WL 4050237, at *2 (D.R.I. July 20, 2020). Defendants' argument comes in two parts: first, Plaintiffs' dormant Commerce Clause challenge fails because Congress authorized the State to take the exact action at issue in this case; and second, Plaintiffs' fair approximation argument fails because of Congress's prior authorization of the tolling regime.

"Congress may 'redefine the distribution of power over interstate commerce' by 'permitting the states to regulate the commerce in a manner which would otherwise not be permissible.'" S.-Cent. Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87-88 (1984) (quoting S. Pac. Co. v. Arizona, 325 U.S. 761, 769 (1945)) (cleaned up). But congressional authorization must be "expressly stated" or "made unmistakably clear." N.Y. State Dairy Foods, Inc. v. Ne. Dairy Compact Comm., 198 F.3d 1, 9 (1st Cir. 1999) (internal citations and quotation marks omitted). This is because "the democratic process at the state level does not in and of itself function as an effective restraint against protectionist state

33

Add.33

laws because the burdens that such laws impose will fall on actors who are unrepresented in state legislatures." <u>Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.</u>, 45 F.4th 542, 552 (1st Cir. 2022). Therefore, this rule "reduces significantly the risk that unrepresented interests will be adversely affected." <u>Id.</u> (quoting <u>S.-Cent. Timber Dev.</u>, 467 U.S. at 92).

Earlier in this case, the Court ruled that it was "unpersuaded by Defendants' broad interpretation of congressional authorization in ISTEA," finding that the statutory scheme does not "evince an unmistakably clear intent by Congress to completely shield state highway tolling activity from Commerce Clause challenges." <u>ATA I</u>, 2020 WL 4050237, at *2 (internal quotation marks omitted). The Court sees no reason to disturb this ruling.[24] Through ISTEA, Congress authorized, subject to certain requirements, an activity it once barred: tolling on the interstate highways. <u>See</u> 23 U.S.C. 129(a). But this allowance does not grant states carte blanche to toll in ways that violate the dormant Commerce Clause.

Defendants' second argument fares no better. It is true that ISTEA permits "a public authority to use toll revenues for non-toll road projects." <u>Owner Operator Indep. Drivers Ass'n, Inc. v.</u>

---

[24] Defendants suggest that the toll system here is "supported by ISTEA and by the [MOUs] entered into between the State and the FHWA, Congress's authorized agent." Defs.' Br. 24 n.24. But the MOUs address compliance with ISTEA and have no bearing on whether ISTEA, through ISTEA, authorized the challenged activity here. <u>See</u> DX34; DX99.

Add.34

Penn. Tpk. Comm'n, 934 F.3d 283, 292 (3d Cir. 2019).  At the
judgment on the pleadings stage, Plaintiffs conceded, and the Court
agreed, this effectively displaced the "excessiveness"[25] part of
the Evansville/Northwest Airlines[26] analysis.  ATA I, 2020 WL
4050237, at *2; see Owner Operator Indep., 934 F.3d at 293 ("ISTEA
contemplated that tolls exceeding the amount needed to fund a toll
road would be collected and spent on non-toll road projects.").
Not satisfied with this congressional gift, Defendants take aim at
Plaintiffs' reliance on highway cost allocation studies ("HCASs")
to show that RhodeWorks' tolling of only Class 8+ trucks does not
fairly approximate usage by all vehicles.  Defendants say if
allocation is required, "there could never be any excess revenue,"
so Plaintiffs' argument is nothing more than a "camouflaged attempt
to challenge the excessiveness of the tolls."[27]  Defs.' Post-Trial
Br. ("Defs.' Br.") 27, ECF No. 229.  As Plaintiffs note, ISTEA

_____

[25] This asks whether a fee is "excessive in comparison with
the governmental benefit conferred."  Evansville-Vanderburgh
Airport Auth. Dist. v. Delta Airlines, Inc., 405 U.S. 707, 717
(1972).

[26] Id. at 716-17; N.W. Airlines, Inc. v. Cty. of Kent, Mich.,
510 U.S. 355, 369 (1994).  The so-called Evansville test is
discussed in detail below.

[27] Foreshadowing their fair approximation argument, Defendants
throw in that ISTEA precludes an argument that fair approximation
must be measured only by the actual costs associated with the
individual tolled facilities and that Congress recognized in ISTEA
the importance of an interconnected transportation system.  These
issues are discussed in more detail below in the context of the
Court's fair approximation analysis.  See infra.

35

Add.35

"says nothing at all about <u>who</u> may be required to pay the toll or the <u>allocation</u> of the toll burden."  <u>See</u> Pls.' Reply Supp. Post-Trial Br. ("Pls.' Reply") 9, ECF No. 231.  The fact that excess revenues are used on other projects does not absolve a state of its Commerce Clause duty to toll users fairly.

The excessiveness and fair approximation inquiries of the <u>Evansville</u> test serve distinct purposes.  Fair approximation zeros in on the fairness of the method by which the fees are charged, not the reasonableness of the amount of money generated from them.  Plaintiffs' reliance on HCAS analyses does not implicitly endorse the State's methodology; it merely attempts to show that a toll system should account in some fair way for all users of the tolled facilities.

### 3.   Burden of Proof

And last, the parties disagree about Plaintiffs' burden of proof: Plaintiffs say the burden is the usual preponderance standard, while Defendants claim it's beyond a reasonable doubt in cases concerning constitutionality.

Superficially, at least two federal district court cases support Defendants' position.  <u>See</u> <u>Donahue v. City of Bos.</u>, 264 F. Supp. 2d 74 (D. Mass. 2003); <u>Devaney v. Kilmartin</u>, 88 F. Supp. 3d 34 (D.R.I. 2015).  But delving deeper, both are distinguishable: in stating that the party contesting constitutionality bears the burden of a beyond-a-reasonable-doubt standard, these cases did so

in reliance on state – not federal – law.  In Donahue, the court
cited to a Massachusetts Supreme Judicial Court case for the
principle that "the party challenging the statute's
constitutionality must demonstrate beyond a reasonable doubt that
there are no conceivable grounds which could support its
validity."  264 F. Supp. 2d at 82–83 (cleaned up).  This principle,
which the court considered in analyzing the constitutionality of
a Massachusetts statute, traces back to 1917 in Massachusetts
common law.  See Perkins v. Inhabitants of Town of Westwood, 115
N.E. 411, 411–12 (Mass. 1917) ("All rational presumptions are made
in favor of the validity of every act of the legislative department
of government, and the court will not refuse to enforce it unless
its conflict with the Constitution is established beyond
reasonable doubt.").  And in Devaney, a Magistrate Judge of this
Court analyzing alleged violations of the federal and Rhode Island
constitutions "pause[d] to assemble the state law principles
applicable to interpreting ordinances."  88 F. Supp. 3d at
44.  Citing only Rhode Island law, she said this:  "Finally, the
party contesting constitutionality . . . bears the burden of
proving beyond a reasonable doubt that the challenged enactment is
unconstitutional."  Id. at 45 (cleaned up).

These principles mimic the burden that state courts impose on
themselves when analyzing constitutionality.  See Gomes v. Bristol
Mfg. Corp., 184 A.2d 787, 790 (R.I. 1962) ("In considering the

37

**Add.37**

question of the constitutionality of a statute this court is bound to uphold it unless its unconstitutionality appears beyond a reasonable doubt."); see also State v. Kofines, 80 A. 432, 435-36 (R.I. 1911) ("'It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed,' says Justice Washington, 'to presume in favor of its validity, until its violation of the Constitution is proved beyond all reasonable doubt.'" (quoting Ogden v. Saunders, 25 U.S. 213, 270 (1827) (opinion of Washington, J.)). So federal courts follow suit and apply this standard when analyzing violations of those states' constitutions. See R.I. Fishermen's All., Inc. ex rel. Fuka v. Dep't of Env't Mgmt., No. CIV.A.07-230ML, 2008 WL 4467186, at *5 (D.R.I. Oct. 3, 2008), aff'd sub nom. R.I. Fishermen's All., Inc. v. R.I. Dep't of Env't Mgmt., 585 F.3d 42 (1st Cir. 2009) ("Plaintiffs carry the burden of proving beyond a reasonable doubt that the regulations violate the Rhode Island Constitution.") (emphasis added).

But here Plaintiffs allege only a federal constitutional violation. Nothing in dormant Commerce Clause jurisprudence instructs that a heavier burden applies in testing a law against the federal Constitution, even when the relevant state law does impose such a standard. Compare N.H. Motor Transp. Ass'n v. Flynn, 751 F.2d 43, 47 (1st Cir. 1984) (never specifying that the burden is beyond a reasonable doubt) with Pet. of Bos. & Me. Corp., 251

38

A.2d 332, 335 (N.H. 1969) (requiring statutes to be proven unconstitutional beyond all reasonable doubt); compare Cherry Hill Vineyard, LLC v. Baldacci, 505 F.3d 28, 33-34 (1st Cir. 2007) (making no mention of heightened standard of proof) with Op. of the Justs., 162 A.3d 188, 209 (Me. 2017), as revised (Sept. 19, 2017) ("[A] statute enjoys a 'heavy presumption' of constitutionality, it is the burden of the party challenging the statute to establish that it is unconstitutional, and the challenging party must meet that burden beyond a reasonable doubt." (quoting Op. of the Justs., 850 A.2d 1145, 1149 (Me. 2004)). Proving the point, those principal dormant Commerce Clause cases the Court relies on today – Scheiner, Trailer Marine, Doran, Trailer Bridge, to name a few - make no mention of the beyond a reasonable doubt standard.[28]

Seeing no reason to take a different route here, the Court gets to the merits.

B.   Merits

1.   Dormant Commerce Clause Principles

Under Article I, Section 8 of the United States Constitution, Congress shall have power to regulate commerce among the several states. The Supreme Court has "long held that this Clause also

---

[28] Even if the beyond a reasonable doubt standard applied, Plaintiffs would meet it, at the very least with respect to fair approximation and likely with respect to discrimination as well.

39

Add.39

prohibits state laws that unduly restrict interstate commerce." Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2459 (2019). "'This negative aspect of the Commerce Clause' prevents the States from adopting protectionist measures and thus preserves a national market for goods and services."[29] Id. (quoting New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273 (1988)).

The Supreme Court has held that modern dormant Commerce Clause doctrine concerns two primary principles: (1) "state regulations may not discriminate against interstate commerce" and (2) states "may not impose undue burdens on interstate commerce." S. Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2091 (2018). "[T]he Commerce

---

[29] Straight out of the gate, Defendants argue Plaintiffs' case should be tossed because there is a good chance that the Supreme Court will re-examine the viability of the dormant Commerce Clause and revoke it. They suggest that, presented with such an opportunity, the Court will likely "reject the dormant Commerce Clause" because it is "not tethered to any constitutional text." Defs.' Br. 18. Although it is true that the dormant Commerce Clause has a "long and complicated history," and the Supreme Court has aptly described its jurisprudence as a "quagmire," the Court has also very recently reinforced its validity. See Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2459 (2019); Quill Corp. v. N. Dakota By & Through Heitkamp, 504 U.S. 298, 315 (1992), overruled on other grounds by S. Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018); see also Am. Trucking Ass'ns, Inc. v. State, Dep't of Transp., 339 Or. 554, 562 (2005). In Tenn. Wine, the Court examined the history of the dormant Commerce Clause, noting that restricting state protectionism "is deeply rooted in our case law" and that without the Clause "we would be left with a constitutional scheme that those who framed and ratified the Constitution would surely find surprising." 139 S. Ct. at 2459. And even if Defendants' crystal ball is accurate and the Supreme Court decides at some future point to reexamine this line of jurisprudence, for now this Court must respect and apply it.

Clause was designed to prevent States from engaging in economic discrimination so they would not divide into isolated, separable units." Id. at 2093-94. In cases involving user fees, the fee is reasonable "if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." N.W. Airlines, Inc. v. Cty. of Kent, Mich., 510 U.S. 355, 369 (1994) (citing Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc., 405 U.S. 707, 716-17 (1972)). Both this Court and the First Circuit, along with other circuits, have applied the Evansville/Northwest Airlines test in highway tolling cases. Cohen v. R.I. Tpk. & Bridge Auth., 775 F. Supp. 2d 439, 445 (D.R.I. 2011); see Doran v. Mass. Tpk. Auth., 348 F.3d 315, 320-21 (1st Cir. 2003); Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 98 (2d. 2009). (And Evansville itself relied on highway tolling cases, finding them "instructive." 405 U.S. at 715.)

