# United States Court of Appeals
# For the First Circuit

No. 22-1795

AMERICAN TRUCKING ASSOCIATIONS, INC., CUMBERLAND FARMS, INC., M&M TRANSPORT SERVICES, INC.,

Plaintiffs-Appellees,

NEW ENGLAND MOTOR FREIGHT, INC.,

Plaintiff,

v.

RHODE ISLAND TURNPIKE AND BRIDGE AUTHORITY,

Defendant-Appellant,

PETER ALVITI, JR., in his official capacity as
Director of the Rhode Island Department of Transportation,

Defendant.

No. 22-1796

AMERICAN TRUCKING ASSOCIATIONS, INC., CUMBERLAND FARMS, INC., M&M TRANSPORT SERVICES, INC.,

Plaintiffs-Appellees,

NEW ENGLAND MOTOR FREIGHT, INC.,

Plaintiff,

v.

PETER ALVITI, JR., in his official capacity as
Director of the Rhode Island Department of Transportation,

Defendant-Appellant,

RHODE ISLAND TURNPIKE AND BRIDGE AUTHORITY,

Defendant.

On Appeal from the United States District Court for the District of Rhode Island, Case No. 1:18-cv-00378-WES-PAS

# Brief of Amicus Curiae
# International Bridge, Tunnel and Turnpike Association in Support of Appellants and Reversal

David S. Coale
  Texas State Bar No. 0787255
  First Circuit Bar No. 1206993
  *dcoale@lynnllp.com*
Lynn Pinker Hurst &
  Schwegmann LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: 214.981.3800
Facsimile:  214.981.3839

## Disclosure Statement

Pursuant to Fed. R. App. P. 26.1 and 28(a)(2) (C), International Bridge, Tunnel and Turnpike Association is a non-governmental corporate party. International Bridge, Tunnel and Turnpike Association has no parent corporation and no publicly held corporation owns more than 10% or more of its stock.

/s/ David S. Coale
David S. Coale (1206993)
*dcoale@lynnllp.com*
**Lynn Pinker Hurst & Schwegmann LLP**
2100 Ross Ave., Suite 2700
Dallas, Texas 75201
Telephone: 214.981.3800
Facsimile: 214.981.3839

# Table of Contents

Disclosure Statement ................................................................................ 3

Table of Contents ..................................................................................... 4

Table of Authorities ................................................................................. 5

Interest of Amicus Curiae ........................................................................ 6

Introduction and Summary of Argument ................................................. 7

Argument ................................................................................................. 8

    A.    From a global perspective, it is not unusual to toll only large trucks. ............................................................. 8

    B.    Tolling is only one source of revenue to support programs like RhodeWorks. ............................................ 11

    C.    Substantively, it is key that interstate *commercial behavior* was not materially affected by RhodeWorks. ............................................................... 11

    D.    Procedurally, RhodeWorks took all reasonable measures to make a fair approximation of use. ............ 13

Conclusion .............................................................................................. 16

Certificate of Service .............................................................................. 17

Certificate of Compliance ....................................................................... 18

# Table of Authorities

**Cases**

*American Trucking Assocs., Inc. v. Alviti*, C.A. No. 19-378 WES, 2022 WL 4364195 (D.R.I. Sept. 21, 2022) ...................... 6

**Other Authorities**

"Truck-toll volume exceeds prediction," The Providence Journal (Jan. 12, 2019) https://www.providencejournal.com/story/news/2019/01/12/ri-reports-truck-toll-volume-exceeds-prediction/6311710007/........................................................10

Alison Premo Black, Chief Economist, 2022 Bridge Report, American Road and Transportation Builders Association ...............................................................................13

Reducing Congestion and Funding Transportation Using Road Pricing in Europe and Singapore, Office of International Programs – Federal Highway Administration, Report #FHWA-PL-10-030, December 2010.........................................................................................7

U.S. Government Accountability Office, Statement before the House Subcommittee on Oversight of the Committee on Way and Means, on Truck Weight and Its Effect on Highways (Jul. 23, 1979) ......................................................... 11

UTA-Edenred, "Toll Overview by Country" (https://web.uta.com/en/toll-cd/toll-overview#mautnachlaendern) ................................................. 8

## Interest of Amicus Curiae

The International Bridge, Tunnel and Turnpike Association (IBTTA) is the worldwide association for owners and operators of tolled and priced roadway facilities and the businesses that serve that industry. Our mission is to advance transportation solutions through tolling and road pricing. Founded in 1932, IBTTA represents 128 U.S. toll operators in 34 states that operate 350 distinct toll facilities with more than 6,500 centerline miles. In 2019, these organizations processed 8.5 billion transactions, representing more than $22 billion in toll revenue for investment and funding of transportation facilities and operations. IBTTA also represents hundreds of toll facility operators in 23 countries on six continents.

