Nos. 22-1795, 22-1796

# In the United States Court of Appeals for the First Circuit

AMERICAN TRUCKING ASSOCIATIONS, INC.; CUMBERLAND FARMS, INC.;
M&M TRANSPORT SERVICES, INC.,

*Plaintiffs - Appellees,*

NEW ENGLAND MOTOR FREIGHT, INC.,

*Plaintiff,*

— v. —

RHODE ISLAND TURNPIKE AND BRIDGE AUTHORITY,

*Defendant - Appellant,*

PETER ALVITI, JR., in his official capacity as Director of the Rhode Island
Department of Transportation,

*Defendant.*

AMERICAN TRUCKING ASSOCIATIONS, INC.; CUMBERLAND FARMS, INC.;
M&M TRANSPORT SERVICES, INC.,

*Plaintiffs - Appellees,*

NEW ENGLAND MOTOR FREIGHT, INC.,

*Plaintiff,*

— v. —

PETER ALVITI, JR., in his official capacity as Director of the Rhode Island
Department of Transportation,

*Defendant - Appellant,*

RHODE ISLAND TURNPIKE AND BRIDGE AUTHORITY,

*Defendant.*

Appeals from the United States District Court for the District
of Rhode Island, No. 1:18-cv-378 (Hon. William E. Smith)

## BRIEF OF PLAINTIFFS-APPELLEES

Richard Pianka
ATA LITIGATION CENTER
80 M Street SE
Washington, DC 20003
(703) 838-1889
rpianka@trucking.org

Charles A. Rothfeld
Evan M. Tager
Reginald R. Goeke
Eric A. White
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
crothfeld@mayerbrown.com
etager@mayerbrown.com
rgoeke@mayerbrown.com
eawhite@mayerbrown.com

*Counsel for Plaintiffs-Appellees*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellees American Trucking Associations, Inc. ("ATA"), Cumberland Farms, Inc., and M&M Transport Services, Inc. hereby state as follows:

1. ATA is a national trade association. ATA does not have any corporate parents. No publicly held corporation owns 10% or more of its stock.

2. Cumberland Farms, Inc. is a wholly-owned subsidiary of EG America LLC, a Delaware limited liability company, which in turn is a wholly-owned subsidiary of EG Group Ltd., a U.K. private limited company. No publicly held corporation owns 10% or more of the stock of any of those entities.

3. M&M Transport Services, Inc. does not have any corporate parents. No publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iv

INTRODUCTION .............................................................................. 1

STATEMENT ................................................................................... 5

    A.   Factual Background ................................................................. 5

    B.   Procedural History ............................................................... 10

INTRODUCTION AND SUMMARY OF ARGUMENT ...................... 13

STANDARD OF REVIEW ............................................................... 16

ARGUMENT ................................................................................. 16

I.   RHODEWORKS DISCRIMINATES AGAINST
    INTERSTATE COMMERCE. ..................................................... 18

    A.   RhodeWorks Has Discriminatory Effects. ........................... 22

        1.   The caps discriminate in effect. ................................. 22

            a.   The caps discriminate as a matter of law .......... 22

            b.   The record evidence confirms that the caps
                  discriminate in effect. ....................................... 33

        2.   RhodeWorks' exemption of straight trucks from
            tolling gives in-staters a discriminatory benefit. ....... 36

    B.   The State's Discriminatory Purpose Confirms That
        RhodeWorks Is Unconstitutional. ....................................... 40

    C.   The Court Should Not Sever The RhodeWorks Caps. .......... 45

II.   THE RHODEWORKS TOLLS DO NOT FAIRLY
    APPROXIMATE USE. ................................................................ 47

    A.   The Fair-Approximation Test Precludes The Imposition
        Of Undue Burdens On Interstate Commerce. ..................... 47

    B.   The District Court Properly Found That The
        RhodeWorks Tolls Do Not Fairly Approximate Use. .......... 52

        1.   Deference to the legislature is not dispositive. .......... 54

## TABLE OF CONTENTS
### (continued)

Page

2.  Non-toll sources of revenue and expenditures
    unrelated to the tolled facility are not part of the
    fair-approximation inquiry. ........................................ 57

3.  The State's argument is not supported by
    precedent. ................................................................. 60

4.  RhodeWorks is not authorized by ISTEA. .................. 63

5.  No court has upheld a user-fee regime like
    RhodeWorks. ............................................................ 64

iii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) .......................................................... 42

*In re Advisory Op. to Governor,*
    856 A.2d 320 (R.I. 2004) ...................................................... 46

*All. of Auto. Mfrs. v. Gwadowsky,*
    430 F.3d 30 (1st Cir. 2005) ................................................. 40

*Am. Trucking Ass'ns, Inc. v. Alviti,*
    14 F.4th 76 (1st Cir. 2021)........................................ 9, 41, 44

*Am. Trucking Ass'ns, Inc. v. Scheiner,*
    483 U.S. 266 (1987)
    ................................ 14, 20, 24, 25, 26, 27, 28, 30, 31, 41, 48, 57, 58, 63

*Am. Trucking Ass'ns, Inc. v. Sec'y of Admin.,*
    613 N.E.2d 95 (Mass. 1993) ................................................ 24

*American Trucking Ass'ns, Inc. v. Michigan Public Service*
    *Comm'n,* 545 U.S. 429 (2005) ....................................... 28, 29

*American Trucking Ass'ns, Inc. v. Smith,*
    496 U.S. 167 (1990) .............................................................. 63

*Bacchus Imps., Ltd. v. Dias,*
    468 U.S. 263 (1984) ............................................... 19, 38, 40

*Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport*
    *Port Auth.,* 567 F.3d 79 (2d Cir. 2009) .............................. 51

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
    520 U.S. 564 (1997)............................................... 17, 20, 26

*Capitol Greyhound Lines v. Brice,*
    339 U.S. 542 (1950) .............................................................. 63

*Chambers Med. Techs. of S.C., Inc. v. Bryant,*
  52 F.3d 1252 (4th Cir. 1995)............................................................ 42

*Cherry Hill Vineyard, LLC v. Baldacci,*
  505 F.3d 28 (1st Cir. 2007) ........................................................ 20, 21

*Cohen v. R.I. Tpk. & Bridge Auth.,*
  775 F. Supp. 2d 439 (D.R.I. 2011) .................................................... 59

*Commonwealth Edison Co. v. Montana,*
  453 U.S. 609 (1981)................................................................ 56, 60

*Comptroller of Treasury of Md v. Wynne,*
  575 U.S. 542 (2015)............................................................ 27, 29, 32

*Cumpiano v. Banco Santander P.R.,*
  902 F.2d 148 (1st Cir.1990) ............................................................ 16

*Doran v. Massachusetts Turnpike Authority,*
  348 F.3d 315 (1st Cir. 2003) ...................................... 30, 31, 32, 33, 39

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines,*
  405 U.S. 707 (1972)..................................18, 47, 52, 56, 58, 59, 61, 62

*Fam. Winemakers of Cal. v. Jenkins,*
  592 F.3d 1 (1st Cir. 2010) ...................19, 20, 21, 39, 40, 41, 42, 43, 44

*Fulton Corp. v. Faulkner,*
  516 U.S. 325 (1996)................................................................... 58

*Granholm v. Heald,*
  544 U.S. 460 (2005)................................................................... 19

*Honda Motor Co. v. Oberg,*
  512 U.S. 415 (1994)................................................................ 3, 65

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977)............................................................ 20, 40, 44

*Industria y Distribucion de Alimentos v. Trailer Bridge,*
  797 F.3d 141 (1st Cir. 2015) ............4, 10, 15, 16, 47, 48, 51, 52, 53, 61

v

*Jones v. Gale*,
470 F.3d 1261 (8th Cir. 2006) ........................................................... 40

*Lamprecht v. FCC*,
958 F.2d 382 (D.C. Cir. 1992) ........................................................... 55

*Landrigan v. McElroy*,
457 A.2d 1056 (R.I. 1983) ................................................................ 46

*Maryland v. Louisiana*,
451 U.S. 725 (1981) ......................................................................... 26

*Members of Jamestown Sch. Comm. v. Schmidt*,
699 F.2d 1 (1st Cir. 1983) ................................................................ 46

*Minnesota v. Clover Leaf Creamery Co.*,
449 U.S. 456 (1981) ................................................................... 40, 50

*N.H. Motor Transp. Ass'n v. Flynn*,
751 F.2d 43 (1st Cir. 1984) ............................................................. 47

*Nat'l Pork Producers Council v. Ross*,
2023 WL 3356528 (U.S. May 11, 2023) ............... 18, 21, 41, 43, 48, 65

*New Energy Co. of Ind. v. Limbach*,
486 U.S. 269 (1988) ......................................................................... 16

*Northwest Airlines, Inc. v. County of Kent*,
510 U.S. 355 (1994) ......................................... 10, 18, 47, 52, 56, 61, 62

*Or. Waste Sys., Inc. v. Dep't of Env't. Quality*,
511 U.S. 93 (1994) ........................................................................... 19

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) ......................................................................... 65

*R.I. Med. Soc. v. Whitehouse*,
239 F.3d 104 (1st Cir. 2001) ............................................................ 46

*Raymond Motor Transp., Inc. v. Rice*,
434 U.S. 429 (1978) ......................................................................... 21

*Sable Comm'ns of Cal. v. FCC,*
  492 U.S. 115 (1989) ................................................................ 55

*Selevan v. N.Y. Thruway Auth.,*
  584 F.3d 82 (2d Cir. 2009) ..................................................... 51

*Selevan v. N.Y. Thruway Auth.,*
  711 F.3d 253 (2d Cir. 2013) ................................................... 51

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas,*
  139 S. Ct. 2449 (2019) ...................................................... 16, 17

*Trailer Marine Transp. Corp. v. Rivera Vazquez,*
  977 F.2d 1 (1st Cir. 1992)
  ...........3, 13, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28, 31, 38, 39, 53

*Turner Broadcasting Sys., Inc. v. FCC,*
  520 U.S. 180 (1997) ................................................................ 56

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt.
  Auth.,*
  550 U.S. 330 (2007) ................................................................ 48

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n,*
  945 F.3d 206 (5th Cir. 2019) ............................................ 40, 42

*Waste Mgmt. Holdings, Inc. v. Gilmore,*
  252 F.3d 316 (4th Cir. 2001) ................................................. 40

*West Lynn Creamery, Inc. v. Healy,*
  512 U.S. 186 (1994) ...................................................... 16, 17, 22

*Whole Women's Health v. Hellerstedt,*
  579 U.S. 582 (2016) ................................................................ 54

## Other Authorities

Donald H. Regan, *The Supreme Court and State
  Protectionism: Making Sense of the Dormant Commerce
  Clause*, 84 Mich. L. Rev. 1091 (1986) ................................. 40

## INTRODUCTION

In the State's account, Rhode Island officials made "careful legislative judgments" that delicately calibrated the RhodeWorks tolling system, with the goal of placing a fair share of bridge repair costs on vehicles that cause most damage to the State's bridges. Br. 2. But, the State continues, Judge William Smith inexplicably invalidated RhodeWorks based on his "own views about where Rhode Island should have drawn the tolling line" and his "disagreement with the legislature's policy decisions." *Id.* at 5, 18.