The test is disjunctive: failing any of the three is sufficient to invalidate a law under the Commerce Clause. As noted above and in the Court's prior rulings, congressional authorization takes excessiveness out of play. See ATA I, 2020 WL 4050237, at *2. So, for Plaintiffs' challenge to succeed, they must show either that RhodeWorks' tolling regime fails to fairly approximate each tolled users' use of the tolled facilities or that it discriminates against interstate commerce. Plaintiffs

41

Add.41

prove RhodeWorks does both.

    2.   Does RhodeWorks fairly approximate use?

The fair approximation test asks whether the tolls "reflect a fair, if imperfect, approximation of the use of the facilities for whose benefit they are imposed" and whether the law has reasonably drawn the line between users it exempts and users it charges for use of a facility.  See <u>Evansville</u>, 405 U.S. 717; <u>Industria y Distribucion de Alimentos v. Trailer Bridge</u>, 797 F.3d 141, 145 (1st Cir. 2015).  Defendants attempt to shape the analysis in three ways: first, they seek to limit what can be considered by excluding evidence of the costs of operating, maintaining, and repairing the tolled facilities; second, if costs are included, they want to dilute the impact by expanding the "denominator" – the benefit side of the equation – to the tolled bridge group's functionally-related facilities; and third, they contend that other sources of RIDOT's revenue must be factored into the equation so that the tolled trucks' share is compared to the financial share paid by other users through various taxes and fees beyond tolls. In line with that attempt, Defendants offer a corresponding idiosyncratic definition of use.  None of these arguments are remotely convincing but must be dispatched to set the stage for explaining why the RhodeWorks tolls do not meet the fair approximation test.

42

Add.42

a.   Parameters of the Test

i.   Are the costs of operating, maintaining, and repairing the bridges relevant to assessing use of the facilities?

The parties disagree about whether use in the fair approximation calculation includes costs associated with the facilities. This costs versus use debate is not mere semantics: inclusion of costs changes the inquiry substantially because the focus becomes allocation of all costs of the facility (past and future) among all users, as opposed to a narrower allocation of fees against only those vehicles Defendants say consume the facility over time. Defendants hope to cabin the inquiry to fees approximating a user's use (as they define it) of a facility, excluding that user's fair portion of what it costs the State to operate, maintain, and repair the facility. And they submit that their position must be correct because consideration of costs is reserved for excessiveness, which congressional authorization removed from the calculation. And because HCASs concern such costs, Defendants argue the Court should grant their Motion in Limine seeking to exclude Plaintiffs' HCAS models, ECF No. 166. But the Court sides with Plaintiffs and finds that the costs of operating, maintaining, and repairing the tolled facilities are the proper metric.

The distinction Defendants attempt to draw between costs and use is an illusory one. Incurred costs are often the basis for

43

imposing a fee in the first place.  See Evansville, 405 U.S. at 714 ("[A] charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance may constitutionally be imposed on interstate and domestic users alike.").  Indeed, Evansville's "reasonable fee" asks whether the fee structure roughly apportions the costs of building and maintaining the facility among the various users who benefit from using it.  See Nw. Airlines, 510 U.S. at 369 ("The Airport's decision to allocate costs according to a formula that accounts for [a] distinction appears to 'reflect a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed.'" ((quoting Evansville, 405 U.S. at 716-17)) (emphasis added); see Selevan, 584 F.3d at 98 (directing the district court to examine fair approximation by "consider[ing] whether the . . . policy at issue reflects rational distinctions among different classes of motorists using the Bridge, so that each user, on the whole, pay some approximation of his or her fair share of the state's cost for maintaining the Bridge") (internal quotation marks and citation omitted). Evansville's language further proves that both retrospective and prospective costs may be considered.  See 405 U.S. at 714.

Defendants' reliance on Jorling v. United States Department of Energy, 218 F.3d 96 (2d Cir. 2000), for the principle that there is a meaningful difference between fair approximation of use of a

facility and fair approximation of the costs of that use only gets them so far.  In Jorling,[30] the Second Circuit observed that frequently the distinction between use and costs makes no difference to the outcome, but there may be situations in which the two diverge.  Id. at 101.  To illustrate the point, Jorling gives an extended helpful hypothetical about planes of varying sizes requiring different degrees of runway staff to land.  Id. at 101-02.  A bigger plane requires more runway staff and thus costs the airport more for each landing than does a smaller plane; a per-landing user fee would not capture this difference in costs but would still likely be permissible as a rough "surrogate for an otherwise complicated and expensive attempt to allocate costs." Id. at 102.  Because the aim of the fair approximation analysis is deciding "whether the challenged method for imposing charges fairly apportions the cost of providing a service," "a method for imposing charges based on each payer's approximate use will pass muster as an adequate apportionment of costs."  Id. at 103. Allocation of costs is what the test is after, even if simpler measures of use can in some cases be substituted in as a proxy. See Evansville, 405 U.S. at 715 ("[W]e have sustained numerous

_____

[30] There, the Second Circuit considered the fair approximation question in the context of the intergovernmental tax doctrine, which borrowed this element from dormant Commerce Clause jurisprudence.  Jorling v. U.S. Dep't of Energy, 218 F.3d 96, 101 (2d Cir. 2000).  The analysis is nevertheless germane.

45

Add.45

tolls based on a variety of measures of actual [road] use, including: horsepower, number and capacity of vehicles, mileage within the State, gross-ton mileage, carrying capacity, and manufacturer's rated capacity and weight of trailers.") (internal citations omitted). <u>Jorling</u>, therefore, does not compel the result Defendants seek. Use is not divorced from costs, and so the Court considers costs of use for allocation.

Which is why Defendants' Motion in Limine to exclude evidence of HCASs is denied. HCASs are tools used by governments (federal and state) to allocate the costs of operating, maintaining, and repairing highways and bridges among different classes of users (<u>e.g.</u>, pavement thickness to account for vehicle load or lane additions to account for passenger car volume). They are studies aimed at answering the very question the fair approximation analysis gets after. Although the HCASs introduced by Plaintiffs are neither perfect analogues, nor necessary to assess fair approximation of use, they are helpful and relevant. Defendants' Motion in Limine, ECF No. 166, is DENIED.[31]

---

[31] To be clear, this ruling does not in any way hint that tolls not based on a HCAS methodology could not pass the fair approximation test. Neither does the Court suggest that one methodology – HCAS or something else – is superior. Rather, the Court only holds that HCASs are relevant to the question of whether RhodeWorks' tolling method fairly approximates the use of the tolled facilities. As discussed below, the RhodeWorks toll program fails the fair approximation test even without considering the HCAS evidence. This evidence merely reinforces why it does. And, in line with this ruling, what remains of Defendants' Motion to

46

ii. Should the analysis focus on the tolled bridges and bridge groups, all Rhode Island bridges, or the entire Rhode Island transportation system?

With costs in the calculus, the Court next concludes that the relevant costs are those of the tolled bridges only. After all, the Court must evaluate whether the fees imposed at the tolled facilities fairly apportion the costs of those facilities among the different users. Defendants try to dilute the Court's holding that costs are relevant by expanding the measure of costs to include the costs of all other bridges and even Rhode Island's entire highway system (roads and bridges alike) – all of which the State pays to maintain – because those roads and bridges provide benefits to tolled trucks, too. Defendants' reasoning is that even if trucks pay a significant portion of the costs for the tolled bridges, their share shrinks dramatically if the denominator is RIDOT's bridge budget or RIDOT's entire budget, especially given the fees that other (un-tolled) users pay in registration fees, gas taxes, and the like discussed below.

In pursuit of this futile end, Defendants lean on this Court's decision in Cohen and several out-of-circuit cases, including

---

Exclude Evidence and Expert Testimony on the Issue of Fair Approximation on the Basis of Congressional Authorization, ECF No. 168, is now DENIED in full. For the same reason, this resolves the relevance of expert testimony about the HCASs (see, e.g., ECF No. 178 (Daubert Motion seeking to exclude testimony of Dr. Rose Ray)).

47

Add.47

Angus Partners LLC v. Walder, 52 F. Supp. 3d 546 (S.D.N.Y. 2014),
to support their contention that all Rhode Island bridges and the
whole highway system are functionally related to the tolled
bridges. But none of these cases support this theory and the Court
easily concludes that the tolled bridges are the proper
measurement.

In Cohen, this Court found there was a "spillover effect"
between the Mount Hope Bridge and the Newport Bridge, which have
a functional relationship in that they make up two of the three
access points to Aquidneck Island and closure of one would
inevitably cause congestion on the other. 775 F. Supp. 2d at 449-
50. And in Angus Partners, the district court analyzed fair
approximation and excessiveness together, finding the Metropolitan
Transportation Authority ("MTA") was an integrated transportation
system from which all users benefitted. 52 F. Supp. 3d at 566.
It surmised, "[e]ven if the tolls charged create a surplus, all
that is required is a 'functional relationship' between the toll
and the facilities used by the toll's payers." Id. at 567 (quoting
Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,
567 F.3d 79, 87 (2d Cir. 2009)). Finding a functional relationship
existed, the court said the "traffic flow on the [Triborough Bridge
and Tunnel Authority] bridges and tunnels would suffer
significantly without the MTA's mass transit and commuter railway

48

Add.48

services," so it was not unfair to allocate "surpluses to support these functionally related facilities." Id. at 568.

Defendants' approach would stretch the functional relationship doctrine beyond all recognition and effectively gut the fair approximation test, so the Court rejects it. A "tolled facility," for purposes of the fair approximation analysis, is the bridge or bridge group for which a specific toll is charged. This conclusion is well supported in the record and the language of ISTEA itself.[32]

> iii. May the Court consider non-toll sources of revenue that fund the RIDOT budget?

Last, considering non-toll funding sources of the RIDOT budget would be inappropriate. Defendants ask the Court to

---

[32] The tolling authorization in ISTEA clearly applies to reconstruction or replacement of "a toll-free bridge." 23 U.S.C. § 129(a)(1)(E). Ample record evidence demonstrates that RIDOT considered the individual bridge groups as the tolled facilities. One, RIDOT entered a separate MOU with the FHWA for each tolled facility. DX34; DX99. Two, RIDOT separately calculated damage percentages for each bridge, which percentages correlate to the relative proportion of bridge costs to be repaid using toll revenue. June 10 Tr. 119:11-120:2; May 25 Tr. 32:24-33:11; PX314-B. And three, RIDOT set up separate revenue accounts for each tolled facility from which the reconstruction costs of each bridge will be paid. June 10 Tr. 108:21-25, 111:21-112:2. That said, not all evidence relating to the RIDOT budget is irrelevant to the fair approximation analysis. Evidence demonstrating how RIDOT apportions the costs of rebuilding and replacing each bridge is helpful to understand the extent to which tolled and un-tolled users are paying their "fair share," particularly using Plaintiffs' methodology. Thus, the Court DENIES Plaintiffs' Motion to Exclude Evidence Related to the Rhode Island Department of Transportation's Road System Budget, ECF No. 181.

49

Add.49

consider other ways users – both tolled and un-tolled – contribute to the costs of maintaining the tolled bridges. This would include, for example, other funding sources for the RIDOT budget like Rhode Island Capital Plan ("RICAP") funds (excess funds in the state's general revenue rainy day fund), the Rhode Island Highway Maintenance Account ("HMA") funded by DMV revenues (license fees, registration fees, etc.), RIDOT gas tax, and general bond obligations. June 10 Tr. 105:12-108:1. To the extent state funds pay for a part of the cost to reconstruct a RhodeWorks bridge, it is paid for using RICAP or HMA funds. Id. 109:25-110:10. Plaintiffs rely on American Trucking Ass'ns, Inc. v. Scheiner, 483 U.S. 266 (1987), and Fulton Corp. v. Faulkner, 516 U.S. 325, 335 (1996), to argue that evidence regarding these contributions is irrelevant. The Court agrees with Plaintiffs.