One of IBTTA's important functions is to represent the interests of its members in matters before Congress, the federal executive branch, and state governments. While we do not regularly get involved in court cases, we offer this brief with a sense of duty to our members in Rhode Island and all organizations involved in funding and financing road infrastructure through tolling and pricing.[1]

---

[1] No counsel for any party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. Timely notice of the intent to file this amicus brief was provided to all parties, and all parties have consented to the filing of this brief.

## Introduction and Summary of Argument

The U.S. has a rich history of toll roads dating back to the 1600s. Tolling is a powerful and effective tool to fund construction, operation, and maintenance of more than 6,500 miles of the most heavily traveled highways in America. While it is not the solution to every transportation problem, tolling is an established choice.

The Court has received persuasive advocacy from the appellants about the legal framework for the RhodeWorks tolling program. This amicus brief discusses four points about the tolling industry that we believe the Court should consider while it evaluates the parties' legal arguments.

*First*, from the perspective of a global industry, Rhode Island is not unique in focusing its tolling plan on large commercial trucks. While evidence is limited about truck-only charges for road use in the U.S., European examples have proven successful in supporting the business interests of highway users, and the related investment in and maintenance of critical roadways and corridors.

*Second*, tolling is only one of many tools available to raise money for programs such as RhodeWorks. The Court should keep that general fact in mind as it reviews the more specific issues in this case about fair approximation.

*Third*, from our "real world" perspective, we do not see the imposition of tolls on heavy commercial vehicles as materially

harming interstate commerce. The tolls may have made some people unhappy. Tolls always do. But these tolls do not appear to have materially changed the actual behavior of in-state or out-of-state companies required to pay the toll, which is what we believe the relevant consideration should be to implicate the Commerce Clause.

***Fourth***, the development of tolls and road pricing on federal-aid highways must reflect a fair approximation of use, measured by fair and sensible standards. The RhodeWorks program met all the relevant criteria as we believe they are understood by our industry. We doubt that further procedural requirements will meaningfully advance the goal of equitable pricing, and are concerned that they would only interfere with the effective operation of already-complex public works programs.

## Argument

### A. From a global perspective, it is not unusual to toll only large trucks.

The trial-court decision says: "Aside from RhodeWorks, no other record evidence reveals a tolling system targeting only large commercial trucks."[2] While the U.S. has limited experience with truck-only tolling, there are several examples in Europe, with more likely to follow.

---

[2] *American Trucking Assocs., Inc. v. Alviti*, C.A. No. 19-378 WES, 2022 WL 4364195 at *5 n.9. (D.R.I. Sept. 21, 2022).

For example, on January 1, 2005, Toll Collect GmbH introduced in Germany a distance-based road-charging system for trucks with a total weight of 12 tons or more.[3] The system covers the entire German Autobahn (motorway) system of more than 12,000 kilometers. Of special significance to this case, passenger vehicles and trucks under 12 tons do not incur a toll. The system had to meet several operational and fairness criteria defined by the German government that are generally consistent with what our laws expect.

If anything is certain in our industry, it is that some road users will inevitably complain about any toll, no matter what. The German system initially faced considerable opposition from the trucking community. But the German government was able to show the cost of roadway improvements and maintenance required to address the costs of damage from heavy goods vehicles over the life of the priced roadways. And further, it later lowered the gross vehicle weight from the 12 tons to 7.5 tons, setting the toll prices to approximate the cost of the investments required over time to ensure the roadway assets were well-maintained, available, and reliable to support the business interests of the trucking industry.

This business case helped turn the opposition of the trucking industry into support. The TollCollect system for collecting tolls on

---

[3] *See* Reducing Congestion and Funding Transportation Using Road Pricing in Europe and Singapore, Office of International Programs – Federal Highway Administration, Report #FHWA-PL-10-030, December 2010, at 19.

9

vehicles weighing 7.5 tons or more is still in operation today and collected €7.3 billion in toll revenue in 2020.