That is a beguiling account, nicely told. But it is fiction. *This* is the real story of RhodeWorks, found as fact by the district court after trial:

- The evidence establishes that RhodeWorks discriminates against out-of-state and interstate trucks, placing disproportionate burdens on trucks traveling in interstate commerce. Add.63-89. Rhode Island effectuated this discrimination by tolling only trucks, exempting those trucks most likely to be owned by in-staters, and then capping the tolls in ways certain to disproportionately benefit in-staters.

- That discrimination is not the incidental impact of a benign program that serendipitously falls more heavily on interstate trucks. Instead, the district court found as fact that RhodeWorks was *designed* to discriminate. The State set out to export its tolling burden to out-of-staters; state officials carefully designed RhodeWorks to do that; and as structured, the tolls *inevitably* have the effect of disproportionately burdening out-of-state and interstate trucks. Add.65-72.

- RhodeWorks accomplished this goal by using highly idiosyncratic features. Rhode Island is the *only* State to use a truck-only tolling system; the *only* one to toll tractor-trailers but not "straight" trucks; and the *only* one using toll caps to limit the impact on local vehicles. It appears that no other State *ever* has imposed tolls with these elements. Add.11-12.

- Rhode Island also appears to be the *only* jurisdiction to use its self-proclaimed "consumptive" method of apportioning the costs of bridge use. Add.53.

- In designing RhodeWorks, state officials did not seek to allocate cost according to use of the tolled facilities. In fact,

the State made literally no effort to fairly approximate either
the costs imposed by tractor-trailers on Rhode Island or the
relative use those vehicles make of the tolled bridges, instead
employing haphazard Google searches to find post hoc
justifications for targeting the trucks most likely to travel
interstate. *See* pages 5-9, *infra.*

RhodeWorks stands in "lonely eminence" (*Honda Motor Co. v.
Oberg*, 512 U.S. 415, 427 (1994)) for a simple reason: its drafters wanted
to impose a disproportionate share of Rhode Island's bridge costs on out-
of-staters—as they said repeatedly. The Framers warned against just
this sort of protectionist regime, which interferes with the preservation
of a national market, produces resentment and retaliation between
states, and encourages economic Balkanization. For these reasons,
RhodeWorks runs afoul of two Commerce Clause principles repeatedly
articulated by the Supreme Court and this Court. Its discriminatory
character impermissibly "impairs or disfavors out-of-state commerce or
cross-border transactions." *Trailer Marine Transp. Corp. v. Rivera
Vazquez*, 977 F.2d 1, 10 (1st Cir. 1992). And its failure to "reasonably
draw[] a line between those it is charging and those it is not" means that

its costs do not fairly approximate use of the tolled facilities, thus imposing undue burdens on interstate commerce. *Industria y Distribucion de Alimentos v. Trailer Bridge*, 797 F.3d 141, 145 (1st Cir. 2015).

To be clear: The Commerce Clause does not impair Rhode Island's ability to raise the funds needed to maintain its infrastructure. The State may use tolling or similar charges to support its bridges in myriad ways that are constitutional—as do all the other states. But it may not do so in a manner that impedes interstate commerce. This Court should affirm the district court's thorough decision holding RhodeWorks unconstitutional.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly found on the record that RhodeWorks discriminates against interstate commerce in effect and was enacted with discriminatory intent.

2. Whether the district court correctly found on the record that RhodeWorks does not "reasonably draw[] a line between those it is charging and those it is not" or "charg[e] each individual entity a fee that is reasonably proportional to the entity's use" of tolled bridges (*Trailer*

4

*Bridge*, 797 F.3d at 145) and therefore fails the Commerce Clause "fair-approximation" test.

## STATEMENT

### A.    Factual Background

As the State notes, Rhode Island implemented RhodeWorks to raise funds for the repair of its bridges, supplementing federal and other state contributions. Br. 8-9. But the State's account skips over the process by which it developed RhodeWorks' tractor-trailer-only tolling regime.

After choosing to impose tolls only on highway corridors that carry substantial volumes of interstate traffic (Add.68), the Rhode Island Department of Transportation ("RIDOT") identified which vehicles to toll. The decision to toll only trucks was developed by Peter Garino, RIDOT's then-Deputy Director, in early 2015. Garino, who is not an engineer, made that decision at his dinner table, without conducting research into the impact of trucks or other vehicles on bridges. *See* App.__(Garino Dep. Designations 15:19-16:8); Add. 68-69. He then ran Google searches for studies supporting his idea, identifying a 1979 General Accounting Office report addressing damage caused to highways

by overweight trucks. App.__(PX005).[1] This 40-year-old report is the sole study cited in RhodeWorks' legislative findings on the damage that trucks cause bridges, and appears to be the only study that RIDOT relied upon in subsequently maintaining that trucks are responsible for 83% of all costs to roads and bridges. App.__(PX085, at 6).[2]

Having decided to toll only trucks, Rhode Island had to determine *which* trucks to toll. In line with the recommendation of RIDOT's consultant CDM Smith, the first public draft of the RhodeWorks legislation proposed tolling trucks that fall within Federal Highway Administration (FHWA) Class 6 and above[3]; that would have produced

---

[1] The district court observed, with some understatement, that "RIDOT's 'process' for identifying a justification for placing the burden on large commercial trucks was less than robust." App.68. The GAO Report itself is not directly relevant to that determination. It dates to the 1970s; is based on data collected in the 1960s; addresses only overweight vehicles, an atypical category of truck; and considers damage to road pavement, not bridges. App.__(PX005); *see* Add.56-57.

[2] Although RIDOT Director Peter Alviti testified that numerous RIDOT employees were involved in "hundreds" of damage calculations (App.__(June 1 Tr. 114:17-114:25)), no defense witness identified any such employee or calculation.

[3] The FHWA places vehicles into classes. Classes 1 to 3 include passenger vehicles. Classes 4 to 7 include buses and vehicles known as straight or single-unit trucks. Class 8 and above are generally termed combination trucks or tractor-trailers. *See* Add.7 n.5.

many tollable trucks, generating significant revenue. *See* App.__(PX080, at 2); *see also* App.__(Regan Depo. Designations at 142:11-142:20). But because Class 6 and 7 trucks are much more frequently owned by in-staters and used for intrastate travel than are tractor-trailers, local trucking businesses opposed the legislation as so configured. *See* Add.69-71.

Responding to this criticism, state officials made two significant revisions to RhodeWorks. The first exempted from tolling all Class 6 and 7 trucks, tolling only tractor-trailers, the trucks most likely to be owned by out-of-staters. Add.69-70. The second added three toll caps that (1) limit tolls to once per day in each direction at any given toll gantry, no matter how many times the truck traverses the gantry; (2) cap tolls at $40 per day for any truck; and (3) cap tolls at $20 for a border-to-border trip along Interstate 95. Add.10-11, 69.

Then-Senate Majority Leader Ruggiero and RIDOT Director Alviti stated publicly that these changes were designed "to address the concerns of the local trucking industry" (App.__(PX146-I (Ruggiero))) and "the trucking industry in Rhode Island" (App.__(PX149-C (Alviti))); *see* App.__(PX 146-H (Alviti) ("the various stakeholders and transportation

7

industries in Rhode Island")). *See* Add.69-70. Contemporaneous documents demonstrate that RIDOT understood the caps' purpose to be "shifting the burden to non-RI trucks." App.__(PX128, comment 11); *see also* App.__(PX030 at 24). RIDOT also paid CDM Smith to study the relative impact of the per-day toll cap on in-state and out-of-state interests; the consultant projected that this cap would disproportionately shift costs to out-of-state trucks. App.__(PX199 at 1-4).

Responding to media questions (App.__(PX174)), RIDOT employee Andrew Koziol then sought additional support for RIDOT's tractor-trailer-only tolling approach, turning again to Google. App.__(May 24 Tr. 105:11-21). As another RIDOT employee explained, Koziol "just compiled some random studies he found on the internet and just summarized the results." App.__(May 25 Tr. 18:5-8 (Rocchio)).

In January 2016, almost a year after RIDOT exempted all other vehicles from tolls, David Fish, head of RIDOT's Bridge Group, asked RIDOT employees to quantify the damage that tractor-trailers cause Rhode Island bridges. App.__(PX268). Engineering firms provided studies on truck damage, but those studies contradicted Koziol's earlier, far higher truck-damage estimate. *See*, *e.g.*, App.__(PX270 at RI0258122

8

(Ohio DOT study finding tractor-trailers responsible for 16.24% of bridge costs)). Fish then instructed his subordinates to stop looking for truck-damage data and RIDOT reverted to Koziol's damage calculations. App.__(PX328). In January 2016, language was inserted into the draft RhodeWorks legislation recounting that, according to RIDOT's estimate, tractor-trailers cause over 70% of damage to state roadways. S. 2246 (R.I.) (2016).

Although RIDOT did no further analysis of the damage caused by trucks, it did substantial additional work to confirm that the bulk of the tolling burden would fall on out-of-state truckers, studying the proportions of in-state and out-of-state traffic flowing through proposed toll gantries. App.__(PX584). RIDOT's focus on the in-state versus out-of-state tolling burden was deemed "critical" for RhodeWorks' success. App.__(PX182 at 2).

The Rhode Island Legislature enacted RhodeWorks in February 2016, excluding Class 6 and 7 trucks from tolling and including the toll caps. *See Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 81 (1st Cir. 2021) ("*Alviti*") (describing legislation). As anticipated, and as explained

below in more detail, the tolls as implemented disproportionately burden out-of-state vehicles.

**B.    Procedural History**

Plaintiffs, companies that operate tractor-trailers in interstate commerce and the trucking industry's national trade association, challenged the constitutionality of RhodeWorks under the Commerce Clause. They advanced two principal arguments: that RhodeWorks discriminates against interstate commerce in its effect and intent; and that the tolls impose costs that do not fairly approximate use of the tolled facilities, as required by the user-fee test stated in *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355 (1994), and *Trailer Bridge*. After two trips to this Court that did not address the merits, the district court conducted a 12-day bench trial. It then ruled for plaintiffs on both grounds.