In Scheiner, the Court refused to weigh the challenged flat tax against other taxes and fees paid by Pennsylvanians. It found that other taxes and fees, such as registration fees, were not paid solely for the use of Pennsylvania's highways and, "even if the relative amounts of the States' registration fees confer a competitive advantage on trucks based in other States, the Commerce Clause does not permit compensatory measures for the disparities that result from each State's choice of tax levels." 483 U.S. at 288. Thus, the Scheiner Court held that the "flat taxes must stand or fall on their own." Id. at 289. In Fulton, the Supreme Court

50

Add.50

likewise rejected this argument, noting the "danger of treating general revenue measures as relevant intrastate burdens for purposes of the compensatory tax doctrine" because it would "allow a state to tax interstate commerce more heavily than in-state commerce anytime the entities involved in interstate commerce happened to use facilities supported by general state tax funds." 516 U.S. at 335 (internal quotation marks omitted).

It is true, as Defendants point out, that <u>Evansville</u> and <u>Northwest Airlines</u> both considered other sources of revenue contributing to the costs of the facilities when assessing fair approximation. <u>See</u> <u>Evansville</u>, 405 U.S. at 718 ("Furthermore, business users, like shops, restaurants, and private parking concessions, do contribute to airport upkeep through rent, a cost that is passed on in part at least to their patrons."); <u>Nw. Airlines</u>, 510 U.S. at 359-60. But these cases dealt with fees that other users paid directly to the tolled facility (like rent), not funding that must be traced to the facility through general tax and licensing revenues. <u>Scheiner</u> and <u>Fulton</u> make clear that the tolls must be evaluated on their own.[33]

---

[33] Even if the Court considered other contributions tolled and un-tolled users make toward the costs of the bridge, it would make no difference to the outcome. The State initially reconstructed the bridges with 80% federal funding and 20% state funding. June 10 Tr. 109:25-110:16. When toll revenues are collected, they reimburse these state and federal funds up to a certain percentage. <u>Id.</u> 110:18-111:3. The remaining costs for each bridge are repaid according to an 80/20 split, with the State paying 20% of those

51

Add.51

b.   What does it mean to use the bridges?

Having set the parameters of the inquiry, the next critical question is, who are the users of the facilities? Defendants contend the only (or the primary) users are Class 8+ trucks because these do most of the damage to bridges, in effect "consuming" the useful life of the bridge over time. If Defendants are correct, then allocating the entire tolling burden to these vehicles is fair. But, if not, the RhodeWorks tolling scheme fails. The Court finds that under every conceivable way of evaluating the question – the common sense understanding of what it means to use a bridge; Defendants' flawed "consumption method"; and Plaintiffs' comparison to HCAS studies - RhodeWorks fails the test.

Defendants have an unusual understanding of what it means to use a bridge. Obviously, in plain language, a "user" of a tolled bridge is a vehicle that crosses the bridge. <u>See</u> <u>Trailer Bridge</u>,

---

costs. By way of example, under the RhodeWorks program a $10 million bridge, with an 80% tractor trailer damage assessment, would be paid for using $8 million in tolls, $1.6 million in federal funds, and $400,000 in state funds once the tolls are fully collected. It is true that <u>some</u> un-tolled users of the bridge pay toward the costs of the project through, for example, gas taxes or registration fees. June 6 Tr. 195:10-197:2. But tolled users – both in-state and out-of-state – also contribute to state revenue used to fund the costs of the facilities through programs like the International Fuel Tax Agreement and the International Registration Plan. <u>See</u> May 26 Tr. 94:25-96:10, ECF No. 236. And there are some un-tolled users (<u>e.g.</u>, those in lower vehicle classes registered out of state) who do not pay in any other way. Consequently, the other payments made by users not tolled under the RhodeWorks system do not render these exemptions reasonable.

797 F.3d at 145 (defining "user fee" as a "charge assessed for the use of a government facility or service").  Dictionaries provide several definitions of the term "use."  The more natural one here is "to carry out a purpose or action by means of [something else.]"  Use, Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/use.  One uses a bridge to get to the other side of the span.

But another definition is "to expend or consume by putting to use."  Id.  Defendants' "consumption" approach relies on this latter notion of use, as if bridges are like bicycles or batteries.  But bridges are not consumable goods; they are infrastructure that once constructed can remain operational for hundreds of years (the Brooklyn Bridge, for example[34]) or quickly fall into dangerous despair and disuse amid disagreements about who's responsible for repair and maintenance (like the Fern Hollow Bridge in Pittsburgh[35]).  To use something does not, in this context, mean to exhaust it; Defendants' consumption approach defies common sense.  In the Court's view, in the context of tolling bridges, use means to cross the bridge in a vehicle.

---

[34]  See  Featured  Video:  Brooklyn  Bridge,  PBS, https://www.pbs.org/kenburns/brooklyn-bridge.

[35]  See John Shumway, Work well underway to replace the Fern Hollow Bridge, CBS Pittsburgh, Aug. 1, 2022.

53

Add.53

It follows, then, that a tolling scheme can fairly approximate use by charging each user a fee that corresponds with the number of times it crosses that bridge. In such a case, users in all vehicle classes would share in the toll burden when the user crosses the corresponding bridge or bridge group. Here, the record demonstrates that 97% of the vehicles making use of the tolled bridges – vehicles in Classes 1-7 – are not tolled. May 25 Tr. 114:12-13. Thus, RhodeWorks operates by design in a way that exempts not only most users, but nearly <u>all</u> users. Without looking much deeper, a system that places the entire toll burden on an extreme minority of users is inherently unfair and fails the test.

But a user fee may be permissible under the dormant Commerce Clause even if it exempts certain classes of users or draws distinctions between classes that are not "wholly unreasonable." See <u>Evansville</u>, 405 U.S. at 717-18; <u>Trailer Bridge</u>, 797 F.3d at 145. Therefore, the fair approximation analysis contemplates the possibility of more than just a correlation based on frequency of an activity. And this makes sense: as the evidence shows, not every use is equal in impact. Indeed, the Supreme Court has sanctioned a variety of measures of use in the highway toll context, including some that vary fees based on weight or vehicle class. See <u>Evansville</u>, 405 U.S. at 715 (collecting cases).[36]

---

[36] Defendants point to cases where states have permissibly varied highway tolls according to the weight or rated capacity of

Defendants argue that the General Assembly reasonably
measured use by vehicle weight class by focusing on which vehicles
do the most damage to bridges and hence "consume them." They
contend that so long as the State's methodology has "a rational
basis in that it reasonably and fairly approximates large
commercial vehicles' use," the Court must afford that methodology
deference and not look to whether a different formula might more
precisely reflect use of the facilities. Defs.' Br. 100. This
methodology is reasonable, they say, because vehicle weight is an
important consideration in regulating highway use and because
vehicle weight measures have been used both as a way of allocating
costs (in HCAS studies) and to estimate pavement damage.

Defendants rely on expert testimony from Dr. Andrzej S. Nowak,
who testified that a "consumption methodology," such as that used
in RhodeWorks, starts with the premise that "each passage of a
vehicle takes a piece of a part of the lifetime which that bridge
has." June 3 Tr. 4:7-17, 5:13-21, ECF No. 240. Heavy vehicles,
according to this approach, take away more of the bridge's

---

different vehicles and thereby, to some degree, used a load-based
measure of use. See Evansville, 405 U.S. at 715 (acknowledging
"we have sustained numerous tolls based on a variety of measures
of actual use, including: . . . a manufacturer's rated capacity
and weight of trailers"); see also Commonwealth v. B&W Transp.
Inc., 448 N.E.2d 728, 734-35 (Mass. 1983). Just because some tolls
use classifications based on weight and are fair does not mean
that every system that uses weight to apportion tolls does so in
a way that satisfies the dormant Commerce Clause.

remaining life with every crossing than do lighter vehicles. Id. 5:21-22. And large commercial trucks "consume" 70-80% of bridge life. Id. 3:3-10. As for Class 6 and 7 trucks, Dr. Nowak testified that while their impact is not "insignificant," the volume of such traffic is small enough that it would not make a difference, id. 16:2-11, and the damage from light vehicles such as passenger cars is "practically negligible" – "so small that it doesn't make a difference in calculation of consumption,"[37] id. 14:7-13.

The State's so-called consumption-based methodology is flawed from nearly every perspective:

To start, the methodology relies on equivalent single-axle loads ("ESALs") and an inapplicable GAO study from the 1970s. Testimony from both Plaintiffs' and Defendants' experts was that ESAL measurements are not an effective way to measure impact on bridges (as opposed to on pavement generally). June 2 Tr. 149:6-9 (Defendants' expert, Dr. Small, testifying that ESALs are not a measurement he would "use to look at bridges"); May 27 191:17-192:8, ECF No. 237 (Plaintiffs' expert, Dr. William Vavrik, testifying that "ESALs are not part of the bridge design process. ESAL was intended out of the Road Test to be a pavement design

_____

[37] It is worth noting that if use equals consumption, and cars do not consume the life of the bridges, two baffling conclusions follow: first, 90% of the vehicles on the bridges are not using them; and second, if only cars were allowed to cross the bridges, the bridges should last forever because they are not being consumed by trucks.

56

Add.56

tool. . . . The bridge tool for load is the design truck."). With respect to the 1970s GAO study, Plaintiffs' expert Dr. Vavrik credibly testified that the purpose of it was to analyze overweight and oversized vehicles; further, the study's findings were based on an early road test for pavement design (not for bridges).[38] May 31 Tr. 15:8-16:22, ECF No. 244.

Defendants' expert, Dr. Nowak, conducting his own analysis, nonetheless reached essentially the same damage estimate as the GAO study and RIDOT's ESAL-based study. See June 3 Tr. 6:16-7:7. Although his analysis did asses the impact on bridges, his methodology narrowly focused on one type of effect on a bridge (fatigue) without assessing other ways vehicles impact bridges.[39] Id. 35:5-24. Furthermore, bridges – and particularly those bridges

---

[38] While courts undoubtedly owe some measure of deference to legislative findings, they may not shirk their "independent constitutional duty to review factual findings where constitutional rights are at stake." Gonzales v. Carhart, 550 U.S. 124, 165 (2007). Indeed, courts have consistently rejected the proposition that legislative factfinding may wholly insulate a statute from constitutional review. See Sable Commc'ns of Cal. v. FCC, 492 U.S. 115, 129 (1989); Lamprecht v. F.C.C., 958 F.2d 382, 392 n.2 (D.C. Cir. 1992). But see Clark v. Paul Gray, Inc., 306 U.S. 583, 594 (1939) (requiring rational basis review of legislative findings).

[39] Plaintiffs attack Dr. Nowak's methodology in many other ways. To name a few, they argue that Dr. Nowak did not conduct a bridge-specific analysis; this type of methodology has never been used to allocate costs across vehicle classes; it excludes certain other traffic-induced loads; and it is based on flawed weight-in-motion ("WiM") data to measure traffic. These critiques all have merit, but the Court need not interrogate them given its holdings.

on interstate highways – are designed to withstand the flow of heavy trucks.  See May 31 Tr. 79:18-80:4 ("[I]n heavy bridges, high-traffic volume bridges, because we're designing for heavy trucks and we have all those factors of safety . . . many of the elements within the bridge have an infinite fatigue life."); see also June 3 Tr. 50:24-51:5.

Even assuming load-based methodologies could appropriately capture how large commercial trucks "use" bridges, and further assuming Defendants are correct that large commercial trucks consume 70-80% of a bridge's life, the State's decision to place the entire toll burden on those users still does not pass the fair approximation test.  While it may be that the government need not charge every "user" of a facility to pass the Evansville test, see Evansville, 405 U.S. at 718 (holding that exempting certain users from paying fees is permissible so long as they are "not wholly unreasonable" and "reflect rational distinctions"), this record evidence makes clear that the State failed to "reasonably draw[] a line between those it is charging and those it is not," Trailer Bridge, 797 F.3d at 145.