Germany is not unique in focusing its toll collection efforts on heavy vehicles and avoiding tolls on cars and other lighter weight vehicles. Denmark, Luxembourg, Belgium, Bulgaria, and Sweden all have tolling regimes that toll only trucks with gross weight as low as 3.5 tons or more.[4] They have completely excluded lighter weight vehicles from the tolling regime. They presumably did so because those exclusions made it easier to gain public acceptance of the tolling plan, and because trucking companies could pass the cost of tolls on to their customers.

The international record of such programs has been consistently positive. They have succeeded in raising revenue for infrastructure development and maintenance, while recognizing the disproportionate damage to bridge structures and pavements from heavy vehicles. And they have enjoyed support from the affected trucking communities, evidencing their business interests in dedicated revenue for dependable roadways, quality infrastructure, predictable facility conditions, and reliable service levels.

---

[4] *See* UTA-Edenred, "Toll Overview by Country" (https://web.uta.com/en/toll-cd/toll-overview#mautnachlaendern) (last visited Feb. 15, 2023).

### B. Tolling is only one source of revenue to support programs like RhodeWorks.

The record shows that the tolling portion of RhodeWorks was intended to raise approximately $45 million per year—less than 10% of the total cost of the RhodeWorks program. That is not at all unusual for similar programs. Thirty-four states in the U.S. use tolling to fund and finance various highway, bridge, and tunnel facilities. In every one of these states, the revenues from tolling represent only a small portion of the total revenues dedicated to road infrastructure in the state, when compared to fuel taxes, registration fees, sales taxes, etc.

The trial court concluded that the toll on heavy trucks was not a "fair approximation" of facility use. But from our industry perspective, considering truck tolls in the broader context of all funding mechanisms used to support the $4.7 billion, 10-year RhodeWorks program, the fact that those tolls make up less than 10% of the total necessary revenue is highly relevant to determining whether a fair approximation has been made.

### C. Substantively, it is key that interstate *commercial behavior* was not materially affected by RhodeWorks.

As noted above, some road users will inevitably complain about any toll. And the trucking companies in this case obviously do not want to pay the RhodeWorks toll. But aside from inevitable

11

complaints and arguments from economic self-interest, we see no evidence of a change in actual commercial behavior that could be associated with an actual harm to trucking companies—and certainly not to a degree that warrants federal intervention into state government activity.

Before the program began, "[t]he trucking industry, which is suing the state in federal court over the tolls, said before the launch that truckers would take alternate routes to avoid the tolls and cause the state to miss its revenue targets."[5] But after six months of tolling, the public record showed:

> Rhode Island's truck-toll volume [was] running ahead of expectations, according to figures from the state Department of Transportation. When the DOT launched the first two truck tolls on Route 95 on June 11, 2018, the state's traffic studies estimated 177,292 trucks would pass under the toll gantries each month and rack up $598,667 in monthly charges. Through six months ending Dec. 10, the tolls have averaged 186,698 big rigs charged per month and $617,805 in billable charges."[6]

The actual heavy truck traffic passing through the tolling gantries was more than 5% higher than the state had estimated.

Because the state did not miss its forecasted targets, we know that truckers plainly did not take alternate routes to any material

---

[5] "Truck-toll volume exceeds prediction," The Providence Journal (Jan. 12, 2019) https://www.providencejournal.com/story/news/2019/01/12/ri-reports-truck-toll-volume-exceeds-prediction/6311710007/ (last visited Feb. 11, 2023).
[6] *Id.*

12

degree. Without evidence of a material change in actual commercial behavior, we see no place for the Commerce Clause. Complaints and cost avoidance are inevitable in any toll program and should not be taken to present an issue of constitutional significance.

### D. Procedurally, RhodeWorks took all reasonable measures to make a fair approximation of use.

By their nature, transportation infrastructure projects are long-term investments, creating assets that live for many decades, and necessarily requiring ongoing investments to sustain the intended user benefits. The test for such projects is purposefully set as a fair approximation of use, recognizing the complexities of exact measures of use. As such, fair approximation of use must consider the life cycle of these assets and the underlying economics to maintain them in productive use.