The court found as fact that RhodeWorks discriminates against interstate commerce in intent and effect. The evidence of discriminatory intent was "compelling." Add.69. This included "both the structure of the law itself" and "the data": Rhode Island exempted from tolling the categories of truck that "[t]he trial evidence showed" most likely to be

10

Rhode Island-plated, and incorporated caps that the evidence also showed "disproportionately" benefit Rhode Island trucks. *Id.* at 71. In addition, the court found that "[l]awmakers and state officials alike specified" that RhodeWorks include these elements specifically to "protect local businesses." *Id.* at 69. In all, this "record evidence demonstrates a common theme of placing the lion's share of the tolling burden on out-of-state large commercial trucks and protecting Rhode Island commercial interests as much as possible," which "was clearly protectionist." *Id.* at 72.

The court further found that the structure of the toll caps "creat[es] real, documented financial incentives to benefit local trucking interests." Add.77. These "discriminatory effects," the court determined, "are not merely hypothetical." *Id.* at 79. The record demonstrated that "Rhode Island-plated vehicles benefit to a significantly greater degree [from the caps] based on their traffic share than out-of-state vehicles." *Id.* at 81. The exclusion of straight trucks from tolling independently had a discriminatory effect, disproportionately benefitting local vehicles. *Id.* at 86.

Addressing the fair-approximation requirement, the district court relied on decisions of the Supreme Court and this Court holding that a user fee is constitutional only if it is a "fair, if imperfect, approximation of the use of the facilities for whose benefit they are imposed" and "has reasonably drawn the line between users it exempts and users it charges for use of a facility." Add.42 (cleaned up). Reviewing the record evidence in detail (*id.* at 42-63), the court found neither requirement satisfied by RhodeWorks. The system "places the entire toll burden on an extreme minority of users" (*id.* at 54); the State's attempt to show that this distinction is reasonable "is flawed from nearly every perspective" (*id.* at 56); and "the record evidence makes clear that the State failed to 'reasonably draw[] a line between those it is charging and those it is not'" (*id.* at 58) because "[i]t was unreasonable for the State to exempt entire classes of similarly impactful vehicles." *Id.* at 60. "For these reasons, the Court [found] that by any relevant measurement the RhodeWorks toll charges do not fairly approximate the use of the tolled facilities." *Id.* at 63.

12

## INTRODUCTION AND SUMMARY OF ARGUMENT

The State proposes an approach that would largely eliminate the protections of the Commerce Clause. Although Rhode Island's articulation of its constitutional standard is hazy, its theory appears to mean that any facially neutral state charge is per se constitutional, at least when somehow tied to "use" of a state facility. But that rule runs directly counter to the goals of the Clause. History shows that seemingly neutral state rules often are implemented for the purpose, and have the clear effect, of placing disproportionate burdens on outsiders. Rhode Island's rule would make it simple for states to achieve disguised protectionist purposes—which is, of course, just what Rhode Island seeks to accomplish here.

It is easy to imagine the consequences of that approach. States would adopt rules to export their financial burdens and "disproportionately impair[] or disfavor[] out-of-state commerce or cross-border transactions." *Trailer Marine*, 977 F.2d at 10. Once one state creates such a burden on interstate commerce, other states are sure to seek similar competitive advantages for their businesses. The inevitable result will be interstate resentment and economic Balkanization.

13

The Supreme Court and this Court have rejected that paradigm. When a state rule discriminates against or burdens interstate commerce "[i]n the general average of instances" (*Am. Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 291 (1987) (cleaned up)), it is immaterial that the law is facially neutral. Courts thus have invalidated state laws identical in principle to RhodeWorks. The State here accuses the district court of "unprecedented second-guessing" of state decisions. Br. 17. But the only unprecedented features of this case are the elements of RhodeWorks that depart from the tolling systems of every other state.

I. RhodeWorks unconstitutionally discriminates against interstate commerce. The toll caps function like flat fees that necessarily have an adverse effect on trucks traveling interstate, thus failing the "internal consistency test" that the Supreme Court uses to identify Commerce Clause violations. The district court's factual findings confirm that the caps discriminate in effect, giving disproportionate benefits and competitive advantages to local trucks. The exclusion of predominantly local straight trucks from tolling also disproportionately benefits in-staters. This discrimination is fatal to RhodeWorks: Laws that

14

discriminate against interstate commerce are almost per se unconstitutional.

The district court also found as fact that RhodeWorks has a discriminatory intent. That is clear from the history and unusual structure of the tolls, and is confirmed by the statements of the state officials who created RhodeWorks. Even if discriminatory intent is insufficient standing alone to establish unconstitutionality, this Court's holdings show that malign intent weighs strongly against RhodeWorks' validity, stripping the law of any presumption of constitutionality.

II. RhodeWorks fails the fair-approximation test used to gauge the constitutionality of user fees. Under that test, a toll must be "reasonably proportional to the [payer's] use" of the tolled facility and "reasonably draw[] a line between those it is charging and those it is not." *Trailer Bridge*, 797 F.3d at 145. RhodeWorks, which falls entirely on a tiny subset of users even though many other vehicles impose equivalent costs on the State, does neither. There is a good reason such fees are unconstitutional: Charges that are not reasonably connected to a user's degree of responsibility for costs allow for the targeting of, and imposition of cumulative burdens on, interstate businesses.

15

## STANDARD OF REVIEW

Legal issues are reviewed de novo and factual findings under the deferential clear-error standard. *Trailer Bridge*, 797 F.3d at 144. This Court will not "upset findings of fact or conclusions drawn therefrom unless, on the whole record, [it] form[s] a strong, unyielding belief that a mistake has been made." *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 152 (1st Cir.1990).

## ARGUMENT

The standards that govern here are settled. The dormant Commerce Clause prohibits state "measures designed to benefit in-state economic interests by burdening out-of-state competitors" (*New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)) or that "unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019); *see, e.g.*, *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192-93 (1994); *Trailer Marine*, 977 F.2d at 10. "This negative aspect of the Commerce Clause prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine*, 139 S. Ct. at 2459 (cleaned up).

The Supreme Court has emphasized that close enforcement of the Commerce Clause is crucial "because removing state trade barriers was

16

a principal reason for adoption of the Constitution." *Tenn. Wine*, 139 S. Ct. at 2459. The importance of this principle cannot be overstated. The Court's many "dormant Commerce Clause cases reflect a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Id*. at 2461 (cleaned up); *see, e.g., West Lynn Creamery,* 512 U.S. at 201-202.

Overturning state rules that are discriminatory or place undue burdens on interstate commerce is essential not only to prevent "economic isolationism" (*Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 578 (1997)), but also to avoid development of resentment between states "and the retaliatory acts of other States that may follow." *Id*. at 577. Thus, careful Commerce Clause scrutiny of state legislation addresses both "the importance of the national interest in a unified economy" and "the lack of power of affected non-residents of the state to protect themselves through the state's political process." *Trailer Marine*, 977 F.2d at 10.

17

The parties agree that particular rules govern Commerce Clause challenges to user fees, including highway tolls. Insofar as relevant here, such a fee is constitutionally permissible only if it (1) "is based on some fair approximation of use of the facilities [for which the fee is paid]" and (2) "does not discriminate against interstate commerce." *Nw. Airlines*, 510 U.S. at 369; *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines*, 405 U.S. 707, 716-17 (1972).[4] Like most Commerce Clause inquiries, those determinations are "heavily dependent upon the facts." *Trailer Marine*, 977 F.2d at 10.

As the district court correctly held, RhodeWorks satisfies neither the anti-discrimination nor the fair-approximation requirement.

# I.  RHODEWORKS DISCRIMINATES AGAINST INTERSTATE COMMERCE.

Because "th[e] antidiscrimination principle lies at the 'very core' of [the Supreme Court's] Commerce Clause jurisprudence" (*Nat'l Pork Producers Council v. Ross*, 2023 WL 3356528, at *7 (U.S. May 11, 2023)

---

[4] The parties agree that another prong of this test, requiring that fees not be excessive in relation to the benefits conferred on the user, has been displaced by congressional action. *See* Add.33-36. That prong is discussed below at 63-64.

("*NPPC*")), we begin with RhodeWorks' discriminatory features. Here, too, the controlling principles are clear.

*First*, "[a] finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose … or discriminatory effect." *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 270 (1984). In this context, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Env't. Quality*, 511 U.S. 93, 99 (1994); *see Granholm v. Heald*, 544 U.S. 460, 472 (2005); *Fam. Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010). If a restriction on commerce is discriminatory, "it is virtually *per se* invalid." *Or. Waste*, 511 U.S. at 99; *see Trailer Marine*, 977 F.2d at 11. The State has not contended that, if discrimination is present, RhodeWorks could survive application of this strict scrutiny.

*Second*, although the State emphasizes that RhodeWorks is facially neutral, the Supreme Court and this Court have said repeatedly that "[e]ven facially neutral laws enacted without discriminatory motive and in furtherance of legitimate local objectives may be discriminatory in effect (and, thus, engender strict scrutiny under the jurisprudence of the

dormant commerce clause)." *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 33 (1st Cir. 2007) (citing *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 352–53 (1977)); *see*, *e.g.*, *Family Winemakers*, 592 F.3d at 13; *Trailer Marine,* 977 F.2d at 10. Similarly, it is immaterial that the challenged law benefits some out-of-staters and harms some in-staters; what matters is that the law disfavors interstate commerce "'in the general average of instances.'" *Scheiner*, 483 U.S. at 291; *see*, *e.g.*, *Family Winemakers*, 592 F.3d at 13.

**Third**, once discriminatory impact is shown, there is no need for a law's challenger to prove concrete market effects. "It does not matter whether the discrimination would actually force [the out-of-stater] from the market or prevent certain goods from reaching [the tolling state]. … Once a state regulation or tax is found to *discriminate* against interstate commerce, it is presumptively invalid." *Trailer Marine*, 977 F.2d at 11; *see Camps Newfound/Owatonna*, 520 U.S. at 581 n.15 ("[a] particularized showing" of lost business "is not required").