By its own calculations, Defendants' methodology exempts users who consume 30% of the bridge life from paying any charge at all for use of the tolled facilities.  The most significant exclusion relates to Classes 6 and 7.  Dr. Nowak explained that although a single crossing of a Class 6 or 7 vehicle may well cause

a similar damage impact as a Class 8+ vehicle, the volume is too low to matter.  <u>See</u> June 3 Tr. 99:12-100:3.  The Court does not credit Dr. Nowak's "low volume" explanation for why Class 6 and 7 vehicles should be excluded.  First, the State itself calculated that single-unit trucks account for 9-25% of the damage to the RhodeWorks bridges.  <u>See</u> PX314-B (also listing the impact from passenger vehicles as between 1-6% of damage).  Second, in his testimony, Dr. Nowak did not discuss these percentages specifically, so it is not clear what he was relying on for his statement about these classes having "low volume."[40]  And other credible evidence contradicts it.  Using Kapsch traffic data, Dr. Peters testified that in July 2020, Class 4-7 vehicles amounted to about 1.53% of traffic, compared to 3.05% for Class 8+ vehicles.  <u>See</u> May 25 Tr. 114:3-22.  The pre-enactment CDM Smith traffic data found that single-unit trucks (Classes 5-7) accounted for approximately 4.5% of traffic, compared to 3.7% of traffic for Class 8+ trucks.  PX320 at 6.  And when calculating the damage

---

[40] Dr. Nowak's expert report includes a table showing all WiM data over a specific period, with counts specific to each class of vehicle.  <u>See</u> Nowak Expert Rep. 16, ECF No. 198-4.  These data show 778,638 Class 4 vehicles, 13,688,655 Class 5 vehicles, 1,631,978 Class 6 vehicles, and 136,235 Class 7 vehicles.  <u>Id.</u>  Class 8+ vehicles amount to 10,560,680 of the traffic count.  <u>Id.</u>  Dr. Nowak's report was not introduced as a full exhibit at trial, but it is in the case record as part of Plaintiffs' response to one of Defendants' Motions in Limine.  The numbers in his chart do not support his statement and, rather, are consistent with Plaintiffs' expert Dr. Peters' findings.

59

Add.59

share attributable to single-unit trucks, RIDOT's Robert Rocchio used traffic data showing that at certain bridge locations single-unit trucks outnumbered tractor trailers (and did outnumber them overall). See PX328 at 7. Finally, weight-in-motion ("WiM") data show that a significant percentage of vehicles that exceeded the weight limits were in Classes 4-7, May 26 Tr. 16:17-25 (Dr. Peters testifying that "a large percentage of the vehicles that exceeded the Rhode Island weight limits were actually in Classes 4 to 7"); PX653 at 25 (reflecting that 86.4% of vehicles exceeding Rhode Island's weight-per-axle limit are in Classes 5-7), but Dr. Nowak excluded these overloaded vehicles from his analysis, June 3 Tr. 58:1-14.

To the extent that consumption or damage-based calculations factor into a tolling program in some way, users having more than a "negligible" impact on the tolled facilities must be assessed a fee for their use, so that all users pay some portion of their fair share. And if the State's own expert, Dr. Nowak, is correct that Class 6 and 7 vehicles cause damage akin to Class 8+ trucks per crossing, their "consumption" of the bridges is far from negligible. It was unreasonable for the State to exempt entire classes of similarly impactful vehicles. See Bridgeport & Port Jefferson Steamboat Co., 567 F.3d at 87-88 (finding that imposing the total cost of a service on one group of users (ferry

passengers) but no charge on another group of users (pleasure boats) failed the fair approximation test).[41]

The analysis could end with Defendants' approach, but it is worth considering Plaintiffs' evidence, too. Plaintiffs' HCASs likewise show that RhodeWorks fails to fairly approximate the costs associated with each user's use of the facilities, they just do so more dramatically.

As told by Dr. Vavrik, HCASs consider the different ways users impact highways and bridges, allocating common costs across all users and incrementally adding responsibility to users who require additional infrastructure or design features. See May 27 Tr. 186:14-188:11, 196:8-198:9, ECF No. 237. Said another way, HCASs are a means to allocate costs to users respective of their use of roads and bridges. Id. 188:1-11. Indeed, the FHWA HCAS states that its study was intended to analyze "the costs occasioned in design, construction, rehabilitation, and maintenance of Federal-aid highways by the use of vehicles of different dimensions, weights, and other specifications, and by the frequency of such

---

[41] If more is needed – and the Court doubts more is - the toll caps (which are discussed in more detail below) illustrate another flaw in the consumption methodology because, when triggered, they break the relationship between the tolls charged and the actual use of the bridge. A large commercial truck passing over the same bridge five times in one day "consumes" the bridge each time it crosses, but it only pays compensation for the first "consumption" in each direction of that bridge. Although fair approximation does not require precision fairness, the RhodeWorks caps run directly counter to the stated premise of the State's methodology.

61

Add.61

vehicles in the traffic stream." PX12 at V-1 (internal quotation marks omitted).

The federal HCAS estimates that tractor trailers account for 29.4% of total highway costs, while single-unit trucks account for 10.7%, and passenger vehicles account for 59.9%. May 31 Tr. 28:17-29:12; PX12 at VI-2. It further estimates that tractor trailers are responsible for 21.4% of all bridge costs. May 31 Tr. 29:7-12; PX12 at V-16. Bridge costs are broken down into minor rehabilitation, major rehabilitation, reconstruction, and new bridges. May 31 Tr. 29:13-20; PX12 at V-16. Under this sub-analysis, tractor trailers are responsible for 32% percent of bridge replacement costs. May 31 Tr. 29:13-20, 49:17-50:14.

Dr. Vavrik also examined nine state HCASs, finding that these states apportioned responsibility to tractor trailers anywhere between just over 20% to just over 40% of highway costs. See May 31 Tr. 27:23-28:3; PX640 at 51. After reviewing these studies, Dr. Vavrik "benchmarked" these data to estimate Rhode Island's situation.[42] May 31 Tr. 39:20-40:14. He testified that, based on an adjustment for the low volume of Class 8+ trucks, Rhode Island's cost allocation for Class 8+ vehicles would be, at the high end, 11% of costs. Id. 55:11-18; PX640 at 65.

---

[42] Rhode Island has not commissioned a HCAS. May 31 Tr. 165:2-4, ECF No. 244.

62

Add.62

Defendants took great pains to discredit the individual HCASs as dissimilar to Rhode Island, but their attacks fall flat. These studies are not meant to be precise analogues to Rhode Island; rather, they are useful for understanding how different government authorities have compiled data and assigned responsibility among users for whom highways and bridges were designed and built. Taking even the highest of these HCAS figures (attributing 40% of bridge costs to large commercial trucks), a tolling system that places 100% of the tolls and 70% percent of the repair costs on those trucks fails to fairly apportion the costs of its bridges among all the users. The HCASS bolster Plaintiffs' position that large commercial trucks should not bear the entire tolling burden associated with defraying the costs of the tolled bridges and that this failure of apportionment does not pass the fair approximation test.

For these reasons, the Court finds that by any relevant measurement the RhodeWorks toll charges do not fairly approximate the use of the tolled facilities and therefore fail this part of the Evansville test.

    3.    Does RhodeWorks discriminate against interstate commerce?

The First Circuit has framed the relevant contours as follows: "Discrimination under the Commerce Clause means differential treatment of in-state and out-of-state economic interests that

benefits the former and burdens the latter[.]" <u>Fam. Winemakers of Ca. v. Jenkins</u>, 592 F.3d 1, 8 (1st Cir. 2010) (internal quotation marks and citation omitted). "A finding that state legislation constitutes economic protectionism may be made on the basis of either discriminatory purpose or discriminatory effect."[43] <u>Gwadosky</u>, 430 F.3d at 35 (quoting <u>Bacchus Imps.</u>, 468 U.S. at 270) (internal quotation marks omitted).

When discriminatory, a statute is "virtually <u>per se</u>" invalid. <u>Or. Waste Sys., Inc. v. Dep't Env. Quality of State of Or.</u>, 511 U.S. 93, 99 (1994). In that event, the State must "show that [the statute] advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." <u>Id.</u> at 100-101 (quoting <u>New Energy</u>, 486 U.S. at 278). This is effectively a strict scrutiny analysis. In contrast, "[a] state statute that regulates evenhandedly and has only incidental effects on interstate commerce engenders a lower level of scrutiny." <u>Gwadosky</u>, 430 F.3d at 35 (applying something resembling rational basis review as applied in <u>Pike v. Bruce Church, Inc.</u>, 397 U.S. 137 (1970)) (internal quotation marks omitted); <u>see also</u>

---

[43] RhodeWorks does not discriminate on its face and is silent on its application to in-state versus out-of-state vehicles. <u>See</u> § 42-13.1-1 et seq.

64

Add.64

Wayfair, 138 S. Ct. at 2091.

> a.  Was RhodeWorks enacted with a discriminatory purpose?

Plaintiffs assert both that RhodeWorks was enacted with a discriminatory purpose and that discriminatory intent alone can render a statute unconstitutional.  See Bacchus Imps., 468 U.S. at 270 ("Examination of the State's purpose in this case is sufficient to demonstrate the State's lack of entitlement to [the Pike balancing test].").

"[W]hen evaluating whether a state statute was motivated by an intent to discriminate against interstate commerce," the Court looks "first to statutory text, context, and legislative history, as well as to whether the statute was closely tailored to achieve the non-discriminatory legislative purpose asserted by the State."[44]  Am. Trucking Ass'n, Inc. v. Alviti ("ATA II"), 14 F.4th 76, 90 (1st Cir. 2021) (internal quotation marks omitted and cleaned up).  "The plain meaning of the statute's words,

---

[44] The Court once again rejects Defendants' argument that discriminatory purpose is irrelevant to the dormant Commerce Clause analysis.  Although the First Circuit at an earlier phase of this litigation doubted both the probative value of the evidence of intent and whether a statute could be struck down based solely on discriminatory purpose, it did not dispense with this inquiry.  See Am. Trucking Ass'n, Inc. v. Alviti, 14 F.4th 76, 89-90 (1st Cir. 2021).  Because the Court finds that Plaintiffs have demonstrated that the RhodeWorks toll system does not represent a fair approximation of the use of the tolled facilities and discriminates in effect, it need not determine whether discriminatory purpose alone is sufficient to find a statute unconstitutional under the dormant Commerce Clause.  Id. at 90.

65

Add.65

enlightened by their context and the contemporaneous legislative history, can control the determination of legislative purpose." Edwards v. Aguillard, 482 U.S. 578, 594 (1987). Although the Court may weigh "the specific sequence of events leading to passage of the statute," id. at 595, it exercises caution in using "evidence of individual lawmakers' motives to establish that the legislature as a whole enacted RhodeWorks with any particular purpose," ATA II, 14 F.4th at 90.

As Plaintiffs see it, their trial evidence proved that RIDOT conceived of, and the General Assembly passed, a revenue-generating system designed to raise funds primarily from out-of-state tractor trailer trucks while protecting local businesses as much as possible. Specifically, they point to the selection of a tolling system (as opposed to other revenue generating options like a taxation regime), pre-enactment and pre-implementation studies focused on the in-state/out-of-state vehicle comparison, comments made by Director Alviti and Senate President Dominick J. Ruggerio to the General Assembly, the decision to exclude Class 7 and smaller trucks, the lack of effort to justify tolling only large trucks, and more.

To start, that the General Assembly chose to enact a statute implementing a toll system to generate revenue to repair its bridge infrastructure, as opposed to a different revenue-generating option (like a gas tax), does not on its own show that lawmakers

66

intended to burden out-of-state interests. Further, the Court agrees with Defendants that two state-commissioned studies – the Blue Ribbon study and the Regional Economic Models, Inc. ("REMI") study – have only marginal relevance. The 2008 Blue Ribbon study examined Rhode Island's funding system across the entire transportation infrastructure and found it was insufficient to support future needs. PX30 at 5. This study proposed several options to generate revenue, one of which was tolling I-95 at the borders. Id. at 24. Although the study may be helpful to understand the need for the RhodeWorks legislation, and was referenced in the legislative findings, it cannot be said that the Blue Ribbon Panel's observation that tolling the I-95 corridor would have little impact on Rhode Islanders reflects on the General Assembly's intent when enacting the RhodeWorks statute nearly seven years later. Id. The 2015 REMI study examined, at RIDOT's behest, the economic impact of the proposed RhodeWorks legislation and noted that "the tolling financing regime shifts a segment of the cost of the RhodeWorks project onto semi-tractor trailer trucks that pass through the state without stopping." PX218 at 4, 6. This study is closer in time to the passage of RhodeWorks and is consistent with the findings of protectionism discussed below. But it is still a step removed from the General Assembly's enactment of the statute.