As to vehicle size, the disciplines of civil and structural engineering teach that heavier vehicles consume more of the useful life of highway and bridge assets, because they do more damage to pavements and structures over time.[7] Accordingly, many road-pricing practices recognize the impacts that different highway users exact upon infrastructure and the life-cycle costs of maintaining transportation assets through differentiated pricing. Differentiated

---

[7] *See* U.S. Government Accountability Office, Statement before the House Subcommittee on Oversight of the Committee on Way and Means, on Truck Weight and Its Effect on Highways, at 3 (Jul. 23, 1979).

13

pricing by vehicle type is accepted and used in tolling practices throughout the U.S. and internationally to reflect the realities of sustaining transportation infrastructure.

The RhodeWorks program took every reasonable step to make a fair approximation of use. Its plans were reviewed and approved through the process that Congress established for tolling on federal-aid highways. Each tolling point received approval from, and established an agreement with, the U.S. Federal Highway Administration in accordance with the regulations established by the U.S. Department of Transportation in carrying out Congress's intent. The process was comprehensive, compliant, and transparent to meet all applicable federal standards before implementation.

IBTTA subscribes to the standard that tolling and road pricing programs must be fair, equitable, and nondiscriminatory. Towards that end, IBTTA contends that the Commerce Clause should regulate the effects of state legislation, not the legislation itself. Since no material diversion of truck traffic was apparent after two years of operation, we see no substantive ***effect*** here that could implicate that clause. That leaves the question of whether the ***process*** was sufficient to give all interested parties the opportunity to be heard, and it plainly was.

Tolling roadways is a complicated and controversial undertaking, with serious political discussion focusing on the

14

equities of who pays and how much. The need to raise money to fund construction and repairs of U.S. highways, bridges, and tunnels reaches new levels of urgency each year. (This is particularly true in Rhode Island, which ranked third in 2020 among U.S. states with the most bridges in poor condition as a percent of their total bridge inventory at 17.5%. Rhode Island also ranked first in 2020 among U.S. states with the largest deck area in poor condition at 19.5%.[8] )

In considering the question of fairness, it is critical to remember that states provide roads and bridges not just for residents of the state, but to anyone who travels in the state. The fact that the RhodeWorks program treats all heavy trucks equally, not distinguishing between origins, destinations, or state of residency, shows the commitment of the program to equity. And the unique characteristics of the mix of intrastate and interstate traffic in Rhode Island, the nation's smallest state by geography, powerfully weigh against further federal intervention in a program that resulted from a fundamentally fair process.

The goal of the law in this area should be to ensure that all users of a given class are treated similarly. When both the substantive effects and procedural history of a law show that this goal was achieved, the federal government should not further

---

[8] *See* Alison Premo Black, Chief Economist, 2022 Bridge Report, American Road and Transportation Builders Association, at 5-6.

15

interfere. IBTTA believes the RhodeWorks program did everything that it is reasonable to expect of state government in this setting.

## Conclusion

For these reasons, the IBTTA supports the position of the Appellants in this case and respectfully requests that this Court reverse the judgment of the district court.

Respectfully submitted,

*/s/ David S. Coale*
David S. Coale
  Texas State Bar No. 00787255
  First Circuit Bar No. 1206993
  *dcoale@lynnllp.com*
**Lynn Pinker Hurst & Schwegmann LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:  214.981.3800
Facsimile:   214.981.3839

***Attorneys for Amicus Curiae International Bridge, Tunnel and Turnpike Association***

16

## Certificate of Service

I certify that, on March 1, 2023, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the First Circuit via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

March 1, 2023

*/s/ David S. Coale*
David S. Coale (1206993)
*dcoale@lynnllp.com*
**Lynn Pinker Hurst & Schwegmann LLP**
2100 Ross Ave., Suite 2700
Dallas, Texas 75201
Telephone:  214.981.3800
Facsimile:  214.981.3839

## Certificate of Compliance

In accordance with Federal Rule of Appellate Procedure 32(a)(7), I certify that the foregoing brief has been prepared in Microsoft Word 365 using 14-point Georgia typeface and is double-spaced (except for headings, footnotes, and block quotations). I further certify that the brief is proportionally spaced and contains 2,245 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). Microsoft Word 365 was used to compute the word count.

March 1, 2023

           */s/ David S. Coale*
David S. Coale (1206993)
*dcoale@lynnllp.com*
**Lynn Pinker Hurst & Schwegmann LLP**
2100 Ross Ave., Suite 2700
Dallas, Texas 75201
Telephone:  214.981.3800
Facsimile:  214.981.3839