**Finally**, although the parties disagree about whether discriminatory intent is sufficient by itself to render a law unconstitutional, there is no doubt that, even if insufficient standing

alone, such intent weighs heavily against a state rule's validity. As this Court explained, when "facially neutral statutory exemptions" are "apparently motivated by a desire to shield in-state interests," that "'weaken[s] the presumption in favor of the validity of the [provision], because [it] undermine[s] the assumption that the State's own political processes will act as a check on local regulations that unduly burden interstate commerce.'" *Family Winemakers*, 592 F.3d at 17 (quoting *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 447 (1978) (cleaned up)); *see also Cherry Hill*, 505 F.3d at 36 (emphasizing challenged law was "wholesome in its purpose"). An intent to discriminate also has obvious evidentiary significance, tending to show that the resulting law in fact had a discriminatory effect; after all, statutes presumptively effectuate their purposes.[5]

In combination, these principles are of fundamental importance. They preclude states from making use of seemingly even-handed rules that have disguised and subtle but persistent discriminatory effects, where the difference in treatment between in- and out-of-staters is "small

---

[5] Courts repeatedly note the close association between intent and effect. *See, e.g.*, *NPPC*, 2023 WL 3356528, at *11; *Family Winemakers*, 592 F.3d at 14.

for an individual" "but the cumulative disparity is ample." *Trailer Marine*, 977 F.2d at 10-11. They thus effectuate the Commerce Clause's central goal to "forbid discrimination, whether forthright or ingenious." *West Lynn Creamery*, 512 U.S. at 201 (internal quotation marks omitted). With that in mind, RhodeWorks discriminates against interstate commerce in *both* effect *and* purpose, rendering it unconstitutional.

## A.     RhodeWorks Has Discriminatory Effects.

The discriminatory *effect* of the RhodeWorks regime is manifest, in two independent respects. The toll caps impose outsize burdens on trucks engaged in interstate commerce. And the complete exemption of straight trucks from the tolls gives in-staters disproportionate benefits.

### 1.     *The caps discriminate in effect.*

#### a.     *The caps discriminate as a matter of law.*

**i. The caps' structure is discriminatory.** As a matter of law, the RhodeWorks caps give the tolling scheme a structure that is discriminatory in effect. Those caps make the system function like a set of flat daily charges for the privilege of using Rhode Island's bridges and roads. A truck will pay only once per day for traveling through a given toll gantry in each direction, no matter how many times it passes that

point; and it will pay no more than $40 per day, no matter how many toll gantries it passes. *See* page 7, *supra*.

This regime *necessarily* will have a discriminatory effect on out-of-state and interstate trucks. Compare two identical trucks that make the same number of bridge crossings in a day, one exclusively in Rhode Island and the other passing through Rhode Island as part of an interstate journey. The RhodeWorks caps mean that the local truck will pay a lower effective rate per bridge-crossing than will the interstate truck. Once the cap is hit, the payment allows unlimited use of a bridge (or all Rhode Island's bridges); for that payment, the local truck likely will have made greater (often vastly greater) use of the State's bridges as compared to the truck that is passing through as part of an interstate trip. And, generally speaking, the more a truck travels in interstate as opposed to intrastate Rhode Island commerce, the greater the disparity will be. The point is not debatable: As this Court explained, it is "intuitively obvious[] that on average [a] flat tax[] represent[s] a much higher per mile charge on out-of-state trucks than on [in-state] trucks for miles traveled in [the taxing State]." *Trailer Marine*, 977 F.2d at 11; *see* Add.76-79.

23

For this reason, the Supreme Court and this Court—as well as other courts across the Nation (*see Am. Trucking Ass'ns, Inc. v. Sec'y of Admin.*, 613 N.E.2d 95, 101 (Mass. 1993) (citing cases))—have held a variety of similar flat truck charges to violate the Commerce Clause. In *Scheiner*, the landmark decision in this area, the Supreme Court invalidated flat annual charges that Pennsylvania imposed on trucks using its roads. In contrast to fuel-consumption taxes that "are directly apportioned to the mileage traveled in Pennsylvania," the Court explained, the "inevitable effect" of flat taxes "is to threaten the free movement of commerce by placing a financial barrier around the State." 483 U.S. at 283-84. And in *Trailer Marine*, this Court invalidated a flat charge imposed by Puerto Rico on truck trailers, noting that the fee was "facially neutral" but "clearly discriminatory in impact" because transient trailers (which were shipped into and out of Puerto Rico) "pay[] the same flat fee as local trailers … even though the transient trailers are presumptively going to cause far fewer accidents and impose far lower costs … [on Puerto Rico] than locally based trailers." 977 F.2d at 10.

To be sure, the RhodeWorks caps are not wholly identical to flat annual fees like those invalidated in *Scheiner* and *Trailer Marine*; they apply on a daily basis per gantry, or for all tolls, rather than on an annual basis. But the RhodeWorks caps share the essential characteristics that made those other fees unconstitutional. Because a truck pays the same toll no matter how many times it passes through a gantry in a day, the charge is not based "'on a relevant measure of actual road use.'" *Scheiner*, 483 U.S. at 291. And "'[i]n the general average of instances, the privilege is not as valuable to the interstate as to the intrastate carrier.'" *Id.* Whether or not that impact is less pronounced under RhodeWorks than under a flat annual cap, it is just as inevitable.

**ii. The State cannot distinguish *Scheiner*.** The State seeks to distinguish *Scheiner* in "three key ways." Br. 39. All are insubstantial.

***First***, the State observes that "many Rhode Islanders never benefit from the toll caps." Br. 39. But that is beside the point. In *Scheiner* itself, the challenged fee was not "saved because some out-of-state carriers which accrue high mileage in [the taxing state] pay the axle tax at a lower per-mile charge than some [in-state]-based carriers" (483 U.S. at 286); what mattered was that, "in the general average of instances," out-of-

staters paid more. That, of course, is the necessary effect of the RhodeWorks caps.

**Second**, the State maintains that the discrimination in *Scheiner* was "more dramatic" than that here. Br. 40. But even if true, this observation, too, is immaterial. If a state law discriminates—as does RhodeWorks—"there is no 'de minimis' defense" (*Camps Newfound/Owatonna*, 520 U.S. at 581 n.15); "[o]nce a state regulation … is found to *discriminate* against interstate commerce, it is presumptively invalid." *Trailer Marine*, 977 F.2d at 11; *accord*, *e.g.*, *Maryland v. Louisiana*, 451 U.S. 725, 760 (1981) ("We need not know how unequal [a] [t]ax is before concluding that it … discriminates").

**Third**, Rhode Island contends that numerous states had adopted potentially disruptive flat taxes like *Scheiner*'s, but "there is no evidence that the capped tolls deter interstate trade." Br. 40-41. Here again, however, *Scheiner* itself explained that "the actual imposition of flat taxes by other jurisdictions is not necessary to sustain the Commerce Clause challenge to Pennsylvania's flat taxes." 483 U.S. at 285. As for the absence of evidence of concrete effects on interstate trade, "[i]t does not matter whether the discrimination would actually force [out-of-staters]

26

from the market or prevent certain goods from reaching [Rhode Island]." *Trailer Marine*. 977 F.2d at 11. Indeed, in *Scheiner* there was no evidence that the fee *actually* discouraged commerce.

**iii. The caps violate the "internal consistency test."** The point is proved by application of the "internal consistency test," which the Supreme Court applies to determine whether a levy has an unconstitutionally discriminatory effect. The test "looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate." *Comptroller of Treasury of Md v. Wynne*, 575 U.S. 542, 562 (2015) (cleaned up); *see Scheiner*, 483 U.S. at 284. There can be no doubt that interstate commerce would be disadvantaged if every State adopted a tolling regime like Rhode Island's.

As the district court explained, under such a scheme, a truck that confines its operation to Rhode Island pays only a single toll per gantry/day in each direction, and no more than $40 per day. Add.78-79. An identical truck that passes through toll gantries the same number of times, but does so as part of an interstate journey (say, up I-95 from Pennsylvania to Maine, traversing seven States), will pay many times

27

that amount simply because it crossed state lines while making the trip, becoming subject to additional charges in each State. "[T]he cumulative effect does not result from the mileage or distance traveled, but from the interstate character of the journey. The same mileage [or number of bridge crossings] in one state would result in only one [toll]." *Scheiner*, 483 U.S. at 284 n.16. And that "has a forbidden impact on interstate commerce because it exerts an inexorable hydraulic pressure on interstate businesses to ply their trade within the State that enacted the measure rather than 'among the several States.'" *Id.* at 286-87. "[T]he inference [of discrimination] is so compelling that only the amount of the discrimination, and not its fact, can be plausibly contested." *Trailer Marine*, 977 F.2d at 10.

The State does not deny that RhodeWorks fails the internal consistency test as articulated in *Scheiner*; instead, it insists that the Supreme Court "pared back the 'internal consistency' test" in *American Trucking Ass'ns, Inc. v. Michigan Public Service Comm'n*, 545 U.S. 429 (2005) ("*MPSC*"). Br. 42; *see id.* at 38. But that is not so. The charge in *MPSC* was imposed on wholly *intrastate* commerce—it fell on trucks "that undertake point-to-point hauls between Michigan cities" (545 U.S.

28

at 431)—and the Supreme Court upheld it for that reason. *See id.* at 437 ("fee … taxes purely local activity"), 438 (truck pays "only because it engages in *local* business"). By its plain terms, the decision has no bearing here.[6]

Unsurprisingly, since the decision in *MPSC* the Supreme Court has reaffirmed the undiminished force of the internal consistency test, specifically rejecting the contention that *MPSC* retreated in any respect from the internal consistency principle. *See Wynne*, 575 U.S. at 563-65 & n.7. As the Court explained, in *MPSC* "[n]either record evidence nor abstract logic ma[de] clear whether the overall effect of [Michigan's charge on intrastate deliveries] would be to increase or to reduce existing financial disincentives to interstate travel." *Id.* But for the reasons explained above, "abstract logic" shows how RhodeWorks *necessarily* imposes financial disincentives on interstate travel; and we show below (at 33-36) that "record evidence" confirms the point.

---

[6]  *MPSC* is inapposite here for other reasons as well. The *MPSC* fee was used to defray administrative costs that "seem more likely to vary per truck or per carrier than to vary per mile traveled," which "means that a per-truck, rather than a per-mile, assessment is likely fair." 545 U.S. at 435-36. RhodeWorks tolls, in contrast, are used for costs that vary per-bridge crossing.

**iv. The caps are not saved by *Doran*.** The State's defense of the RhodeWorks caps rests in substantial part on the decision upholding Massachusetts' system of toll-frequency discounts in *Doran v. Massachusetts Turnpike Authority*, 348 F.3d 315 (1st Cir. 2003). *See* Br. 34-36. But that program was decisively different from RhodeWorks, for several reasons.