Next, although Plaintiffs suggest that RIDOT's selection of

67

Add.67

which bridges to toll evinces a discriminatory intent because RIDOT downgraded certain bridges on the interstate highways in order to toll them, Plaintiffs have not demonstrated that the selected bridges did not meet the 29 U.S.C. § 129 requirements. See PX317 at 5 (indicating all bridges meet the Title 129 definition); June 1 Tr. 136:17-137:5, 140:9-15. As Director Alviti testified, RIDOT also looked to invest in bridges that would become structurally deficient. June 1 Tr. 133:21-135:2. Nothing in the law requires the State to select bridges in the worst condition. And since ISTEA specifically allows for excess toll dollars to be redirected toward other bridges, it makes economic sense to toll high-volume bridges even if they are not the worst of the worst. This evidence adds little.

And it is true that RIDOT, with the help of its consultants, carefully evaluated the difference in impact on in-state and out-of-state trucks prior to RhodeWorks' enactment. PX190. Clearly it was important to state officials and the General Assembly to understand the extent to which Rhode Islanders would be impacted by the tolling program. Id. (in an email, explaining that "RIDOT leadership will not take 'no it can't be done' as an answer and told Rocchio that if [CDM Smith] couldn't come up with a plan, he needs to find someone who can"). And at the same time, RIDOT's "process" for identifying a justification for placing the burden on large commercial trucks was less than robust. See Garino Dep.

68

Add.68

15:12-16:8 (recalling that the concept of a trucks-only tolling provision was divined at the family dinner table); May 24 Tr. 105:13-108:12 (recounting that justifying sources were found through an Internet search). This evidence weighs in favor of an intent to shift the burden to out-of-state trucks, but only marginally so.

Beyond these minor points, however, Plaintiffs presented compelling evidence that the General Assembly sought to protect local businesses with its decision to toll only Class 8+ trucks. In 2015, lawmakers made public the first version of RhodeWorks, which would have tolled all Class 6+ trucks. PX83. The inclusion of Class 6 and 7 trucks was based on a recommendation made by RIDOT consultant CDM Smith. PX80 at 1-2. However, only a couple weeks later, a second draft was proposed with two important changes: (1) Class 6 and 7 vehicles were exempted from tolling and (2) a limitation was added to address repeat per-day visits to a single gantry. PX101. Lawmakers and state officials alike specified at the time that these changes were made to address concerns raised by local businesses and that both changes would reduce the impact of the tolls on local industries.[45]    PX146I (Senate President

---

[45] Defendants suggest that these statements are irrelevant in part because vehicles in Classes 4-7 contribute to bridge costs in other ways, including by paying certain fees and gas taxes in Rhode Island.    But as addressed above in the context of fair approximation, these vehicles' contributions by way of general fees and taxes have little relevance.  The question here concerns

Ruggerio testifying that "the revised bill takes several important steps to improve upon the original bill to address the concerns of the local trucking industry.  It applies to trucks Class 8 and above, these are the larger commercial trucks, not your local landscaper truck or not your local, the usual pick-up trucks."); PX146H (Director Alviti testifying that "[i]t's important for you to know that these changes came as a result of us listening to the various stakeholders and transportation industries in Rhode Island.  There were – there was some criticism as to the impact that this legislation, our original legislation, might impose on various industries, we listened to those industries, we've met with them and we've changed our legislation to improve it.  But not only improve it, to actually provide economic incentives to those industries to do business in Rhode Island.").  Although the Court is mindful that comments made by individual legislators are not always the most probative evidence bearing on legislative purpose, see ATA II, 14 F.4th at 90, these statements are not, as Defendants claim, wholly irrelevant because they were made by Senate President Ruggerio and Director Alviti – two key officials

---

whether these provisions were enacted with the intent of local protectionism.

behind the RhodeWorks legislation.[46]

But the most important evidence of the intent of the General Assembly to protect local businesses and residents at the expense of interstate commerce is found in both the structure of law itself and in the data. The trial evidence showed that lower-classed trucks are more likely to be Rhode Island-plated than Class 8+ trucks. See May 26 Tr. 13:8-25 (comparing Rhode Island share of Class 4-7 vehicles at "42 percent, 38 percent" with Rhode Island share of Class 8+ vehicles at "generally an 18 to 20 percent range"). This means that approximately 80% of the tolled vehicles are from out of state. And the less than 20% of tolled Class 8+ trucks from Rhode Island disproportionally receive the benefit of the toll caps, which the Court finds below discriminate in effect. These discriminatory effects "strengthen[] the inference that the

---

[46] In Alliance of Auto Manufacturers v. Gwadosky, the First Circuit rejected an attempt to show that the legislative process demonstrated intent. 430 F.3d 30, 36 (1st Cir. 2005). There, the legislature deleted the at-issue language, but ultimately restored it after an "intense lobbying campaign." Id. The court held that the legislative process evidence was "indeterminate." Id. at 38-39. It continued, "[a]s a general rule, statutory interpretation cannot safely be made to rest upon inferences drawn from intermediate legislative maneuvers. In this instance, such reliance would be especially problematic because there are countless reasons why the state legislature may have altered its position." Id. at 39 (internal citation omitted). The Court is cautious that it must not "lose[] sight of the forest while searching for trees." Id. at 37. But, as the First Circuit stated, "context is a critically important interpretive tool," and this legislative process helps put RhodeWorks in context when discerning its purpose from the statute "as a whole." Id.

71

statute was discriminatory by design." <u>Fam. Winemakers</u>, 592 F.3d at 14. Furthermore, both the exclusion of lower-classed trucks and the ceiling imposed by the toll caps make the statute less tailored and effective in fulfilling its express purpose of funding the repair of its failing bridges.

On the whole, the record evidence demonstrates a common theme of placing the lion's share of the tolling burden on out-of-state large commercial trucks and protecting Rhode Island commercial interests as much as possible through the exemption of Class 4-7 vehicles and the utilization of toll caps. This intent to mitigate the effect of tolling on local businesses was clearly protectionist.[47]

---

[47] Plaintiffs also rely on PX128 – and particularly a comment made on the draft Rhode Island Office of Management and Budget document – to show discriminatory purpose. Pls.' Post-Trial Br. ("Pls.' Br.") 52, ECF No. 228. The Court admitted this document over Defendants' objection for the limited purpose of demonstrating a level of understanding regarding the shifting burden of tolls between in-state and out-of-state users. May 26 Tr. 40:20-43:25. As for the comments, the Court indicated they were "beyond that limited purpose" and had "limited relevance and limited usefulness because it's not even known who is making" them. <u>Id.</u> 43:18-25. Given this ruling, the Court does not rely on the comment now (nor is it necessary to the Court's conclusion).

72

Add.72

> b.    Does RhodeWorks discriminate against
> interstate commerce in effect?

Typically, "[a] state law is discriminatory in effect when, in practice, it affects similarly situated entities in a market by imposing disproportionate burdens on out-of-state interests and conferring advantages upon in-state interests." <u>Fam. Winemakers</u>, 592 F.3d at 10.   In other words, a statute discriminates within the context of the dormant Commerce Clause when it disfavors competitors based on their location outside a state's borders. <u>See</u> <u>id.</u>    "[T]he mere fact that a statutory regime has a discriminatory <u>potential</u> is not enough to trigger strict scrutiny under the dormant [C]ommerce [C]lause." <u>Cherry Hill Vineyard</u>, 505 F.3d at 37 (cleaned up).   Plaintiffs must prove an actual adverse impact.[48]   <u>Id.</u> at 36.

Plaintiffs argue three strands of evidence demonstrate the discriminatory effect of the RhodeWorks tolling program: (1) the differential impact of the toll caps; (2) the locations of the tolls; and (3) the classes of vehicles tolled versus those not

---

[48] In <u>Cherry Hill Vineyard, LLC v. Baldacci</u>, the First Circuit considered what kind of evidentiary showing was needed for discriminatory effect.   505 F.3d 28, 36 (1st Cir. 2007).   It concluded that when a statute is facially neutral and wholesome in purpose, the showing of discriminatory effect "must be substantial."   <u>Id.</u> at 36.   Later, the First Circuit noted but did not decide "whether a lesser showing might suffice when a law is allegedly discriminatory in both effect and purpose." <u>Fam. Winemakers</u>, 592 F.3d at 11 n.11.   Either way, Plaintiffs meet their burden.

tolled.

i.   The Toll Caps

Plaintiffs' contention is that the toll caps discriminate against interstate commerce because local interests disproportionately reap the benefit of the caps and so the structure of the RhodeWorks tolls inevitably burdens interstate travel more heavily than intrastate travel.  Although Plaintiffs acknowledge that the RhodeWorks tolls do not, on their face, look exactly like the unconstitutional flat fees at issue in <u>Scheiner</u> or the transitory trailer fee struck down in <u>Trailer Marine</u>, the tolls nonetheless "share the essential characteristics that made those [] flat fees unconstitutional." Pls.' Post-Trial Br. ("Pls.' Br.") 29, ECF No. 228.

Defendants, for their part, dispute the applicability of <u>Scheiner</u> and <u>Trailer Marine Transport Corp. v. Rivera Vazquez</u>, 977 F.2d 1 (1st Cir. 1992), and argue the toll caps are instead analogous to the frequency-based discounts held constitutional in <u>Doran</u>.  And, alternatively, even if the Court finds the caps to be like flat fees, they are more like those found constitutional in <u>American Trucking Ass'ns v. Michigan Public Service Commission</u>, 545 U.S. 429 (2005).

As the parties acknowledge, none of these cases are directly on point.  And the fact-dependent nature of dormant Commerce Clause challenges has long been understood as part of what makes them

74

Add.74

difficult.  See Scheiner, 483 U.S. at 280 (noting series of judicial responses to specific state tax measures resembled a "quagmire").  That said, the Court agrees that these four cases – Scheiner, Trailer Marine, Doran, and Michigan – are the essential guideposts for the inquiry.  And, as explained below, the Court agrees with Plaintiffs that RhodeWorks' toll caps discriminate against out-of-state interests by failing Scheiner's "internal consistency test" and by creating real, documented financial incentives to benefit local trucking interests.

For this reason, and as the First Circuit has already indicated, Scheiner is the most important analogue.  See ATA II, 14 F.4th at 90 (calling Scheiner the "the most factually analogous precedent cited" by Plaintiffs).  In Scheiner, the Supreme Court assessed the constitutionality of two Pennsylvania statutes that amounted to "flat taxes" on out-of-state users of the Commonwealth's highway system.[49]  483 U.S. at 270-71.  The Supreme Court struck down those fees as unconstitutional after applying

---

[49]  The first was a $25 "marker fee," which exempted Pennsylvania-registered vehicles because the fee was deemed part of the cost of registration.  Am. Trucking Ass'ns, Inc. v. Scheiner, 483 U.S. 266, 274 (1987).  The second was an axle tax with an accompanying reduction for Pennsylvania registration fees in the same amount.  Id. at 274-75.  Both fees were assessed upon all trucks operating in Pennsylvania, regardless of whether they were registered in Pennsylvania or elsewhere, but the net effect was that out-of-state trucks paid the fees, while trucks registered in Pennsylvania received a rebate equivalent to the fees on their registration, and so paid nothing.  Id. at 283.

the so-called "internal consistency" test.  Id. at 284.  To be constitutional under this test, the Court explained, "a state tax must be of a kind that, 'if applied in every jurisdiction, there would be no impermissible interference with free trade.'"  Id. (quoting Armco Inc. v. Hardesty, 467 U.S. 638, 644 (1984)).  The Pennsylvania fees had an "inevitable effect . . . to threaten the free movement of commerce by placing a financial barrier around" Pennsylvania.  Id.  Because "[i]n practical effect, . . . they impose a cost per mile on [out-of-state] trucks that is approximately five times as heavy as the cost per mile borne by local trucks, the taxes are plainly discriminatory."  Id. at 286.