***First*** is the reason stated in *Doran* itself. Under the Massachusetts regime, which offered discounts at specified toll plazas to travelers who purchased a transponder from the Commonwealth (*see* 348 F.3d at 316-17), "[t]he frequent driver will receive a greater amount of discounts than the infrequent driver, but he or she will, of course, also pay a correspondingly greater amount in tolls." *Id*. at 319. As the Court thus explained:

> The tolls in issue here, in contrast [to the fees in *Scheiner*], are imposed on a *per-use basis*. They are imposed only when the driver actually uses the toll plazas or tunnels and are *directly proportional to that use*. As the *Scheiner* court put it, "[s]o long as a State bases its tax on a relevant *measure of actual road use*, obviously both interstate and intrastate [drivers] pay according to the facilities in fact provided by the State," and the program places no undue burden on interstate commerce.

30

*Id.* at 320 (quoting *Scheiner*, 483 U.S. at 291) (emphasis added). The Court added: "Thus, … the program does not fail *Scheiner*'s internal consistency test. … As the [Supreme] Court put it, if more than one state adopted a similar discount program, the Commerce Clause is satisfied where the programs would 'maintain state boundaries as a neutral factor in economic decision-making.'" *Id.* (quoting *Scheiner*, 483 U.S. at 282-83). That was true in Massachusetts, where "the tolls are assessed uniformly in direct proportion to use of the toll facilities." *Id.* at 321.

That is not true of RhodeWorks' tolls, which are *not* "directly proportional to use," based on "a relevant measure of actual road use," or assessed "in direct proportion to use of the toll facilities"; they do not vary with use at all (at a single gantry) or once a cap is reached (on a daily basis). Consequently, RhodeWorks, unlike the Massachusetts program, fails the internal consistency test.[7]

---

[7]  The State's assertion that the RhodeWorks caps "do not 'sever' the 'connection to actual use'" because they "reset every day" is plainly wrong. Br. 36. That is *exactly* what the caps do; once the cap is reached, increased use of tolled bridges has no effect on the amount charged that day. Of course, trucks pay only if they "use" the bridge, but that was just as true in *Scheiner* and *Trailer Marine*, where trucks paid fees only if they "used" roads in Pennsylvania and Puerto Rico. As for the State's assertion that the caps serve "policy benefits" or "multiple goals" (*id.* at 33, 37), *(con't)*

***Second***, the State insists that the Commerce Clause anti-discrimination principle comes into play only when the challenged rule "favors in-state over out-of-state competitors." Br. 28. But there was *no* competition in *Doran*; the challenged rule involved tolls imposed on passenger cars, and the plaintiffs were noncommercial drivers of automobiles. *See* 348 F.3d at 317-18. Accordingly, the concern with preservation of a national market that underlies the Commerce Clause applies with full force here, but applied with greatly diminished force (or not at all) in *Doran*.

***Third***, as we have explained (at 20-21, *supra*), an intent to discriminate strips facially neutral state laws of any presumption favoring constitutionality; we show below (as the district court found) that Rhode Island enacted RhodeWorks with discriminatory intent. But plaintiffs' complaint in *Doran* "contain[ed] no allegation of discriminatory purpose." 348 F.3d at 321. Accordingly, the State here, unlike

---

application of state rules that are inherently discriminatory—as are those that violate the internal consistency test, which "helps courts identify tax schemes that discriminate against interstate commerce" (*Wynne*, 575 U.S. at 562)—may not be justified unless they serve a compelling interest. *See* page 19, *supra*. The State does not claim that to be true here.

Massachusetts in *Doran*, gets no thumb on its side of the constitutional scale.

**Finally**, the State insists that there is no discrimination because "the $20 cap on the border-to-border I-95 route is structured to benefit interstate vehicles." Br. 37; *see also id.* at 29, 41, 64. But as the district court explained, this cap is "irrelevant" because RIDOT set tolls on I-95 to total less than $20, "which prevents this statutory mandate from ever having an impact." Add.76 n.50.[8]

### b. The record evidence confirms that the caps discriminate in effect.

Although the caps' inevitably discriminatory impact on interstate commerce is enough to render them unconstitutional, the record confirms that the caps *in fact* disproportionately burden trucks traveling in interstate commerce.

The district court found that "[t]he discriminatory effects shown by Plaintiffs are not merely hypothetical." Add.79. The caps provide

---

[8] The evidence actually showed that tolls substantially exceeding $20 for a border-to-border crossing would lead trucks to divert off I-95, thus *reducing* the State's toll revenue. App.__(PX 704, 408 at RI0374881. The $20 cap therefore cost the State nothing and was not implemented to provide a real-world benefit to interstate truckers.

disproportionate benefits to local businesses, when considered both in the aggregate and individually:

- In the aggregate, Rhode Island-plated trucks received a 23% markdown from full-fare tolls, while out-of-state trucks received only an 8% markdown. In-state vehicles thus obtained almost 40% of the discounts on only 18.6% of the transactions—gaining well over two times their fair share of the discount. Add.79-80.

- The same discriminatory effect is apparent at the once-per-day/per-gantry cap: Rhode Island vehicles received almost 48% of the savings from that cap, although those trucks again were responsible for only 18.6% of the transactions. Add.80; App.__(May 26 Tr., 59:20-60:2).

- Similarly, the $40 daily cap gave Rhode Island-plated vehicles 36% of the discounts on just 18.6% of the transactions, while out-of-state vehicles received 64% of the discounts on 81.4% of the transactions. Add.80-81. In-state vehicles that hit the $40 cap saved more than 40% of their toll costs, while out-of-state

trucks hitting the cap saved less than 30% of theirs. App.__(May 26 Tr., 68:13-25).

- "The sum of this evidence" is that "Rhode Island-plated vehicles benefit to a significantly greater degree based on their traffic share than out-of-state vehicles"; "the burden on out-of-state Class 8+ trucks is clear and significant." Add.81.

The State does not challenge these factual findings as clearly erroneous—or, indeed, mention them at all.[9] It therefore must be accepted as settled that the RhodeWorks caps have a discriminatory impact. This effect was substantial: In the aggregate, the caps gave in-staters a significant and disproportionate percentage reduction on a

---

[9] The State's only mention of the evidence bearing on discriminatory effect is its assertion that "the percentage of out-of-state tractor-trailers benefitting from the caps was consistently higher than the percentage of in-state tractor-trailers benefitting." Br. 32; *see id*. at 36. If the State means by this statement that more out-of-state than in-state trucks received some benefit from the caps, its submission is irrelevant and misleading, given the vastly larger number of out-of-state trucks subject to the tolls. The State's further assertion that the disparity in benefits is attributable to "a small number of very-high-frequency drivers who work near toll gantries" (*id*.) finds no support in the record.

35

major component of a trucker's costs.[10] But the precise amount of this discriminatory saving is immaterial; again, there is no de minimis defense to Commerce Clause discrimination and no need to show loss of business as a result. For that reason, too, RhodeWorks is unconstitutional.

>    **2.** ***RhodeWorks' exemption of straight trucks from tolling gives in-staters a discriminatory benefit.***

RhodeWorks also discriminates against interstate commerce in another and independent way: It exempts the straight trucks that are most likely to be owned by in-staters and to travel intrastate.

There is no doubt that tolling only tractor-trailers confers a grossly disproportionate benefit on Rhode Island businesses, and the State does not contend otherwise. The district court found that more than twice as many Rhode Island-registered trucks fall into the Class 4-7 categories that are exempted from tolling than fall into the Class 8+ categories that are tolled; these smaller trucks are used far more often for intrastate trips; and 80% of the tolled vehicles are from out-of-state. Add.71, 86. Yet

---

[10]  The State can hardly deny that tolls have a significant impact on truckers' bottom lines; the caps were added to RhodeWorks because local truckers objected to paying the tolls.

there is no programmatic reason to distinguish smaller from larger trucks: Because straight trucks generally have fewer axles than do tractor-trailers, their weight-per-axle is frequently high, meaning that they cause as much damage to bridges as do tractor-trailers. App.__(May 26 Tr. 15:11-17); *see* Add.86 (smaller and larger trucks are "similarly situated vehicles (in terms of axle weight")). In fact, 86.4% of vehicles that exceed Rhode Island's weight-per-axle limit are in Classes 4-7. *See* App.__(PX653 at 25).

The State does not deny that exemption of straight trucks from tolling predominantly benefits in-staters, with no programmatic benefit.[11] Instead, it argues that this disparate effect is consistent with the Commerce Clause because the straight trucks that benefit from the exclusion don't compete with the tractor-trailers trucks that pay tolls. Br. 27-28. This contention is wrong, for two reasons.

***First***, there *is* competition between smaller and larger trucks. The record demonstrates that, at least some of the time, either a straight

---

[11] The State's implication (not argued below) that RhodeWorks exempted straight trucks from tolling because laser technology makes it easy to distinguish tractor-trailers (Br. 11, 30-31) is insupportable. There is no evidence that RhodeWorks drew its distinction for this reason, or that other forms of technology cannot identify straight trucks.

truck or a tractor-trailer may be used for deliveries, and in these circumstances the tolling exclusion gives the predominantly Rhode Island-owned straight trucks a competitive advantage. App.__(May 27 Tr. 131:2–132:3). The State does not refute this evidence; instead, it makes the observation that cement trucks don't compete with tractor-trailers. Br. 28. That observation is doubtless true, but is a non sequitur: Some straight trucks do compete with some tractor-trailers, and that is what matters to establish discriminatory effect. *Cf. Bacchus*, 468 U.S. at 269 ("neither the small volume of sales of exempted [products] nor the fact that the exempted [products] do not constitute a present 'competitive threat' to other [products]" is "dispositive of the question whether competition exists").[12]

**Second**, and relatedly, the State exaggerates the degree to which favored and disfavored entities must compete. Each benefitted business need not compete with each disadvantaged one; there is, again, no de minimis exception to the Commerce Clause anti-discrimination principle.

---

[12] The district court opined that evidence on this competition was "mostly speculative" and lacking quantification. Add.87-88. But citing *Trailer Marine*, the court held that "none of this matters" because "overtly protectionist legislation such as RhodeWorks offends the Commerce Clause even in the absence of specific market impact." *Id*. at 88.

And although the State complains that there was no evidence that in-state competitors actually gained a competitive advantage over those based out-of-state (Br. 28), there is no such requirement: When "the fee structure at issue does discriminate," "[s]uch an imbalance in favor of local interests … over similarly situated non-resident interests … is a proper concern of the Commerce Clause whether or not the market participants are direct business rivals." *Trailer Marine*, 977 F.2d at 11.