RhodeWorks differs from the law struck down in Scheiner in that it does not impose a simple flat fee for the privilege of using all Rhode Island bridges or roads.  Instead, the State assesses a series of single user fees in varying amounts for traversing specific bridges, which accrue unless or until the user crosses that bridge more than once in a single day (in each direction) or reaches $40 in total tolls across the RhodeWorks system in a single day.[50]  Perhaps recognizing this distinction,

---

[50] There is also a third statutory toll cap, but the Court concludes it is irrelevant.  Section 42-13.1-4(c) prohibits the State from charging a commercial truck using an RFID more than $20 on a border-to-border trip on I-95.  RIDOT's pricing decisions set the total tolls for this journey at $17.75, see DX250, which prevents this statutory mandate from ever having an impact.  The Court will not hypothesize (in either direction) about how RIDOT

76

Add.76

Plaintiffs do not argue that the entire program compares to
Scheiner. Rather, they argue that when the limitations on tolling
are triggered, the toll caps effectively operate as a series of
daily flat fees. Plaintiffs describe a hypothetical example to
make the point: say two trucks travel the same number of miles and
cross the same bridges per day, one doing so exclusively within
Rhode Island and the other passing through the state. The "local
truck will pay for the privilege of using Rhode Island's roads at
a lower effective rate per mile and per bridge-crossing than will
the interstate truck." Pls.' Br. 27. This, they argue, is because
the local truck will have made greater use "of the State's bridges
as compared to the truck that is passing through as part of an
interstate trip." Id. It is of no moment, they say, that some
in-state trucks will pay more in the aggregate because, on average,
the caps will inevitably cause the tolls to fall more heavily on
out-of-state trucks.

Under RhodeWorks, a fee is assessed when a large commercial
truck makes use of a bridge or bridge group specifically associated
with the RhodeWorks program. Thus, the toll cap discounts are not
based on whether a truck uses Rhode Island's bridges, as in
Scheiner, but with how they do so. Although perhaps unlikely, an
out-of-state large commercial truck could enter Rhode Island and

---

could have implemented the tolls on this corridor or the potential
effect of those decisions.

travel freely around it without ever accruing any toll at all. And such a truck could likewise enter Rhode Island and travel across various tolled bridges and receive exactly the same benefit through the caps as a Rhode Island-based truck. Thus, unlike Scheiner, the tolls do not appear at first blush to create a financial barrier around the state. 483 U.S. at 284.

But Scheiner's internal consistency test gets to the rub. It asks whether, if the same system was applied in every jurisdiction, it would cause an "impermissible interference with free trade." Id. at 283. Imagine an interstate highway system with tolls and caps like RhodeWorks across every state. And consider a trucking company based in Pennsylvania. A tractor trailer might be able to travel 600 miles in a day (ten hours per day at sixty miles per hour, to keep it simple), in which case it could make the trip between Harrisburg and Pittsburgh three times (about 200 miles each way). But such a driver might instead bypass Pittsburgh and go on to Indianapolis, Indiana (about 540 miles). Assuming a toll system like RhodeWorks with a toll cap that limited the tolls to one toll per gantry crossing per day in each direction, the Harrisburg to Pittsburgh route driver would pay only the tolls from the first 200 miles to Pittsburgh and the 200 miles back to Harrisburg (400 miles total). The interstate driver would also pay the Pennsylvania tolls but would lose the benefit of the caps when she crossed into Ohio, and then again when she crossed into

78

Add.78

Indiana.  And, assuming each state also has a maximum daily toll like RhodeWorks, this too could come into play.  So long as a driver confines her trips to one state, the total fare will not be proportional to the miles driven or bridges crossed.  This system does not permit a vehicle to "pass among the States as freely as it may roam the State in which it is based," and neither does it "maintain state boundaries as a neutral factor in economic decisionmaking."  Id.  Rather, such a system "exerts an inexorable hydraulic pressure on interstate businesses to ply their trade within the State that enacted the measure rather than 'among the several States.'"  Id. at 286-87 (quoting U.S. Const., Art. I, § 8, cl. 3).

The discriminatory effects shown by Plaintiffs are not merely hypothetical.  See ATA II, 14 F.4th at 89 (quoting Associated Indus. of Mo. v. Lohman, 511 U.S. 641, 654 (1994) ("The Supreme Court has 'repeatedly . . . focused [its] Commerce Clause analysis on whether a challenged scheme is discriminatory in effect,' and 'emphasized that equality for the purposes of . . . the flow of commerce is measured in dollars and cents, not legal abstractions.'")).  Like the fees in Trailer Marine, the structure of the RhodeWorks tolls with their attendant caps ensures that the financial impact falls more heavily on large commercial trucks traveling primarily in interstate commerce than on similar local

trucks.   977 F.2d at 10-11.

Dr. Peters testified in practical terms that Rhode Island-plated trucks, in the aggregate, received a 23% markdown (on average) from full fare tolls, while out-of-state-plated trucks received only an 8% markdown (on average).  May 26 Tr. 55:6-16; PX653 at 19, 34 (based on Emovis data).  And Rhode Island vehicles received a disproportionate share of the benefits: in-state vehicles accrued 39.9% in discounts, despite only amounting to 18.6% of the transactions.  May 26 Tr. 54:5-25, 56:15-24 (indicating the Emovis data for months besides July 2020 reflected a similar pattern); PX653 at 16, 18 (based on Emovis data).

Looking at the caps individually, Dr. Peters estimated that Rhode Island-plated vehicles account for approximately 48% of the once per-day/per-gantry cap.  May 26 Tr. 59:5-23; PX639 at 21.  He cited an extreme example of a Rhode Island-plated truck that crossed a gantry thirteen times in each direction, accruing more than $150 in tolls, and paying only $13.  May 26 Tr. 60:17-61:15; PX639 at 22.  The user most likely to benefit from this type of cap, he testified, is a local one who uses the facilities frequently throughout the day.  May 26 Tr. 62:7-19.  As for the $40 daily cap, Dr. Peters testified that Rhode Island-plated vehicles received 36% of the discounts (on 18.6% of transactions), while out-of-state vehicles received 64% of the discounts (on 81.4% of transactions).  Id. 65:13-66:16; PX639 at 24 (reflecting

percentages of 36.08 and 63.92, respectively); PX639 at 16 (giving percentages of transactions). This means, according to Dr. Peters, that Rhode Island vehicles are "more frequently getting the discount," May 26 Tr. 66:17-19, and that once Rhode Island vehicles hit the $40 maximum, they then "accrue more benefit," id. 69:3-6.

The sum of this evidence is that both in-state and out-of-state vehicles can benefit from the caps, but Rhode Island-plated vehicles benefit to a significantly greater degree based on their traffic share than out-of-state vehicles. Although no record evidence specifically translated this difference into a per-mile or per-bridge crossing calculation like the court relied on in Trailer Marine, the burden on out-of-state Class 8+ trucks is clear and significant. 977 F.2d at 10 (summarizing the aggregate evidence as showing that "the transient trailer pays almost half the ordinary flat fee, effectively paying five or six times as much per accident"). Plaintiffs have proven that the caps violate the internal consistency test and inevitably shift the toll burden to out-of-state interests. The Court concludes the caps discriminate in effect.

Doran does not counsel a different result. See 348 F.3d at 320. In Doran, the First Circuit analyzed a toll program giving discounts to drivers who purchased a Massachusetts E-Z Pass transponder. Id. at 317. The toll scheme was constitutional because the discount was available "on identical terms" to all

81

drivers, and the drivers' tolls remained directly tied to their use of the highways, notwithstanding their residences.  Id. at 319.  And although non-participating drivers without an E-Z Pass may pay slightly more per-gantry crossing, such a distinction was not based on residence, but on participation in the program.  Id. But here the toll caps sever this pivotal connection to actual use of the bridges.  After the caps kick in, a driver pays nothing no matter how many times they drive through the gantries, unlike the discount in Doran where the tolls remained tied to gantry use. And, as in Scheiner, the break between how a user uses the roads/bridges and what they pay, practically functions to give a substantial discount to in-state interests.  As the Court has already noted, this is just as the caps were intended to function.

Similarly, Defendants' analogy to Michigan falls short.  They contend that the toll caps apply in the same way as the $100 Michigan assessment because both impose(d) fees based purely on intrastate activity.  See 545 U.S. at 434.  The Michigan fee applied to trucks engaging in "point-to-point" commercial transactions, which the Court deemed "purely local activity."  Id. at 437.  Here, unlike in Michigan, it cannot be said that the fees apply to "purely local activity."  See id. at 438 ("An interstate firm with local outlets normally expects to pay local fees that are uniformly assessed upon all those who engage in local business, interstate and domestic firms alike.").  Importantly, the burden

82

Add.82

of a widely applied RhodeWorks toll program would fall on interstate commerce, whereas the burden in <u>Michigan</u> falls on increased intrastate commerce.

Finally, Defendants' argument that Plaintiffs failed to identify specific market competitors is also inapt. There is no doubt that, in some dormant Commerce Clause cases, the market matters when asking whose economic interests are treated discriminatorily. <u>See, e.g.</u>, <u>E. Ky. Res. v. Fiscal Ct. of Magoffin Cnty., Ky.</u>, 127 F.3d 532, 543-44 (6th Cir. 1997); <u>Gen. Motors Corp. v. Tracy</u>, 519 U.S. 278, 298 (1997) ("Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities."); <u>Cherry Hill Vineyard</u>, 505 F.3d at 36, 38 (comparing effects on in-state wineries to those on out-of-state wineries). Here, Plaintiffs rely on the undifferentiated market of businesses that transport goods on interstate highways using trucks of varying types. Their argument, as it relates to the tolled vehicles, is that the caps inevitably shift the economic burden to out-of-state carriers while shifting the benefit to in-state carriers. And this is enough. Just as the First Circuit noted in <u>Trailer Marine</u>, such an "imbalance in favor of local interests . . . is a proper concern of the Commerce Clause whether or not the market participants are direct business rivals." 977 F.2d at 11. Thus, the toll caps discriminate against interstate

commerce in effect.

## ii. Location

Next, Plaintiffs contend that in placing the toll locations on the interstate freight corridors, the State "gerrymandered the tolls" so that the gantries are more likely to capture interstate travel despite that the bridges on state roads are more in need of repair. Pls.' Reply 15. Defendants say no, the placement of the gantries is not evidence of discrimination because Congress specifically authorized the tolling of existing bridges on the interstate and other federally-funded roads through ISTEA. The Commerce Clause does not require states to set up tolls in a manner that achieves "road-by-road apportionment." Defs.' Br. 50. This time, Plaintiffs' argument fails.

It is true that Plaintiffs' data show that over 90% of toll revenue is collected from the I-95 and I-295 corridors, as of July 2020. May 25 Tr. 131:15-24; PX652 at 12. Dr. Peters testified that these corridors are heavily used in interstate commerce, including by out-of-state users and so-called through trippers. May 25 Tr. 131:15-132:15. Indeed, as noted above, he calculated that more than 80% of the RhodeWorks tolls were billed to out-of-state large commercial trucks. PX653 at 31; see also June 3 Tr. 143:2-18 (Dr. Saraf confirming data showing more than 80% out-of-state truck transactions); DX327 at 15 (same).

But this does not show a discriminatory effect any more than

84

it shows a discriminatory purpose, an argument the Court has already addressed. Plaintiffs may be correct that many of the RhodeWorks bridges were in better condition than others in the state, but it is not for this Court to ensure perfect equity in bridge selection or to weigh whether RIDOT should have chosen other bridges because they may be in worse structural condition. As Plaintiffs concede, ISTEA permitted the State to choose bridges connecting parts of interstate highways as its tolling locations. See 23 U.S.C. 129(a) (permitting reconstruction or replacement of a toll-free bridge and conversion into a tolled facility on federal highways). Plaintiffs have not shown that the locations of the tolls discriminate in effect.

### iii. Class 4-7 Exemption[51]

Finally, Plaintiffs say that by exempting Classes 4-7 – which are more likely to be Rhode Island-plated than Class 8+ vehicles, May 26 Tr. 14:9-15 – from tolling, RhodeWorks shrank the pool of locally-owned trucks eligible for tolling by 70% even though these vehicles bear significant weight-per-axle and are less likely to take interstate trips. Plaintiffs point again to Dr. Peters, who relied on data collected by the American Transportation Research Institute ("ATRI"), CDM Smith, and Emovis transaction data. In addition to causing the tolling burden to fall disproportionately

---

[51] Plaintiffs style this argument as related to Classes 4-7, but the supporting evidence relates primarily to Classes 6 and 7.

on out-of-state vehicles, Plaintiffs also say exempting Class 6 and 7 trucks amounts to giving a competitive advantage to Rhode Island business and truck owners.  Defendants retort that the only relevant comparison here is between large commercial vehicles.