The State's remaining arguments are insubstantial. It relies on *Doran* to support its assertion that an adverse competitive effect must be shown (Br. 29), but *Doran* involved tolls on passenger cars and had no occasion to address business competition. The State's reliance on the $20 border-to-border cap's asserted purpose "to protect interstate tractor-trailers" (*id.*) rests on a false premise. *See* note 8, *supra*. And whether or not an *innocuous* state regulation that happens to "have disparate impacts on in-state and out-of-state businesses" (Br. 31-32) may be presumed constitutional, a state rule bears no "presumption in favor of … validity" when, as here, the state acted with discriminatory intent to create a uniquely aberrational regime designed to benefit in-staters. *Family Winemakers*, 592 F.3d at 17.

**B.    The State's Discriminatory Purpose Confirms That RhodeWorks Is Unconstitutional.**

The State's creation of RhodeWorks with the purpose of discriminating against interstate commerce strongly supports the conclusion that RhodeWorks is unconstitutional.

1. Proof of discriminatory intent by itself requires invalidation of state legislation under the Commerce Clause. The Supreme Court and this Court have said that repeatedly, as have other circuits.[13] There is good reason for this rule. As the leading commentator in this area has explained: "If we ask which feature makes protectionist legislation antithetical to the very idea of federal union, the answer is obvious. It is the protectionist purpose, the unvarnished intention of taking something away from other states just to enjoy it at home." Donald H. Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant*

---

[13] *See*, *e.g.*, *Bacchus*, 468 U.S. at 270;; *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 n.15 (1981); *Hunt* 432 U.S. at 352-53; *Family Winemakers*, 592 F.3d at 14; *All. of Auto. Mfrs. v. Gwadowsky*, 430 F.3d 30, 35-36 (1st Cir. 2005); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 334 (4th Cir. 2001); *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 214 (5th Cir. 2019); *Jones v. Gale*, 470 F.3d 1261, 1269 (8th Cir. 2006).

*Commerce Clause*, 84 Mich. L. Rev. 1091, 1126 (1986).[14] This Court did not decide during the last appeal in this case whether intent alone can establish unconstitutionality, but strongly suggested that it can, describing the method for establishing intent: *"[W]hen evaluating whether a state statute was motivated by an intent to discriminate against interstate commerce*, we ordinarily look first to statutory text, context, and legislative history, as well as to whether the statute was closely tailored to achieve the [non-discriminatory] legislative purpose." *Alviti*, 14 F.4th at 89-90 (cleaned up; emphasis added).

But even if discriminatory intent alone does not establish unconstitutionality, it certainly is *relevant* to RhodeWorks' validity. An intent to discriminate strips state legislation of any presumption of constitutionality and also tends to show that the law had a discriminatory effect. *See* pages 20-21, *supra*. The State's assertion that evidence of intent "adds nothing" (Br. 28) therefore is plainly wrong—as confirmed by the substantial attention this Court has paid to

---

[14] The Supreme Court and this Court have cited this article with approval. *See NPPC*, 2023 WL 3356528, at *8, *11; *Scheiner*, 483 U.S. at 285 n.20; *Family Winemakers*, 592 F.3d at 14.

ascertaining discriminatory intent in Commerce Clause cases. *See*, *e.g.*, *Family Winemakers*, 592 F.3d at 13-17.

2. Here, the district court correctly found intent to discriminate—a factual finding reviewed under the clearly erroneous standard.[15] In arguing to the contrary, the State ignores what the district court described as "the most important evidence" of intent: "the structure of the law itself" and "the data." Add.71. These features include:

- The State gerrymandered RhodeWorks, exempting from tolling the trucks most likely to be local and imposing caps likely to benefit local trucks. The use of such "specific and highly irregular features" strongly suggests discriminatory intent, as does the fact that "[n]o other state" structures its tolls in this way. *Family Winemakers*, 592 F.2d at 15, 16. Given RhodeWorks' aberrational features, it is hardly likely

---

[15] *See*, *e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2326 (2018) (under Equal Protection Clause, "district court's finding of fact on the question of discriminatory intent is reviewed for clear error."); *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 212-13 (5th Cir. 2019) (same under Commerce Clause); *Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1260 (4th Cir. 1995) (same).

42

that RhodeWorks' discriminatory effects are the accidental product of innocuous legislation.

- The State's own consultant recommended tolling trucks in Classes 6 and 7, and as initially introduced RhodeWorks would have tolled those vehicles—but the Legislature then exempted those trucks from tolling and added caps in response to complaints from the local trucking industry. Add.69-70. This made RhodeWorks less "closely tailored to achieve the legislative purpose" of raising revenue (*Family Winemakers*, 592 F.2d at 13), while benefitting Rhode Island trucks at the expense of out-of-staters.

- As we have shown, the record demonstrates RhodeWorks' discriminatory impact. That the law "discriminates against out-of-state[rs] … in its effects strengthens the inference that the statute was discriminatory by design." *Family Winemakers*, 592 F.2d at 14; *see NPPC*, 2023 WL 3356528, at *11 (discriminatory effect is important *because* it "disclose[s] purposeful discrimination against out-of-state businesses").

Rather than address this compelling structural evidence of intent, the State simply dismisses the relevance of statements made by then-Senate Majority Leader Ruggiero and RIDOT Director Alviti that were cited by the district court, asserting that statements by individual legislators and executive branch officials *never* may be considered as bearing on legislative intent. Br. 24-25; *see* Add.69-71. But that plainly is wrong. This Court has looked to just such statements to determine discriminatory legislative intent in Commerce Clause cases. *See*, *e.g.*, *Family Winemakers*, 592 F.2d at 7 & n.4, 14.

The views of the legislative leader who shepherded RhodeWorks into law and the administrator whose office conceived and drafted the legislation are of obvious probative value. *See*, *e.g.*, *Hunt*, 432 U.S. at 352 (relying on statement of state agriculture commissioner).[16] The State is equally incorrect in contending that these statements reflect only anodyne concerns of "local commuters" and "local constituents" (Br. 26) rather than an intent to discriminate; the speakers stated as their goal

---

[16] The Court's prior decision in this case precluding discovery from public officials prevented plaintiffs from exploring the intent behind statements reportedly made by the Governor and House Speaker indicating that RhodeWorks was designed to place the majority of the tolling burden on out-of-staters. *Alviti*, 14 F.4th at 81-82, 88-90.

44

advancing the interests of "'the local trucking industry'" and "transportation industries in Rhode Island.'" Add.70; *see also* App.__(PX-149-C (Alviti's statement that RhodeWorks was intended to reduce the tolls' impact "upon the trucking industry in Rhode Island")). There can be no doubt, as the district court found, that RhodeWorks' intent "was clearly protectionist." Add.72.[17]

## C.   The Court Should Not Sever The RhodeWorks Caps.

Finally, the State is wrong that the caps should be severed from the remainder of RhodeWorks if the Court holds them unconstitutional. Br. 44-46. Of course, we submit that *all* of RhodeWorks is unconstitutional on both discrimination and fair-approximation grounds, so there is nothing from which the caps could be severed. But severance would be improper even if the Court believes that the caps are RhodeWorks' only unconstitutional element.

---

[17] Other evidence also points toward discriminatory intent, including the State's careful advance evaluation of the impact that tolling rules would have on in- versus out-of-state vehicles and the unorthodox process used by RIDOT to design RhodeWorks. *See* Add.68-69; pages 6-9, *supra*. The district court found that "[t]his evidence weighs in favor of an intent to shift the burden to out-of-state trucks, but only marginally so." Add.69.

Although RhodeWorks contains a severability clause, such clauses "are not conclusive." *R.I. Med. Soc. v. Whitehouse*, 239 F.3d 104, 106 (1st Cir. 2001) (evaluating Rhode Island statute). Even when a law contains such a clause, courts "may hold a portion of a statute unconstitutional and uphold the rest" only when "the unconstitutional portion is not indispensable to the rest of the statute" and that portion "can be severed without destroying legislative purpose and intent." *Id.* The RhodeWorks caps fail that test.

As the history of RhodeWorks indicates, the caps were essential to enactment of the statute, added to the legislation just weeks after initial introduction as an important part of the response to vociferous local opposition to the tolls. *See* pages 7-8, *supra.* They are not a "minor part of the statutory scheme." *Members of Jamestown Sch. Comm. v. Schmidt*, 699 F.2d 1, 13 (1st Cir. 1983). To the contrary, it is unlikely that, absent the caps, the Legislature "would have passed" RhodeWorks. *Landrigan v. McElroy*, 457 A.2d 1056, 1061 (R.I. 1983); *see In re Advisory Op. to Governor*, 856 A.2d 320, 333 (R.I. 2004) (refusing to sever provision). That makes severance improper.

## II.   THE   RHODEWORKS   TOLLS   DO   NOT   FAIRLY APPROXIMATE USE.

The district court correctly held that RhodeWorks fails for another, independent reason: By imposing 100% of tolls on (predominantly out-of-state) tractor-trailers that make up a tiny portion of users, the tolls do not fairly approximate use of Rhode Island's bridges. Add.41-63.

### A.   The   Fair-Approximation   Test   Precludes   The Imposition   Of   Undue   Burdens   On   Interstate Commerce.

The fair-approximation test is a principal tool used to set aside "undue burdens" on interstate commerce. It understands that fair approximation "is essentially a question of allocation." *Trailer Bridge*, 797 F.3d at 145. The ultimate inquiry is "whether the government is charging each individual entity a fee that is reasonably proportional to the entity's use, and whether the government has reasonably drawn a line between those it is charging and those it is not." *Id.*; *see also, e.g.*, *Nw. Airlines*, 510 U.S. at 369 (distinguishing between those who "actually use" the facility and those who do not); *Evansville*, 405 U.S. at 719 (describing test as "measure of the relative use of facilities"); *N.H. Motor Transp. Ass'n v. Flynn,* 751 F.2d 43, 47 (1st Cir. 1984) (Breyer, J.) (assessing whether fee "helped to apportion costs fairly among ... users").

The contents of the test are derived from the Commerce Clause principles underlying the fair-approximation requirement. If one state may impose a fee on those engaged in interstate commerce that lacks a reasonable connection to relative use of the facilities (by the payer and by others) for which the fee is charged, other states may, too. In the aggregate, the accumulation of such disproportionate fees on disfavored categories of payers will impose duplicative and possibly crushing burdens on interstate commerce. *See generally Scheiner*, 483 U.S. at 291-92. This prospect is especially pernicious because states will often seek to "shift[] the cost of regulation to other States" and, "when the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007) (cleaned up).