On the first point, Plaintiffs again are correct.  The record reveals that there are more than double the number of Rhode Island-registered trucks in Classes 5-7 than there are combination trucks (Classes 8+).  See PX752; June 10 Tr. 175:1-24 (discussing with Director Alviti FHWA statistics stating that Rhode Island's fleet includes 10,518 straight trucks and 4,223 combination trucks).  Further, combination trucks are used more often on "long-haul" trips, whereas lower-classed trucks are used more (but not exclusively) for local, intrastate trips, e.g., delivery, garbage service, or cement mixing.  See May 25 Tr. 160:11-161:13.  Shifting the tolling burden away from these classes of similarly situated vehicles (in terms of axle-weight) that are owned in higher percentages by local interests and which travel more frequently intrastate onto another group that is far more likely to be owned by out-of-state interests and to travel interstate both reduces the overall burden on local businesses and increases the tolls paid by tolled (mostly non-local) businesses.  The Court finds the statute discriminates against interstate commerce in this way.

Plaintiffs' second argument is that by exempting Classes 6 and 7 from tolling and increasing the tolls paid by out-of-state

Class 8+ trucks, Rhode Island business owners gain a competitive advantage through lower operating costs and because those local business owners could switch their vehicles to avoid the tolls. See May 26 Tr. 20:9-21:2, 28:18-29:1. Plaintiffs rely on Dr. Peters' testimony to argue it is enough that some Class 6 and 7 trucks compete with Class 8+ trucks; it, Plaintiffs say, is a matter of common sense that certain freights can be carried by smaller and larger trucks alike. Id.

Dr. Peters' testimony is mostly speculative. Plaintiffs did not put forth any concrete evidence demonstrating an increase in Rhode Island-based companies' use of un-tolled trucks, changes in vehicle fleets, diversion,[52] or any other data demonstrating that lower-classed trucks compete in the same market as large commercial trucks. See May 27 Tr. 23:3-25:6 (Dr. Peters testifying that he has neither quantified how likely it is that Class 8+ owners would switch to Classes 6 and 7 or what percentage would if they did,

---

[52] Defendants point out that Plaintiffs have not presented concrete evidence of diversion around the tolled bridges. The Court agrees. Although there is some evidence in the record that prior to implementation CDM Smith estimated around 25% of trucks would divert around the tolled facilities, see May 26 Tr. 29:20-30:8, Plaintiffs have not shown how diversion has affected tolling, see May 23 Tr. 167:2-25, ECF No. 236 (President of Rhode Island Trucking Association stating that while diversion has come up informally in conversation, he has no knowledge that any members are actually diverting); June 13 Tr. 22:1-3, ECF No. 243 (testifying Cumberland Farms has not diverted to avoid tolls), 35:15-18 (testifying M&M Transport is not diverting around the tolls), 52:1-13 (having no knowledge of whether ATA members have diverted to avoid tolls).

Add.87

nor conducted any studies or economic analyses on that inquiry, nor observed any change in the traffic data since RhodeWorks' tolls went live in 2018, nor heard any anecdotal evidence suggesting such a switch). Neither did Plaintiffs introduce any evidence that in-state competitors have gained a competitive advantage at the expense of out-of-state competitors that use Class 8+ trucks.[53]

But in the end, none of this matters: As noted above, under Trailer Marine, overtly protectionist legislation such as RhodeWorks offends the Commerce Clause even in the absence of a specific market impact. 977 F.2d at 11. There is no question that the RhodeWorks legislation excluded lower-classed trucks to reduce the financial burden on in-state businesses and this, in turn, increases the tolls on the mostly interstate Class 8+ vehicles. In sum, the exclusion of similarly-situated vehicles like those in Classes 4-7 not only violates the fair approximation test and supports the Court's finding on discriminatory purpose, but, as with the toll caps, discriminates against interstate

---

[53] Defendants additionally argue that the decision to toll only large commercial vehicles does not evidence discrimination because (1) non-tolled vehicles pay in other ways; (2) there is no evidence that these users only travel intrastate; and (3) the decision to toll certain classes is for the General Assembly. These arguments were addressed above in the fair approximation section.

commerce in effect.[54]

        c.    Strict Scrutiny

    Having found RhodeWorks discriminates in purpose and effect, the Court applies strict scrutiny, asking if the State can "show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." Or. Waste, 511 U.S. at 100-01 (quoting New Energy, 486 U.S. at 278) (cleaned up). This analysis is straightforward. Rhode Island has a legitimate - even compelling - interest in the maintenance of its ailing bridges. But there is no reason that interest cannot be served by a tolling system that does not offend the Commerce Clause. Indeed, many states have implemented tolling systems that fairly apportion their costs across various users and do not discriminate against interstate commerce. Applying strict scrutiny, RhodeWorks' tolling program fails the test.

---

[54] Because the Court holds that RhodeWorks' tolling scheme discriminates against interstate commerce, it need not decide whether it also fails under Pike v. Bruce Church, Inc., 397 U.S. 137 (1970). See Fam. Winemakers, 592 F.3d at 10.

Add.89

III. Conclusion[55]

Because RhodeWorks fails to fairly apportion its tolls among bridge users based on a fair approximation of their use of the bridges, was enacted with a discriminatory purpose, and is discriminatory in effect, the statute's tolling regime is unconstitutional under the dormant Commerce Clause of the United States Constitution. Plaintiffs' request for a permanent injunction is GRANTED, and RhodeWorks' tolling system is enjoined. The Court specifically orders the following:

1.    Under 28 U.S.C § 2201, judgment shall enter declaring R.I. Gen. Laws § 42-13.1-4(a), which precludes tolling any vehicle except large commercial trucks, along with its implementing regulations, unconstitutional.

2.    Defendants are permanently enjoined from charging or collecting tolls pursuant to R.I. General Laws § 42-13.1-4, or from enforcing nonpayment of such tolls through penalty for nonpayment or avoidance under R.I. Gen. Laws §§ 42-13.1-11, 12.

---

[55] For convenience, the Court summarizes the various rulings made throughout this decision: Plaintiffs' Motion to Reopen, ECF No. 221, is GRANTED; Defendants' Motion for Judgment on Partial Findings, ECF No. 222, is DENIED; Defendants' objection related to Dr. Saraf's testimony, see June 6 Tr. 68:17-72:19, 73:15-75:4, is SUSTAINED and that testimony is stricken; Defendants' objection to the admission of Exhibit DX236 is SUSTAINED; Defendants' Motion in Limine No. 1, ECF No. 166, is DENIED; Defendants' Motion in Limine No. 2, ECF No. 168, is now DENIED in full; and Plaintiffs' Motion to Exclude Evidence Related to the Rhode Island Department of Transportation's Road System Budget, ECF No. 181, is DENIED.

This injunction shall take effect 48 hours following entry of final judgment.

3.      The clerk is directed to enter final judgment in favor of Plaintiffs.

4.      The Court defers ruling on Plaintiffs' request for attorneys' fees and costs (including expert-witness fees) pursuant to 42 U.S.C. § 1988.  The motion for fees and costs shall not be filed until after any appeal is decided and a mandate is issued or, if no appeal is taken, until the period for entering a Notice of Appeal expires.  See Local Rule 54.1 (setting deadline for motion for attorneys' fees "[u]nless otherwise ordered by the Court").  From that time the prevailing party will have fourteen days to file a motion for fees and costs, with an accompanying bill of costs, as set forth in Local Rules 54.1 and 54.

IT IS SO ORDERED.

_William E. Smith_
William E. Smith
District Judge
Date: September 21, 2022

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

American Trucking Associations, Inc.;
Cumberland Farms, Inc.; M&M Transport Services,
Inc.;  New England Motor Freight, Inc.
      Plaintiffs,


     v.

                                                        C.A. No. 18-378-WES


Peter Alviti, Jr. in his Official Capacity as
Director of The Rhode Island Department of
Transportation; Rhode Island Turnpike and Bridge Authority
      Defendants.

## **JUDGMENT**

**[  ]** Jury Verdict.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

[ **X** ] Decision by the Court.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.


IT IS ORDERED AND ADJUDGED:

Judgment hereby enters for the Plaintiffs, American Trucking Associations, Inc., Cumberland Farms, Inc, M&M Transport Services, Inc., and New England Motor Freight, Inc. against Defendants Peter Alviti, Jr. in his Official Capacity as Director of The Rhode Island Department of Transportation and  Rhode Island Turnpike and Bridge Authority pursuant to the Findings of Fact and Conclusions of Law entered on September 21th, 2022 by this Court.


                                        Enter:

                                        /s/ Carrie L. Potter
                                        Deputy Clerk


Dated: September 21, 2022

R.I. Gen. Laws, § 42-13.1-1

§ 42-13.1-1. Short title

This chapter shall be known and may be cited as "The Rhode Island Bridge Replacement, Reconstruction, and Maintenance Fund Act of 2016".


R.I. Gen. Laws, § 42-13.1-2

§ 42-13.1-2. Legislative findings

The general assembly finds that:

> (1) The state of Rhode Island, through the Rhode Island department of transportation ("the department"), funds the reconstruction, replacement, and maintenance of all bridges in Rhode Island, except the Newport Bridge, the Mount Hope Bridge, the Jamestown-Verrazano Bridge, and the Sakonnet River Bridge.

> (2) According to the Federal Highway Administration (FHWA) 2015 National Bridge Inventory (NBI) data, there are seven hundred sixty-four (764) bridges in Rhode Island greater than twenty feet (20′) in length. Of these NBI bridges, one hundred seventy-seven (177) bridges, or twenty-three percent (23%), are classified as structurally deficient.

> (3) For the past several decades, Rhode Island has depended on three (3) primary sources for funding all transportation infrastructure construction, maintenance, and operations: federal funds, state bond funds, and motor fuel tax revenue. Of these sources, two (2), federal funds and motor fuel tax revenue, are mutable.

> (4) The 2008 governor's blue ribbon panel on transportation funding, the 2011 senate special commission on sustainable transportation funding, and the 2013 special legislative commission to study the funding for East Bay bridges determined that there is insufficient revenue available from all existing sources to fund the maintenance and improvement of Rhode Island transportation infrastructure.

(5) In 2011, the general assembly adopted a component of the recommended systemic change to transportation funding by dedicating increased resources from the Rhode Island capital plan fund and creating the Rhode Island highway maintenance account, to be funded by an increase in license and registration fees, beginning in FY2014.

(6) In 2014, the general assembly adopted changes to the Rhode Island highway maintenance account to provide additional state revenue for transportation infrastructure in future years.

(7) Although the state is shifting from long-term borrowing to reliance upon annual revenues to fund transportation infrastructure on a pay-as-you go basis, and although a recurring state source of capital funds has been established, there is still a funding gap between the revenue needed to maintain all bridges in structurally sound and good condition and the annual amounts generated by current dedicated revenue sources.

(8) According to the U.S. General Accounting Office, just one, fully-loaded five-axle (5) tractor trailer has the same impact on the interstate as nine thousand six hundred (9,600) automobiles. The department estimates that tractor trailers cause in excess of seventy percent (70%) of the damage to the state's transportation infrastructure, including Rhode Island bridges, on an annual basis. However, revenue contributions attributable to tractor trailers account for less than twenty percent (20%) of the state's total annual revenues to fund transportation infrastructure.

(9) The United States Congress, consistent with its power to regulate interstate commerce and pursuant to 23 U.S.C. § 129, has authorized states to implement reconstruction or replacement of a toll-free bridge and conversion of the bridge to a toll facility, provided that the state:

> (i) Has in effect a law that permits tolling on a bridge prior to commencing any such activity; and

> (ii) Otherwise complies with the requirements of 23 U.S.C. § 129.