In this respect, the fair-approximation requirement, like related principles that invalidate burdensome but ostensibly neutral impositions on commerce, serves in part "to smoke out a hidden protectionism." *NPPC*, 2023 WL 3356528, at * 11 (cleaned up); *see also Trailer Bridge*,

797 F.3d at 144 (noting, in the user-fee context, that the Commerce Clause "inhibits economic protectionism between the states") (cleaned up). To preclude this danger, the allocation of costs between payers need not be precise, but it must draw lines that reasonably take account of users' relative use of the facility and the cost that such use imposes on the state. *See* Add.43-46.

Rhode Island recognizes that there *is* a fair-approximation test. But its understanding of the test is very different from that expressed by the Supreme Court and this Court—and would strip the test of essentially all content. In the State's view, *any* charge that is somehow tied to use of a facility is per se constitutional. Br. 48-49. Under this conception, it is enough that those charged use the tolled facility to some degree, irrespective of (a) who else uses the facility and is *not* charged or (b) how much those who pay actually are responsible for the cost of operating the facility. As the State declares, all that matters to uphold a bridge toll is that the payer use the bridge. "This case," the State adds, "is as simple as that." Br. 49.[18]

_____

[18]  The State's characterization of RhodeWorks as "per-use road tolls" is wrong. Br. 48. Under the caps, trucks are *not* charged "per use"; a truck *(con't)*

49

Under this understanding, any highway toll (indeed, any fee imposed on those who use a facility) satisfies the fair-approximation test, and the State's judgment whether the charge is "fair" and "approximates use" is in practice unreviewable. The State is unabashed about this. It gives away the game when it articulates the governing standard in these terms: "'[T]hose challenging the legislative judgment must convince the court that the legislative facts … could not reasonably be conceived to be true by the governmental decisionmaker.'" Br. 58 (quoting *Clover Leaf Creamery*, 449 U.S. at 464). Notably, the State draws this standard from the portion of *Clover Leaf Creamery*—a case that did not involve user fees—that addressed the Equal Protection Clause and applied "rationality analysis under [that] Clause." *Id.* Thus, the State would literally read the fair-approximation test off the books, replacing it with an equal-protection rationality analysis that famously imposes almost no restraint on state action.

_____

that crosses a tolled bridge twenty times in a day is charged only once, and after hitting the $40 daily cap is not charged again. *See* Add.61 n.41. The State's theory therefore must be that a charge is a "fair approximation of use" even if does not vary at all with amount of use.

50

But that cannot be correct. The fair-approximation standard is "essentially a short-hand test for determining whether a user fee infects interstate commerce" (*Trailer Bridge*, 797 F.3d at 147), serving the crucial purpose of forestalling undue burdens on commerce. It is hardly likely that the Supreme Court and this Court meant to advance that goal through a rule that, as a practical matter, tells states that anything goes. And in fact, that is not how courts apply the fair-approximation test. They recognize that implementation of the test is highly "fact-dependent." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 98 (2d Cir. 2009). And courts (including the Supreme Court) apply the test by engaging in a serious factual inquiry. *See, e.g.*, *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 88 (2d Cir. 2009) (charge invalid because "nothing in the record" satisfies fair-approximation test)[19]; *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 259-60 (2d Cir. 2013) (after

---

[19]     The constitutional problem there was that, so far as the record revealed, fee payers paid the entirety of the costs of a service that also benefitted non-payers—just as do payers of the RhodeWorks tolls. The State distinguishes *Bridgeport* only on the grounds that untolled vehicles in Rhode Island make *other* sorts of payments that are used on the tolled bridges and that the Legislature made factual findings purporting to support the tolls. Br. 56. We explain below that those arguments are wrong on their own terms.

51

discovery, finding charge constitutional on review of the record); *see also Nw. Airlines*, 510 U.S. at 370 & n.16 (noting district court's unchallenged finding on the record that user fee was invalid in part because fee-payers were overcharged for certain services).

## B. The District Court Properly Found That The RhodeWorks Tolls Do Not Fairly Approximate Use.

The district court correctly found that requiring tractor-trailers to pay the entirety of the RhodeWorks tolls results in those trucks paying amounts that do not fairly approximate use of tolled bridges. Such charges are not "reasonably proportional to the entity's use" and manifestly do not "reasonably draw[] a line between those [the state is] charging and those it is not." *Trailer Bridge*, 797 F.3d at 145. *See* Add.42-63.

Of course, as the district court recognized, "a user fee may be permissible under the dormant Commerce Clause even if it exempts certain classes of users" so long as it "draws distinctions between classes that are not 'wholly unreasonable.'" Add.54 (citing *Evansville* and *Trailer Bridge*). But on a close review of the record, the court found as fact that the lines drawn by RhodeWorks fail even that forgiving standard. The court explained in detail that the methodology used by the State to show

that tractor-trailers are reasonably distinguished from straight trucks "is flawed from nearly every perspective" (*id*. at 56) and that the "record evidence makes clear that the State failed to 'reasonably draw[] a line between those it is charging and those it is not.'" *Id*. at 58 (quoting *Trailer Marine*, 797 F.3d at 149); *see id*. at 56-63.

As an initial matter, the court found that "97% of the vehicles making use of the tolled bridges—vehicles in Classes 1-7—are not tolled," meaning that RhodeWorks "exempts not only most users, but nearly *all* users." Add.54 (emphasis added). Perhaps most significant, the court determined that Class 6 and 7 trucks are exempted from tolling even though they are not meaningfully distinguishable from tractor-trailers in their impact on bridges, and certainly cause a significant portion of bridge damage. The State's *own* evidence showed that a substantial portion of bridge damage is caused by straight trucks. *Id*. at 58-59. And more credible evidence demonstrated that tractor-trailers actually are responsible for well under half, and likely only a small fraction, of bridge costs. *Id*. at 58-63. The State's assertion that the district court simply perceived "that single-unit trucks were getting too sweet a deal" (Br. 63) therefore is hardly a fair characterization of the court's analysis.

The State does not challenge—indeed, apart from its conclusory and derisive mischaracterization of the district court's reasoning (*see* Br. 49, 57), it fails even to acknowledge—the court's factual findings.[20] Unless the State is correct that its line-drawing is effectively unreviewable, that is reason enough to affirm the decision below. And the scattershot arguments the State does offer on fair approximation are wrong.

### 1.     *Deference to the legislature is not dispositive.*

The State repeatedly invokes the legislative findings. Br. 47-48, 50, 57-59. But although deference to the legislature is a venerable doctrine, it is not conclusive; courts "must not place dispositive weight on [legislative] findings, for the [c]ourt[s] retain an independent constitutional duty to review factual findings where constitutional rights are at stake." *Whole Women's Health v. Hellerstedt*, 579 U.S. 582, 597

---

[20]  The State's only specific reference to the district court's detailed factual findings is its argument that the court erred in concluding that a vehicle's impact on "pavement generally" differs from its impact on "bridges specifically"; the State complains that a defense expert testified that "studying pavement makes no difference." Br. 57-58. But the district court considered this testimony—which departed from the assessments of the federal government and other states, and was rebutted by plaintiffs' expert—and found it unpersuasive. Add.56-61. The State does not even attempt to show that this finding was clearly erroneous.

(2016); *accord Sable Comm'ns of Cal. v. FCC*, 492 U.S. 115, 129 (1989). Indeed, "[i]f a legislature could make a statute constitutional simply by 'finding' that black is white or freedom, slavery, judicial review would be an elaborate farce." *Lamprecht v. FCC*, 958 F.2d 382, 392 n.2 (D.C. Cir. 1992) (Thomas, J.).

And if ever there were a case where legislative deference should not carry the day, this is it. The Legislature did not purport to make an independent factual inquiry into the bridge damage caused by trucks. Instead, it deferred to RIDOT—which engaged in a Keystone Kops process, where the foundational truck-tolling decision was made at a kitchen table by a non-engineer and then supported by result-driven Google searches; those turned up a 40-year-old GAO report that was based on data dating back a further ten years, concerning different sorts of vehicles (overweight trucks), traveling on materially different surfaces (highway pavement rather than bridges). *See* Add.57; pages 6-9, *supra*.

In any event, the district court did not—as the State would have it (Br. 57-58)—disregard the Legislature's findings. Rather, the court discussed those findings, noted that they were entitled to some deference, and supplemented them with trial evidence. *See* Add.56-61 & n.38.

Courts routinely do just that. *See, e.g.*, *Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 196 (1997) (examining "the evidence before Congress" and the "evidence presented to the District Court" to "supplement the congressional determination" about the need for legislation). Commerce Clause cases are no exception. *See, e.g.*, *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 621-22 n.12 (1981) (Court has "required a showing, based on factual evidence in the record, that the fees charged do not appear to be manifestly disproportionate to the services rendered") (cleaned up); *Nw. Airlines*, 510 U.S. at 359-60 (examining evidence in fair-approximation context); *Evansville*, 405 U.S. at 719-20 (same).

Nor does the State advance its case by asserting that the legislative judgment was "reasonable" "[e]ven setting aside the legislative findings." Br. 59. That is the purest ipse dixit. As explanation, the State says only that the Legislature "borrowed the FHWA's classification scheme." *Id.* But that is hardly a reasoned basis for setting toll rates; the State offers no evidence that the classification scheme was designed to rank vehicles by bridge damage. And as we have explained, a distinction that lacks any factual foundation does not satisfy the fair-approximation test. States

56

doubtless get much leeway in setting user fees, but charges are not constitutional simply because the state says so.

> ## 2. *Non-toll sources of revenue and expenditures unrelated to the tolled facility are not part of the fair-approximation inquiry.*

The State also is incorrect in asserting that, when determining whether a toll reasonably distinguishes between those it is charging and those it is not, a court should consider "non-toll sources of revenue [used] to fund bridge repairs" that come from entities *not* charged the tolls. Br. 53; *see id.* at 53-55. In *Scheiner*, the Supreme Court rejected this very argument, holding that "[t]he flat taxes must stand or fall on their own." 483 U.S. at 289.

That understanding serves essential goals. For one thing, the State's contrary approach would be unmanageable. It would require a court to determine, among many other things, whether the payer of a toll also made other payments to the charging state that were used in connection with the tolled facility; whether the payer of the toll made federal payments that were used in connection with the facility, and in what amount; which other forms of payment made to the charging state by other users of the facility were used in connection with the facility,

and in what amount; and endlessly on and on. The Supreme Court has warned against "plung[ing]" into precisely this sort of "morass of weighing comparative tax burdens." 483 U.S. at 288-89; *see* Add.49-52.