R.I. Gen. Laws, § 42-13.1-3

§ 42-13.1-3. Definitions

As used in this chapter, the following words and terms shall have the following meanings, unless the context shall indicate another or different meaning:

(1) "Availability payment" means a payment by the department under a contract for a toll facility or any other facility that is based on the availability of the facility at a specified performance level and may include, without limitation, compensation for operations, maintenance, and financing of the facility.

(2) "Department" means the department of transportation, or, if the department shall be abolished, the board, body, or commission succeeding to the principal functions thereof or upon whom the powers given by chapter 5 of title 37 to the department shall be given by law.

(3) "Large commercial truck" shall be defined pursuant to the Federal Highway Administration (FHWA) vehicle classification schedule as any vehicle within Class 8 - single trailer, three (3) or four (4) axles, up to and including Class 13 - seven (7) or more axle multi-trailer trucks, as such classifications may be revised from time to time by the FHWA.

(4) "Other vehicle" means any vehicle that has not been defined pursuant to this chapter as a large commercial truck.

(5) "Passenger vehicle" shall be defined pursuant to the Federal Highway Administration (FHWA) vehicle classification schedule as any vehicle within Class 1, 2, and 3 as such classifications may be revised from time to time by the FHWA.

(6) "Radio frequency identification transponder" or "RFID" means a toll collection system approved by the department that may consist of a toll tag placed inside the vehicle and an overhead antenna that reads the toll tag and collects the toll.

(7) "Toll evader" means, for the purposes of this chapter, any registered owner of any large commercial truck that passes through any electronic tolling location as authorized pursuant to § 42-13.1-4 and who does not pay the required toll and/or fees, fines, or penalties within the maximum allowable period specified under § 42-13.1-11.

(8) "Toll facility" means equipment or capital improvements funded in whole or in part by toll revenue, or required to effectuate toll collection.

(9) "Turnpike and bridge authority" means the Rhode Island turnpike and bridge authority (RITBA), a public instrumentality of the state of Rhode Island, created by the general assembly pursuant to chapter 12 of title 24.

## R.I. Gen. Laws, § 42-13.1-4

### § 42-13.1-4. Authority to collect tolls on large commercial trucks only

(a) The department is hereby authorized to fix, revise, charge, and collect tolls for the privilege of traveling on Rhode Island bridges to provide for replacement, reconstruction, maintenance, and operation of Rhode Island bridges. The tolls shall be fixed after conducting a cost-benefit analysis and providing an opportunity for public comment. The tolls shall be collected on large commercial trucks only and shall not be collected on any other vehicle; provided, however, no vehicle shall be tolled other than a tractor or truck tractor as defined in 23 C.F.R. 658.5, pulling a trailer or trailers. No act authorizing tolls on passenger vehicles pursuant to this chapter shall take effect until it has been approved by the majority of those electors voting in a statewide referendum. The secretary of state shall certify the results of the statewide referendum. Tolls on large commercial trucks may be implemented utilizing all-electric toll collection methodologies on a cash-less basis, or utilizing any other methodologies determined by the department.

(b) Subject to § 42-13.1-14, the department will establish a program to limit the assessment of the tolls upon the same individual large commercial truck using a RFID to once per toll facility, per day in each direction, or an

equivalent frequency use program based upon individual large commercial truck use.

(c) Subject to § 42-13.1-14, the total amount of tolls imposed upon the same individual large commercial truck using a RFID for making a border-to-border through trip on Route 95 Connecticut to Route 95 Massachusetts, or the reverse, shall not exceed twenty dollars ($20.00).

(d) Subject to § 42-13.1-14, the daily maximum amount of the tolls collected upon the same individual large commercial truck using a RFID shall not exceed forty dollars ($40.00).

(e) Tolls shall not be subject to supervision or regulation by any commission, board, bureau, agency, or official of the state or any municipality or other political subdivision of the state except the department.

## R.I. Gen. Laws, § 42-13.1-5

### § 42-13.1-5. Collection of tolls on passenger cars and other vehicles expressly prohibited

Notwithstanding any other provisions of this statute, the department is expressly prohibited from collecting tolls hereunder on other vehicles, herein defined to include motorcycles, passenger cars, and all other vehicles classed one through seven (7) pursuant to the Federal Highway Administration (FHWA) vehicle classification schedule.

## R.I. Gen. Laws, § 42-13.1-6

### § 42-13.1-6. Rhode Island bridge replacement, reconstruction and maintenance fund established

(a) There is hereby created a special account in the intermodal surface transportation fund, as established in § 31-36-20, to be known as the Rhode Island bridge replacement, reconstruction, and maintenance fund ("the fund").

(b) The fund shall consist of all those monies received by the department under this chapter, including:

> (1) The monies received through the collection of tolls on bridges in Rhode Island;

> (2) Any fees, fines, or penalties collected pursuant to this chapter; and

> (3) Investment earnings on amounts credited to the fund.

(c) Unexpended balances and any earnings thereon shall not revert to the general fund but shall remain in the Rhode Island bridge replacement, reconstruction, and maintenance fund. There shall be no requirement that monies received into the fund during any given calendar year or fiscal year be expended during the same calendar year or fiscal year.

## R.I. Gen. Laws, § 42-13.1-7

### § 42-13.1-7. Designation of toll bridges

The director of the department may designate any Rhode Island bridge on the National Highway System as a toll bridge in order to facilitate the financing of replacement, reconstruction, and maintenance of Rhode Island's system of bridges.

## R.I. Gen. Laws, § 42-13.1-8

### § 42-13.1-8. Amount of tolls

The department's authority to fix and adjust the amount of tolls shall be determined by the costs of replacement, reconstruction, maintenance, and operation of Rhode Island's system of bridges and/or any portion or portions thereof, including costs associated with the acquisition, construction, operation, and maintenance of the toll facilities and administrative costs in connection therewith.

### R.I. Gen. Laws, § 42-13.1-9

### § 42-13.1-9. Limitations on use of revenue

All revenue collected pursuant to this chapter and deposited to the Rhode Island bridge replacement, reconstruction, and maintenance fund shall be used to pay the costs associated with the operation and maintenance of the toll facility, and the replacement, reconstruction, maintenance, and operation of Rhode Island bridges on the National Highway System or any other use permitted under 23 U.S.C. § 129.

### R.I. Gen. Laws, § 42-13.1-10

### § 42-13.1-10. Procurement of toll facilities

Without limiting any right of the department to award contracts under any other law, the department shall have the right to procure toll facilities through contracts aggregating the services of design, engineering, construction, finance, operations, maintenance, or any combination of the foregoing. Notwithstanding any requirement of law to the contrary, the department may award such contracts on the basis of competitive negotiation in accordance with § 37-2-19. Such contracts may include availability payments or any other compensation structure determined appropriate by the department to further the objectives of this chapter.

### R.I. Gen. Laws, § 42-13.1-11

### § 42-13.1-11. Penalty for nonpayment of toll

(a) The department shall have the authority to establish and collect fees, fines, and penalties from registered owners of large commercial trucks who use, or attempt to use, any toll facility established under § 42-13.1-4, without paying the toll at the rate then in force for such use.

(b) Any fee, fine, or penalty shall be in addition to the toll or tolls initially incurred and shall be no less than an amount sufficient to cover the cost of administration and collection of said fines, fees, and penalties.

(c) The registered owner of the large commercial truck subject to toll shall be primarily responsible for all tolls, fees, fines, and penalties assessed pursuant to the provisions of this chapter.

(d) Prior to the collection of any toll on large commercial trucks, the department shall establish a maximum allowable period for the payment of tolls and any subsequent fees, fines, and penalties assessed.

## R.I. Gen. Laws, § 42-13.1-12

### § 42-13.1-12. Additional penalties--Toll evasion

Any toll evader who fails or refuses to pay or prepay the required toll and such fees, fines, and penalties as assessed under § 42-13.1-11 and within the maximum allowable period specified therein, shall be required to pay a fine not to exceed three thousand dollars ($3,000) and shall pay the toll amount due and any administrative costs, or shall have their registration suspended until payment is made in full for the violation. A toll evader under this section shall receive a traffic violation summons which shall be subject to the jurisdiction of the traffic tribunal. All amounts due under this section shall be remitted to the Rhode Island bridge replacement, reconstruction, and maintenance fund.

## R.I. Gen. Laws, § 42-13.1-13

### § 42-13.1-13. Conformance to statute, rules, and regulations

All programs and funding proposals shall conform to applicable federal law, rules, and regulations. The department shall promulgate state rules and regulations to carry out the purposes of this chapter. Included within said rules and regulations shall be a provision requiring any public comment period to continue for at least thirty (30) days and a provision requiring

advance notification to be provided to the governor, speaker of the house of representatives, and president of the senate prior to any announcement of public hearing or public comment period establishing or modifying the amount of tolls to be collected. In promulgating these rules and regulations, the department shall establish policies and procedures that promote procedural transparency.

## R.I. Gen. Laws, § 42-13.1-14

### § 42-13.1-14. Severability

If a part of this chapter is held unconstitutional or invalid, all valid parts that are severable from the invalid or unconstitutional part remain in effect. If a part of this chapter is held unconstitutional or invalid in one or more of its applications, the part remains in effect in all constitutional and valid applications that are severable from the invalid applications. This severability clause shall be applicable to each provision of this chapter, regardless of whether or not any particular provision references this section.

## R.I. Gen. Laws, § 42-13.1-15

### § 42-13.1-15. Bridge preservation and salt mitigation

(a) In any fiscal year when the department fails to complete appropriate bridge maintenance, no new construction and design contracts subject to reporting under § 42-13.1-16 shall be awarded for the subsequent year or until proof of appropriate bridge maintenance is provided.

(b) The director must submit detailed information regarding bridge maintenance activities undertaken during the fiscal year to the governor, office of management and budget, the speaker of the house, and the president of the senate no later than thirty (30) days after the fiscal year ends, beginning with fiscal year 2017. The information shall also be posted on the department's website.

(c) Notwithstanding the provisions of § 42-13.1-16, bridge maintenance requirements may be waived if the director certifies that:

> (1) Certain bridges are in a state of disrepair such that maintenance activities will not forestall further deterioration; or

> (2) Certain bridges have a maintenance plan that does not require any activities during any given calendar year; or

> (3) Certain bridges have been modified such that maintenance to prevent salt erosion and deterioration is no longer required; or

> (4) The department has not used salt on certain bridges or has stopped using salt for winter maintenance as a long-term change in practice; or

> (5) Other specific circumstances exist to eliminate the need for maintenance activities in any given calendar year.

(d) Failure to comply is subject to the penalties contained in § 35-3-24.


## R.I. Gen. Laws, § 42-13.1-16

## § 42-13.1-16. Reporting

The department shall submit to the office of management and budget, the house fiscal advisor, and the senate fiscal advisor, a report on the progress of implementation of this chapter within thirty (30) days of the close of each of the fiscal quarters of each year. The reports shall also be posted on the department's website. The reports shall include, at a minimum:

> (1) Construction and design contracts of five hundred thousand dollars ($500,000) or greater planned to be advertised in the upcoming federal fiscal year, their value, and expected award date;

> (2) Construction and design contracts of five hundred thousand dollars ($500,000) or greater awarded in the prior federal fiscal year, date of award, value, and expected substantial completion date;

> (3) Expected final cost of:

(i) Any construction contracts of five hundred thousand dollars ($500,000) or greater that reached substantial completion in the prior federal fiscal year; and

(ii) Any design contracts of five hundred thousand dollars ($500,000) or greater completed in the prior federal fiscal year;

(4) Total number of workers employed through the contract and the number of the workers in that total with a Rhode Island address; and

(5) This report shall also include a current list of all federal, discretionary, and any other grants that the department has applied for and the status of that application and identify any changes from the prior report. For any grants that require a state match, the department shall identify if the source for the state's match is available under currently authorized funding.

## R.I. Gen. Laws, § 42-13.1-17

### § 42-13.1-17. Equality of opportunity

No bid under this chapter shall be deemed complete nor awarded if the bid fails to include a specific written plan for the bidder to be in conformity with § 37-14.1-6, ensuring that minority business enterprises reach a minimum of ten percent (10%) of the dollar value of the bid. Pursuant to §§ 37-14.1-1 and 37-14.1-3, for the purposes of chapter 13.1 of title 42, women shall be included in the definition of "minority business enterprise." The aforementioned written plan should be submitted on forms created and distributed by the director of administration.