Moreover, the State's approach would invite state abuse that surely would burden interstate commerce. Interstate businesses that pay tolls (or other user fees) also pay (in many states) non-toll charges of the sorts invoked by Rhode Island; in the trucking context, that includes charges like registration fees and fuel taxes. *See* Add.52. So Rhode Island would use different payments made *by* the toll-payer to justify the toll also imposed *on* the payer. And insofar as more general forms of taxation are used to support a facility, the State's approach effectively "would allow a state to tax interstate commerce more heavily than in-state commerce anytime the entities involved in interstate commerce happened to use facilities supported by general state tax funds," which *also* likely are paid by the toll payer. *Fulton Corp. v. Faulkner*, 516 U.S. 325, 335 (1996) (addressing compensatory tax doctrine). The Supreme Court "declined to open such an expansive loophole" in Commerce Clause protections. *Id.*[21]

---

[21] The State relies for its contrary understanding on *Evansville*, which it says "examined the fairness of the airport fees—levied only on some *(con't)*

Equally misguided is the State's contention that fair approximation of bridge use must take account of state expenditures for "associated state services up and down the highway" and on the "broader infrastructure system," on the theory that the tolls are fairly used to pay for those other services. Br. 55. It may be that the fair-approximation test properly considers benefits received by the toll payer from the charging state away from the tolled facility, when there is a "functional relationship" between use of that facility and other related facilities, so that expenditures on those other facilities can be shown to provide clear benefits related to use of the facility where the toll is collected. *See*, *e.g.*, *Cohen v. R.I. Tpk. & Bridge Auth.*, 775 F. Supp. 2d 439, 449-50 (D.R.I. 2011); *see also* Br. 55 (citing "functional relationship" cases).

But there is nothing like that here. The State simply observes, vaguely, that everything "up and down the highway" is related to everything else on the highway (and, presumably, on all connected highways across the country). That unquantifiable approach "would

---

users—by looking to the broader funding picture." Br. 54. But *Evansville* addressed "fees that other users paid directly to the tolled facility (like rent), not funding that must be traced to the facility through general tax and licensing revenues." Add.51; *see Evansville*, 405 U.S. at 718.

stretch the functional relationship doctrine beyond all recognition and effectively gut the fair approximation test." Add.49.

And the State's proposed standard here is, again, unmanageable. The State does not explain which of the state expenditures necessary to provide the "advantages of a civilized society" (*Commonwealth Edison Co.*, 453 U.S. at 624) are, and which are not, considered under its theory. Do expenditures on bike paths, drainage improvement, and myriad similar items in the RIDOT budget support the constitutionality of the RhodeWorks tolls because they are part of Rhode Island's "broader infrastructure system"? The State does not say. Nor does it explain whether differences in such expenditures from year to year mean that tolls might be constitutional one year and not the next when the tolls stay constant but bike-path expenditures change. This is not a defensible constitutional test.

### 3. *The State's argument is not supported by precedent.*

The State misreads the decision below when it asserts that the district court "conclude[d] that tolling some users and not others is constitutionally suspect." Br. 51. As noted, the district court recognized that a state *may* exempt some users from paying a user fee when there

is a reasonable basis for drawing that line, as the State elsewhere recognizes. *Id*. at 57.

And the decisions the State offers as a "wall of precedent" (Br. 53) permitting exemption of certain users from fees actually support our point, demonstrating that charges typically are not imposed only on entities that get *no* benefit from the facility. In *Northwest Airlines*, for instance, airlines complained that they were assessed a fee used to pay "the costs of air operations," while airport concessions were not charged. 510 U.S. at 369. The Court rejected the challenge because "[o]nly the Airlines and general aviation actually use the runways and navigational facilities of the Airport; the concessions use only the terminal facilities." *Id.*; *accord Trailer Bridge*, 797 F.3d at 143 (holding that port-scanning fee exempting some users fairly approximated use because those exempted did not use the service). That rationale offers no justification for excluding from the RhodeWorks tolls the vast bulk of vehicles that *do* "actually use" the facilities paid for by the tolls.

Similarly, in *Evansville*, the Court upheld an airport fee that fell on enplaning passengers but exempted many users of the airport, including deplaning passengers. 405 U.S. at 719-20. The Court explained that it

was reasonable to distinguish passengers from other airport users "because the boarding of flights requires the use of runways and navigational facilities not occasioned by non-flight activities." *Id.* at 718. In addition, commercial air transportation, the users of which paid the fee, "requires more elaborate navigation and terminal facilities, as well as longer and more costly runway systems, than do flights by smaller private planes." *Id.* As for deplaning passengers, the Court found it "not unreasonable to presume that passengers enplaning at an airport also deplane at the same airport approximately the same number of times," so most of those users did in fact pay. *Id.* at 719. Indeed, the Court in *Northwest Airlines* characterized *Evansville* as holding that "airports may lawfully distinguish among classes of users ... based on their differing uses of airport facilities." 510 U.S. at 369 n.15.[22] None of this

---

[22]  The fees in *Evansville* also exempted much smaller categories of airport users, like active-duty military and travelers on temporary layovers. 405 U.S. at 718. But that trivial exclusion shows that user-fee cost allocations need not be perfect (thus, tolls might exclude buses or ambulances), not that unreasonable exemptions are permissible.

remotely justifies the exclusion from RhodeWorks of vehicles that are responsible for much of the use of the tolled bridges.[23]

### 4. *RhodeWorks is not authorized by ISTEA.*

The State halfheartedly suggests that RhodeWorks is authorized by the ISTEA statute. Its theory evidently is that, because ISTEA permits states to use toll revenue for *purposes* not directly related to a tolled facility, the statute also authorizes Rhode Island to require tractor-trailers to pay "an amount greater than the *share of costs* they impose on bridges." Br. 62 (emphasis added). But that does not follow.

ISTEA displaces the "excessiveness" prong of the Commerce Clause user-fee test, which precludes states from collecting fees in amounts that exceed the benefit provided the payer. That says nothing about the fair-approximation requirement. "The excessiveness and fair approximation

---

[23] The State's heavy reliance (Br. 60-61) on *Capitol Greyhound Lines v. Brice*, 339 U.S. 542 (1950), is surprising. That decision involved not a user fee but a levy on issuance of automobile title certificates (*id.* at 544), and predated the Court's modern user-fee holdings. In any event, *Capitol Greyhound* relied on flat-tax decisions that the Court subsequently rejected in *Scheiner*, and the Court therefore expressly disapproved *Capitol Greyhound* as well. *See American Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 172, 179-80 (1990) (plurality op.). Indeed, although the State dismisses Justice Frankfurter's *Capitol Greyhound* dissent (Br. 61), *Scheiner* expressly embraced that dissent. 483 U.S. at 291.

inquiries … serve distinct purposes. Fair approximation zeros in on the fairness of the method by which the fees are charged, not the reasonableness of the amount of money generated from them." Add. 36. RhodeWorks' constitutional defect lies in its allocation of charges *between* users (and attendant danger that such fees will fall disproportionately on interstate commerce), not the use made of the funds collected.

### 5. *No court has upheld a user-fee regime like RhodeWorks.*

Finally, the State insists that "[n]o Circuit has struck down" a toll "for failure to fairly approximate" and "[t]he district court's approach stands alone." Br. 48, 49. The State is indeed correct that there is no case on all fours factually with this one. But that is because no other state has, or apparently ever has had, a toll like RhodeWorks—which falls on only a minuscule subset of the vehicles using the tolled facilities, draws lines between vehicles that the record shows have no basis in fact, and further divorces tolls from use through caps.

RhodeWorks is not unconstitutional simply because it is an extreme outlier. Add.46 n.31. That no other U.S. jurisdiction ever has thought it appropriate to use the RhodeWorks formula, however, surely suggests a consensus that the formula does not reflect a fair approximation of use.

*Cf. Honda*, 512 U.S. at 430. The unprecedented feature of this case is not the district court's approach—which carefully follows the guidance of the Supreme Court and this Court, and closely analyzes the State's factual justifications for RhodeWorks—but RhodeWorks itself. States have very significant leeway in crafting tolls and other user fees, and may use any number of approaches in doing so. But because RhodeWorks does not even attempt to fairly approximate use, it fails the fair-approximation test and imposes an undue burden on commerce.[24]

---

[24]    The State concludes by saying that "the 'undue burden' test implements *Pike* balancing." Br. 64 n.2 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)); *see id.* 20-21. This gets matters backwards; *Pike*'s balancing test is one of the means by which courts implement the broader prohibition of undue burdens on commerce. And the *Pike* doctrine supports our fair-approximation argument. Seven Justices very recently made clear that *Pike*'s test is more searching than the rational-basis inquiry contended for here by the State. *NPPC*, 2023 WL 3356528, at *16-17 (Sotomayor, J.); *id.* at *17-18 (Barrett, J.); *id.* at *18-22 (Roberts, C.J.). The fair-approximation test is more searching still: Although *Pike* calls for unquantified balancing of incommensurate interstate and local interests (*see id.* at *12 (Gorsuch, J.)), user fees are governed by a separate test seeking a quantifiable determination whether the fees fairly approximate use. That inquiry is not precise, but it involves assessing commensurate values and does not require balancing at all. Making such a determination falls squarely within the ordinary judicial role. *Cf. id.* at *17 (Sotomayor, J.).

## CONCLUSION

The Court should affirm the judgment of the district court.

Dated:  May 25, 2023

Respectfully submitted,

*/s/ Charles A. Rothfeld*

Richard Pianka
ATA LITIGATION CENTER
80 M Street SE
Washington, DC 20003
(703) 838-1889
rpianka@trucking.org

Charles A. Rothfeld
Evan M. Tager
Reginald R. Goeke
Eric A. White
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
crothfeld@mayerbrown.com
etager@mayerbrown.com
rgoeke@mayerbrown.com
eawhite@mayerbrown.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12996 words, excluding the parts of the motion exempted by Rule 32(f).

I further certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: May 25, 2023                /s/ *Charles A. Rothfeld*
                                   Charles A. Rothfeld

                                   *Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that that on May 25, 2023, I electronically filed the foregoing with the Clerk of the Court using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished via CM/ECF.

Dated: May 25, 2023                    /s/ *Charles A. Rothfeld*
                                       Charles A. Rothfeld

                                       *Counsel for Plaintiffs-Appellees*