# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

Nos. 22-1795, 22-1796

AMERICAN TRUCKING ASSOCIATIONS, INC.; CUMBERLAND FARMS, INC.
M&M TRANSPORT SERVICES, INC.,

*Plaintiffs-Appellees,*

NEW ENGLAND MOTOR FREIGHT, INC.,

*Plaintiff,*

*v.*

RHODE ISLAND TURNPIKE AND BRIDGE AUTHORITY,

*Defendant-Appellant,*

PETER ALVITI, JR., IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
RHODE ISLAND DEPARTMENT OF TRANSPORTATION

*Defendant.*

_____

AMERICAN TRUCKING ASSOCIATIONS, INC.; CUMBERLAND FARMS, INC.
M&M TRANSPORT SERVICES, INC.,

*Plaintiffs-Appellees,*

NEW ENGLAND MOTOR FREIGHT, INC.,

*Plaintiff,*

*v.*

PETER ALVITI, JR., IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
RHODE ISLAND DEPARTMENT OF TRANSPORTATION

*Defendant-Appellant,*

RHODE ISLAND TURNPIKE AND BRIDGE AUTHORITY,

*Defendant.*

_____

Appeals from the United States District Court for the District
of Rhode Island, No. 1:18-cv-378 (Hon. William E. Smith)

**BRIEF OF AMERICAN HIGHWAY USERS ALLIANCE, INTER-
MODAL ASSOCIATION OF NORTH AMERICA, NATSO,**

TRUCKLOAD CARRIERS ASSOCIATION, TRALA, RHODE IS-
LAND TRUCKING ASSOCIATION, INC., MAINE MOTOR
TRANSPORT ASSOCIATION, INC., MARYLAND MOTOR
TRUCK ASSOCIATION, INC., TRUCKING ASSOCIATION OF
MASSACHUSETTS, MOTOR TRANSPORT ASSOCIATION OF
CT, INC., NEW HAMPSHIRE MOTOR TRANSPORT ASSOC.,
TRUCKING ASSOCIATION OF NEW YORK, PENNSYLVANIA
MOTOR TRUCK ASSOCIATION, VERMONT TRUCK AND BUS
ASSOCIATION, ALABAMA TRUCKING ASSOCIATION, INC.,
GEORGIA MOTOR TRUCKING ASSOCIATION, INC., ARKAN-
SAS TRUCKING ASSOCIATION, FLORIDA TRUCKING ASSO-
CIATION, INC., LOUISIANA MOTOR TRANSPORT
ASSOCIATION, INC., NORTH CAROLINA TRUCKING ASSOC.,
INC., SOUTH CAROLINA TRUCKING ASSOC., INC., MISSIS-
SIPPI TRUCKING ASSOCIATION, VIRGINIA TRUCKING AS-
SOCIATION, TENNESSEE TRUCKING ASSOCIATION,
KENTUCKY TRUCKING ASSOCIATION, INC., WEST VIRGINIA
TRUCKING ASSOCIATION, INC., IDAHO TRUCKING ASSOCI-
ATION, NEVADA TRUCKING ASSOCIATIONS, INC., SOUTH
DAKOTA TRUCKING ASSOCIATION, WASHINGTON TRUCK-
ING ASSOCIATIONS, ARIZONA TRUCKING ASSOCIATION,
HAWAII TRANSPORTATION ASSOCIATION, NEW MEXICO
TRUCKING ASSOCIATION, NORTH DAKOTA MOTOR CARRI-
ERS ASSOC., INC., COLORADO MOTOR CARRIERS ASSOCIA-
TION, MONTANA TRUCKING ASSOCIATION, OREGON
TRUCKING ASSOCIATIONS, INC., INDIANA MOTOR TRUCK
ASSOCIATION, INC., CALIFORNIA TRUCKING ASSOCIATION,
UTAH TRUCKING ASSOCIATION, ALASKA TRUCKING ASSO-
CIATION, INC., OHIO TRUCKING ASSOCIATION, ILLINOIS
TRUCKING ASSOCIATION, INC., MISSOURI TRUCKING AS-
SOCIATION, MINNESOTA TRUCKING ASSOCIATION, TEXAS
TRUCKING ASSOCIATION, MICHIGAN TRUCKING ASSOCIA-
TION, INC., IOWA MOTOR TRUCK ASSOCIATION, INC., NE-
BRASKA TRUCKING ASSOCIATION, OKLAHOMA TRUCKING
ASSOCIATION, WISCONSIN MOTOR CARRIERS ASSOCIATION
AND WYOMING TRUCKING ASSOCIATION, INC., AS *AMICI
CURIAE* IN

### SUPPORT OF PLAINTIFFS-APPELLEES

Prasad Sharma
psharma@scopelitis.com
Scopelitis, Garvin, Light, Hanson &
 Feary, P.C.
4601 North Fairfax Drive, Suite 220
Arlington, Virginia 22203
(202) 551-9030

*Attorney for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* American Highway Users Alliance, Intermodal Association of North America, NATSO, Truckload Carriers Association, TRALA, Rhode Island Trucking Association, Inc., Maine Motor Transport Association, Inc., Maryland Motor Truck Association, Inc., Trucking Association of Massachusetts, Motor Transport Association of CT, Inc., New Hampshire Motor Transport Assoc., Trucking Association of New York, Pennsylvania Motor Truck Association, Vermont Truck and Bus Association, Alabama Trucking Association, Inc., Georgia Motor Trucking Association, Inc., Arkansas Trucking Association, Florida Trucking Association, Inc., Louisiana Motor Transport Association, Inc., North Carolina Trucking Assoc., Inc., South Carolina Trucking Assoc., Inc., Mississippi Trucking Association, Virginia Trucking Association, Tennessee Trucking Association, Kentucky Trucking Association, Inc., West Virginia Trucking Association, Inc., Idaho Trucking Association, Nevada Trucking Associations, Inc., South Dakota Trucking Association, Washington Trucking Associations, Arizona Trucking Association, Hawaii Transportation Association, New Mexico Trucking Association, North Dakota Motor Carriers Assoc., Inc., Colorado Motor Carriers Association, Montana Trucking Association, Oregon Trucking Associations, Inc., California Trucking Association, Utah Trucking Association, Alaska Trucking Association, Inc., Indiana Motor Truck Association, Inc., Ohio Trucking Association, Illinois Trucking Association, Inc., Missouri Trucking Association, Minnesota Trucking Association, Texas Trucking Association, Michigan Trucking Association, Inc., Iowa Motor Truck Association, Inc., Nebraska Trucking Association, Oklahoma Trucking Association, Wisconsin Motor Carriers Association, and Wyoming Trucking Association, Inc., certifies that, with respect to each *amicus*, it has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..........................................0

TABLE OF CONTENTS ....................................................................i

TABLE OF AUTHORITIES................................................................ii

IDENTITY AND INTEREST OF *AMICI CURIAE* ..............................1

INTRODUCTION............................................................................6

ARGUMENT ..................................................................................9

I.    NO STATE WOULD DESIGN A TOLLING SCHEME LIKE RHODEWORKS UNLESS THE INTENT WAS TO UNFAIRLY SHIFT THE BURDEN ONTO OUT-OF-STATE INTERESTS. ..................................................................9

    A.    RHODE ISLAND'S NOVEL TOLLING SCHEME WAS REVERSE ENGINEERED TO SHIELD IN-STATE PAYERS. ..................................................................9

    B.    THERE IS NO REASONABLE EXPLANATION FOR RHODE ISLAND ADOPTING SUCH A RADICAL TOLLING REGIME. ....................................................12

        1.    RhodeWorks Is Not the Product of Thoughtful Toll Design. ..............................................................12

        2.    Drawing the Line at Class 8 and Above Trucks Is Incoherent. ...............................................13

        3.    The Decision to Use a Particular Tolling Technology Cannot Justify a Constitutional Violation. ...................................................15

    C.    INTERNATIONAL ANALOGS TO THE RHODEWORKS TOLLING STRUCTURE HAVE FACED SIMILAR LEGAL IMPEDIMENTS.......................17

II.    OUTDATED METHODOLOGY AND DISREGARD FOR REVENUE GENERATED UNDER INTERSTATE COMPACTS UNDERPIN RHODE ISLAND'S MISTAKEN VIEW OF "FAIR APPROXIMATION OF USE." ...........................20

## TABLE OF CONTENTS
### (continued)

Page

A.    RHODE ISLAND ATTRIBUTES FAR TOO MUCH DAMAGE TO TOLLED BRIDGES TO CLASS 8 AND ABOVE TRUCKS. .................................................. 20

B.    RHODE ISLAND ALSO IGNORES REGISTRATION AND FUEL TAX FEES PAID BY OUT-OF-STATE TRUCKS UN-DER INTERSTATE COMPACTS, LEADING TO "DOUBLE TAXATION." ............................. 25

CONCLUSION ....................................................... 28

CERTIFICATE OF COMPLIANCE...................................... 29

CERTIFICATE OF SERVICE............................................. 30

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Amer. Trucking Associations v. Scheiner*,
  483 U.S. 266, (1987)...............................................................15, 17

*Cont'l Baking Co. v. Woodring*,
  286 U.S. 352 (1932)......................................................................14

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta
  Airlines, Inc.*,
  405 U.S. 707 (1972)......................................................................12

*Ne. Patients Grp. v. United Cannabis Patients & Caregivers
  of Me.*,
  45 F.4th 542 (1st Cir. 2022)..........................................................11

*Nw. Airlines, Inc. v. Cnty. of Kent*,
  510 U.S. 355 (1994)......................................................................12

*Trailer Marine Transport Corp. v. Rivera Vazquez*,
  977 F.2d 1 (1st Cir. 1992)........................................................14, 15

**Statues & Regulations**

Pub. L. No. 102-240, § 4008 ...............................................................26

**Other Authorities**

Andrea Broaddus & Carsten Gertz, "*Tolling Heavy
  Goods Vehicles: Over-view of European Practice
  and Lessons from German Experience*," Transportation
  Research Record: Journal of the Transportation
  Research Board, No. 2066, p. 106 (Dec. 2008)...........................17, 18

*Black's Law Dictionary* (11th ed. 2019) ............................................19

Commission Decision 2009/150, 2006 O.J. (L50) 1 (EC). ...................19

Council Directive 2011/76, 2011 O.J. (L269) 1 (EC)............................19

Federal Highway Administration, Traffic Monitoring
  Guide, at App. C...................................................................14

Shokravi H, Bakhary N, Heidarrezaei M, Rahimian
  Koloor SS, Petrů M. *A Review on Vehicle Classification*

**TABLE OF AUTHORITIES**
**(continued)**

*and Potential Use of Smart Vehicle-Assisted*
  *Techniques.* SENSORS (BASEL). Jun. 8, 2020...................................16

Transport & Environment, Green Budget Europe,
  *Towards a European Fuel Tax Agreement: How to*
  *Cut Diesel Tax Competition by Adopting US/Canada*
  *IFTA Model for Trucks*, p.1 (Apr. 2015).....................................18, 19

*Tolling by Weight,* International Society for
  Weigh-in-Motion ...............................................................................14

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

The American Highway Users Alliance ("Highway Users") is the united voice of the motoring public, promoting safe, uncongested highways and enhanced mobility and related benefits for people and business. A 300-member coalition, the Highway Users includes companies, trade associations, safety advocacy groups, and motoring clubs. Its members represent or support millions of road users from the truck, bus, auto, RV, and motorcycling modes. Such users pay the bulk of the fees deposited into the Federal Highway Trust Fund, fees which the public wants to see turned into highway, bridge, and highway safety investments that help grow the economy, improve supply chains, enhance safety, and improve the quality of life. The Highway Users' mission is to advocate for efficient use of highway funds to achieve the benefits of a

---

[1] All parties have consented to the filing of this amicus brief. No counsel for any party authored this brief in whole or in part, and, except as noted, no party, party's counsel, or person other than amici, their respective members, or their counsel contributed money that was intended to fund preparing or submitting this brief. NETAEC, which is a nonprofit membership association of 10 state trucking associations in the Northeast, contributed money to the preparation of this brief on behalf of nine of its members listed herein.

highway system that has adequate capacity, is safe, and is in good or better condition in order to enhance the economy.

The Intermodal Association of North America ("IANA") is a leading transportation trade association representing the combined interests of the intermodal freight industry. The intermodal freight industry involves the movement of freight, in a container or on a trailer, by more than one mode of transportation. IANA's voting membership is comprised of over 1,000 corporate members involved with the intermodal transportation of cargo throughout the United States, including intermodal and over-the-road motor carriers, railroads (Class I, short-line, and regional), water carriers, stacktrain operators, port authorities, intermodal marketing and logistics companies, and suppliers to the industry such as equipment manufacturers, leasing companies, and technology firms. IANA's members transport over 90% of the intermodal cargo moving throughout the United States. IANA's mission is to promote the growth of efficient intermodal freight transportation through innovation, education, and dialogue. As motor carriers are a crucial link in the nation's intermodal network, IANA highly value sta-

bility and uniformity in the trucking sector of the industry and across the entire nation.

NATSO represents America's travel centers, truck stops, and off-highway transportation energy providers catering to motorists and commercial truck drivers traveling on the Interstate Highway System and the local population. Truck stops and travel centers serve as the home away from home for the nation's professional drivers. In addition to providing fuel, food, showers and other amenities, NATSO's members provide approximately 90 percent of the nation's overnight truck parking capacity. Nationwide, there are more than 5,000 truck stops and travel plazas that fit the traditional definition of a truck stop, and there are several thousand more that also serve truck drivers under a different format. NATSO membership includes single, family-run operations, regional chains and large national chains. NATSO members comprise the country's downstream fuel distribution system. They are surrogates for the motoring public in that they identify the most reliable, lowest-cost transportation energy available, and deliver that energy to every community in the country.

The Truckload Carriers Association ("TCA") is the only national trade association whose collective focus is the truckload segment of the trucking industry. TCA represents dry van, refrigerated, flatbed, and rail intermodal carriers operating in the 48 contiguous U.S. states, as well as Alaska, Mexico, and Canada. As a major part of an industry that has over half a million companies within the United States operating millions of Class 8 and above vehicles, TCA and its trucking company members regularly advocate before the courts on matters affecting the national transportation industry's common interests and inform on the potential impacts these matters could have on their operations.

TRALA is a voluntary nonprofit trade association founded to serve as the unified voice for the truck renting and leasing industry. TRALA's mission is to foster a positive legal and regulatory climate within which companies engaged in leasing and renting vehicles and trailers, as well as related businesses, can compete without discrimination in the North American marketplace. TRALA's nearly 500 members engage mainly in commercial truck renting and leasing, vehicle finance leasing, and consumer truck rental, but its membership also includes companies with motor-carrier operations and approximately one hundred supplier

4

member companies that offer equipment, products, and services to TRALA renting and leasing company members. Today, about one in every four trucks on the road, regardless of size, is a rented or leased vehicle.

A group of 48 state trucking associations.[2] A state trucking association is a nonprofit trade association that represents the interests of its trucking industry members – both motor carriers and the vendors and suppliers to the trucking industry – within its respective state. A state trucking association is the primary advocate for the trucking industry before the legislative, regulatory, and judicial branches of state government and, where necessary, the federal government. Collectively, the *amici* state trucking associations represent roughly 35,000 member companies.

Together, *amici* represent tens of thousands of highway users and beneficiaries of national highway systems, which have been critical to the free flow of commerce and the economic dynamism of the United States. *Amici* have a vital interest in ensuring the constitutional protec-

_____

[2] A full list of *amici* state trucking associations is included in the Appendix.

5

tions that were put in place to secure this result are upheld. Affirming the district court's decision is essential to discouraging other states from embracing any program, like RhodeWorks, that seeks to discriminate against, or unduly burden, interstate commerce in general and the trucking industry, specifically.

## INTRODUCTION

In conceiving of, and implementing, the RhodeWorks truck-only tolling scheme, Rhode Island was confoundingly groundbreaking and anachronistic at the same time. Together, these aspects of Rhode Island's tolling scheme contribute to it being unconstitutional under the dormant Commerce Clause.

RhodeWorks was groundbreaking as the first and only scheme in the United States to *only* toll Federal Highway Administration ("FHWA") Class 8 and above trucks—i.e., the largest kinds of trucks, which are commonly used for interstate or cross-country transportation.[3] Yet, the bridges on which Rhode Island elected to erect tolls are not traversed only by Class 8 and above trucks. They are traveled on,

---

[3] Unless otherwise stated, any reference to a class of vehicles shall be with respect to the corresponding FHWA Class.

crossed, or *used*, in common parlance, by owners of passenger vehicles, buses, and Class 5-7 straight trucks on a daily basis. It is no coincidence that the majority of those users are local Rhode Islanders who are not subject to tolling. Instead of designing a fair, user-based scheme to raise its revenue goals, Rhode Island started with the foundational premise that it would be more politically palatable to make out-of-state users foot the overwhelming majority of the bill.

Next, and only after deciding to toll only trucks, Rhode Island went searching for a way to justify this decision. It did so by turning back the hands of time and relying on an old 1979 Government Accounting Office ("GAO") study that was based on an even older 1966 report on road testing to conclude that Class 8 and above trucks contribute far more to roadway wear and tear than they contribute in taxes and fees. Not only was Rhode Island wrong to rely on an abandoned approach that measured pavement deterioration and not bridge wear and tear, but it also ignored the taxes and fees that Class 8 and above vehicles, including out-of-state vehicles, already pay toward Rhode Island's roadways.

Starting with a constitutionally impermissible objective of placing the burden of the tolling scheme on out-of-state trucks, RhodeWorks is built on layers of irrational premises. *First*, exempting 97% of bridge users from the toll cannot result in a fair charge for bridge use. *Second*, singling out tolled vehicles based on vehicle configuration and not weight does not rationally reflect a vehicle's contribution to bridge wear and tear. *Third*, ignoring the myriad ways and amounts that out-of-state trucks already contribute to funding of Rhode Island's roads and bridges may effectively paint Class 8 and above trucks as freeloaders, but it has no basis in fact.

Citizens across the country, Rhode Islanders included, benefit from the constitutionally protected flow of interstate commerce. Although tolling is not *amici*'s preferred option for addressing critical transportation infrastructure needs for myriad policy reasons, tolling schemes, like Rhode Island's, must not be allowed to circumvent the legal protections afforded interstate commerce. For that reason, this Court should affirm the decision below.

# ARGUMENT

## I. NO STATE WOULD DESIGN A TOLLING SCHEME LIKE RHODEWORKS UNLESS THE INTENT WAS TO UNFAIRLY SHIFT THE BURDEN ONTO OUT-OF-STATE INTERESTS.

Rhode Island embarked on an effort to explore ways to increase funding for infrastructure, including Rhode Island's bridges. It did not take long to settle on tolling as the solution and from the outset, the focus was on trucks and not passenger vehicles. Add. 6. With Rhode-Works, Rhode Island is the only State to deploy a truck-only tolling system. That alone makes Rhode Island unique, but RhodeWorks makes it even more peculiar because it targets only large, combination trucks—i.e., the very trucks most likely to be making interstate trips. Add. 11-12. RhodeWorks is the end product of a deliberate design to shift the toll burden to predominantly out-of-state trucks.

### A. RHODE ISLAND'S NOVEL TOLLING SCHEME WAS RE-VERSE ENGINEERED TO SHIELD IN-STATE PAYERS.

Simply put, Rhode Island decided it wanted to impose a tolling system that inflicted little to no pain on locals, who are the primary users of Rhode Island's bridges. Its backfilled justifications are implausible and irrational.

9

Prior to the first draft of the legislation authorizing RhodeWorks, the Rhode Island Department of Transportation ("RIDOT") was intently focused on how the design of a toll system would impact out-of-state versus in-state vehicles. Add. 6. In fact, RIDOT's consultant's report noted that understanding the percent of truck traffic that was in-state versus out-of-state was "[a]n important consideration in the development of the RhodeWorks program." May 25 Tr. 10:8-11:6 (Rocchio). Aware that trucks represent more out-of-state traffic than do passenger vehicles, and through a process that the district court called "less than robust," RIDOT's then-Deputy Director conceived the truck-only tolling idea at his family dinner table. Add. 68-69. Only after the die had been cast did RIDOT begin a frantic effort, including numerous Google searches, to seek support justifying its unique approach. As American Trucking Associations ("ATA") has explained, and as further explained herein, these post-hoc efforts do not justify the unique tolling scheme as either constitutional or rational.

In the face of opposition from local interests to the legislation it initially proffered, RIDOT offered a second draft of the legislation that would remove Class 6 and 7 trucks from tolling, despite its consultant's

recommendations to include those classes of trucks. Add. 69. This second draft also limited tolls assessed against the same vehicle to once per location, per day in each direction. Legislators and state officials stated that the changes would reduce the impact of the proposed tolls on local businesses. *Id.* Even the State concedes that "constituents opposed tolling Class 6-7 trucks to protect small businesses," State Br. at 26, which they understand to be local businesses. State Br. at 31.

The result of the changes in the second draft are consistent with Rhode Island's fixation on shifting the burden to out-of-state trucks. The roughly 40% of Class 4-7 truck traffic that comprise Rhode Island-registered vehicles escaped tolling altogether, leaving approximately 80% of tolled vehicles coming from out-of-state. Add. 71. There can be no more stark an example of a state legislative process not serving as an "effective restraint against protectionist state laws" resulting in the disproportionate imposition of burdens "on actors who are unrepresented in the state legislatures." Add. 33-34 (quoting *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542, 552 (1st Cir. 2022).

**B.    THERE IS NO REASONABLE EXPLANATION FOR RHODE ISLAND ADOPTING SUCH A RADICAL TOLLING REGIME.**

**1.    RhodeWorks Is Not the Product of Thoughtful Toll Design.**

Rhode Island enacted RhodeWorks tolls to generate additional revenue to fund transportation infrastructure with a goal of $45 million per year. Add. 6. A "toll" is defined as "the consideration paid [] to use a public road, highway, or bridge." *Black's Law Dictionary* (11th ed. 2019). Rather than applying the toll to all bridge users to keep rates down, as RIDOT's consultant had suggested when recommending inclusion of Class 4-7 trucks, Rhode Island exempted approximately 97% of the total vehicle traffic that uses the tolled bridges. Add. 11. A tolling regime in which only 3% of the users pay for use can hardly be considered a "fair approximation of the use of the facilities." *Nw. Airlines, Inc. v. Cnty. of Kent*, 510 U.S. 355, 369 (1994) (citing *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 716-17 (1972)). Tolling schemes that pass constitutional muster often broaden the toll base in order to keep rates down. Because a large percentage of local constituents are exempted under RhodeWorks, out-of-

state payers like those represented by *amici* are powerless to ensure that toll rates are reasonable.

Ignoring the inconvenient fact that 97% of users are exempted, the State argues that "RhodeWorks tolls are 'fair' because they, like all per-use road tolls, charge only those trucks that use Rhode Island bridges." State Br. at 48. Importantly, the State equates "use" with crossing a bridge. *Id.* ("If a truck crosses one bridge, it is charged one toll."). If RhodeWorks tolls were "like all per-use road tolls," they would charge *all trucks* and *all passenger vehicles* that cross Rhode Island bridges. Add. 11-12 (discussing uniqueness of RhodeWorks Class 8 truck and above toll structure). But RhodeWorks only targets trucks, not all users. Even worse, RhodeWorks only applies to Class 8 trucks and above. So, the trucks Rhode Island identified as most likely to be registered in Rhode Island do not pay to cross a Rhode Island bridge while the tolls paid by out-of-state trucks subsidize their use. Although the State understands what a "fair approximation" toll *should* look like, they deliberately failed to implement one.

### 2. Drawing the Line at Class 8 and Above Trucks Is Incoherent.

Establishing Class 8 and above as the demarcation for which vehi-

cles get tolled is not reasonable. The State argues that the line was drawn because Class 8 and above vehicles cause the heaviest damage to the bridges.[4] State Br. at 30. Even assuming weight is the primary factor contributing to damage, the FHWA vehicle classifications which RhodeWorks incorporated make no reference to weight.[5]  Federal Highway Administration, Traffic Monitoring Guide, at App. C. Therefore, it is entirely possible for a Class 6 single unit truck to carry a load weighing more than a load carried by a Class 8 combination vehicle. In fact, the district court found that a large percentage (86.4%) of vehicles that *exceeded* Rhode Island's weight limits were in exempted Classes 5-7. Add. 60.

Recognizing the weakness of their rationale, the State claims deference under *Cont'l Baking Co. v. Woodring*, 286 U.S. 352 (1932), but tellingly leave out the critical prelude to the quote about adapting regu-

---

[4] Amici address the issue of damage allocation in Section II.A.

[5] The RIDOT Director correctly noted that many tolling agencies differentiate toll rates so that larger vehicles are charged higher amounts than smaller vehicles. Add. 12. If weight were the concern, Rhode Island could have chosen weigh-in-motion technology to differentiate tolls based on vehicle weight. *See Tolling by Weight,* International Society for Weigh-in-Motion    (https://www.is-wim.net/what-iswim/applications-of-wim-data/tolling-by-weight/) (last visited May 17, 2023).

lations to classes of operations.[6]  State Br. at 49-50. The Court said that in making a classification, the Legislature is "entitled to consider frequency and character of use to adapt its regulations." *Woodring*, 286 U.S. at 373. The record indicates that straight trucks' use of the tolled bridges is not markedly different from Class 8 and above trucks, thus providing no basis for Rhode Island's purported adaptation. Add. 59.

### 3.  The Decision to Use a Particular Tolling Technology Cannot Justify a Constitutional Violation.

Despite the State's own admission that removal of Class 6 and 7 vehicles in the second draft of the legislation was in response to constituents' desire to protect local businesses, State Br. at 26, it instead offers a less constitutionally suspect rationale that administrative collection considerations required the exemption of straight trucks. *Id.* at 31. By its own account, the State's use of specialized laser toll detection technology which detects a gap between a tractor and a trailer (*i.e.*. Class 8 and above combination vehicles) that does not exist with

---

[6] In *Trailer Marine Transport Corp. v. Rivera Vazquez*, 977 F.2d 1, 10 (1st Cir. 1992), this Court said, "[T]he Supreme Court has not shown states the deference normally afforded them in matters of economic regulation."

straight trucks (*i.e.*, Class 7 and below trucks) is an administrative consideration that justifies the toll structure.

That may be true if exempting Class 7 and below vehicles was "the only practical means" of collecting the tolls. *Trailer Marine*, 977 F.2d at 12 (citing *Amer. Trucking Associations v. Scheiner*, 483 U.S. 266, (1987)). But, as this Court stated in *Trailer Marine*, "'only practicable means' is a more demanding standard than mere administrative convenience" and Rhode Island was in no way obligated to use the specialized technology. *Id.* In fact, a wide array of technologies are used in open road electronic tolling and are capable of differentiating based on vehicle classification, if so desired, in ways that would not require outright exemption of Class 7 and below vehicles. *See* Shokravi H, Bakhary N, Heidarrezaei M, Rahimian Koloor SS, Petrů M. *A Review on Vehicle Classification and Potential Use of Smart Vehicle-Assisted Techniques*. Sensors (Basel). Jun. 8, 2020 (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7309154/) (last visited May 16, 2023).

### C. INTERNATIONAL ANALOGS TO THE RHODEWORKS TOLLING STRUCTURE HAVE FACED SIMILAR LEGAL IMPEDIMENTS.

With no example in the United States, *amicus* International Bridge, Tunnel and Turnpike Association ("IBTTA") looks to Europe to bolster the validity of RhodeWorks' truck only tolling scheme. A brief review only highlights RhodeWorks' legal infirmities and demonstrates the European example is critically different.[7]

In 2005, Germany enacted a distance-based toll (the "HGV Toll") for trucks greater than 12 tons using the national motorways. The HGV Toll was authorized by a 1999 European Union (EU) directive regulating heavy goods vehicles tolls on the trans-European road network, which set the vehicles to be tolled at 12 tons or greater maximum laden weight and set a formula for calculating toll rates. Andrea Broaddus & Carsten Gertz, "*Tolling Heavy Goods Vehicles: Over-view of European Practice and Lessons from German Experience*," Transportation Re-

---

[7] Although amici understand the analysis here is under the U.S. Constitution, European law does concern itself with discrimination against the free movement of commerce. Because IBTTA points to Germany as a similar model, the Court may benefit from the key differences and, to the extent they are similar, why both schemes have faced legal challenges based on discrimination.

search Record: Journal of the Transportation Research Board, No. 2066, p. 106 (Dec. 2008) ("Broaddus"). The EU directive "aimed to reduce discrimination and barriers to trade by ensuring similar conditions across the internal market." *Id.* At the time, foreign-registered vehicles made up 35% of truck-kilometers on Germany's national motorways and made no direct contributions to infrastructure costs.[8] Ferrol O. Robinson, *Heavy Vehicle Tolling in Germany: Performance, Outcomes and Lessons Learned for Future Pricing Efforts in Minnesota and the U.S.*, p. 3 (Oct. 1, 2008).

In fact, the German trucking industry initially supported the tolling scheme to level the playing field against foreign trucks, who filled their tanks just across the border to avoid Germany's higher diesel tax. Broaddus, at p. 109. This European problem is solved for trucks in the United States through IFTA. *See* Transport & Environment, Green Budget Europe, *Towards a European Fuel Tax Agreement: How to Cut*

---

[8] Compare this to 80% of tolled vehicles being out-of-state in Rhode Island and, as discussed in Section II.B, *infra*, out-of-state trucks already contributing significantly to Rhode Island's infrastructure costs prior to the tolling scheme through apportionment of registration fees under the International Registration Plan ("IRP") and fuel taxes under the International Fuel Tax Agreement ("IFTA"). Add. 71.

*Diesel Tax Competition by Adopting US/Canada IFTA Model for Trucks*, p.1 (Apr. 2015) (https://www.transportenvironment.org/discover/towards-european-fuel-tax-agreement/) (last visited May 30, 2023) (noting that due to Luxembourg's lower diesel tax compared to neighboring countries Germany, Belgium, and the Netherlands, Luxembourg generates fuel tax revenue 4 to 5 times higher per person than in those countries). Here, instead of addressing a free-rider problem that does not exist due to IFTA, Rhode Island is essentially double-taxing predominantly out-of-state trucks.

Notably, Germany originally proposed to rebate €600 million in fuel taxes imposed on fuel purchased in Germany to partially offset the HGV Toll expenses, but the European Commission struck that provision down as *de facto* unfair discrimination against foreign trucking companies. Commission Decision 2009/150, 2006 O.J. (L50) 1 (EC) (noting that "some hauliers (sic), which are predominantly non-German … will have to pay more toll than others while transporting the same heavy goods the same distance on the same motorway."). Also notably, the EU amended its HGV tolling directive in 2011 to extend application to vehicles weighing 3.5 tons or more. Council Directive 2011/76, 2011

O.J. (L269) 1 (EC). Germany and numerous European countries now set truck only[9] tolls at trucks weighing 3.5 tons or more, thus capturing many more trucks based on their weight and without regard to their configuration (whether straight trucks or combination trucks).

Rhode Island's measures favoring in-state interests would be illegal discrimination in the EU just as it is here. Even so, there are important differences when compared to RhodeWorks. Congress has not authorized truck only tolling as the EU did. Further, the EU-authorized scheme is based on the weight of the vehicles and not some artificial distinction based on vehicle configuration.

## II. OUTDATED METHODOLOGY AND DISREGARD FOR REVENUE GENERATED UNDER INTERSTATE COMPACTS UNDERPIN RHODE ISLAND'S MISTAKEN VIEW OF "FAIR APPROXIMATION OF USE."

### A. RHODE ISLAND ATTRIBUTES FAR TOO MUCH DAMAGE TO TOLLED BRIDGES TO CLASS 8 AND ABOVE TRUCKS.

To justify its novel approach to tolling, Rhode Island looked to the

---

[9] Germany more recently sought to extend tolling to passenger vehicles by pairing relief from motor vehicle tax for German-registered vehicles that pay the toll. As with the truck scheme, the proposal was struck down by the Court of Justice of the EU as discriminatory. Case C-591/17, Republic of Austria v. Federal Republic of Germany, ECLI:EU:C:2019:504 (Jun. 18, 2019).

distant past to support its finding that Class 8 and above trucks con-
tribute greater than 70% of the damage to Rhode Island's infra-
structure. In its findings, the General Assembly referenced a 1978 GAO
Study that the district court found inapplicable, because (1) it measured
the burden imposed by oversized and overweight vehicles (as opposed to
standard, legal trucks) and (2) it relied on the notion of equivalent sin-
gle-axle loads ("ESALs"), which derived from a 1966 American Associa-
tion of State Highway Officials ("AASHO") Road Test.[10] As to the
former, the record indicates 86.4% of vehicles that *exceeded* Rhode Is-
land's weight limits, and to which the GAO study may have been rele-
vant, were in exempted Classes 5-7. Add. 60. As to the latter, the
district court found there was agreement that "ESAL measurements are
not an effective way to measure impact on bridges (as opposed to on
pavement generally)."[11]  Add. 56.

    In addition to being irrelevant to bridge design, ESALs are not a

---

[10] The ESAL is a measurement unit that was used to take data from dif-
ferent trucks of different sizes with different axle groupings in order to
determine an equivalent load for purposes of pavement design.

[11] Even the most recent version of the AASHTO Guide for Pavement
Structures has jettisoned the ESAL concept because improved computer
capability has enabled better modeling. May 27 Tr. at 173:15-174:2
(Vavrik).

cost allocation tool. May 27 Tr. at 178:13-15 (Vavrik). Highway cost allocation studies ("HCAS") are a more modern way to allocate costs of infrastructure, including bridges, to users commensurate with their use. The point of an HCAS is to ascertain whether "each class of vehicle [is] paying their fair share." *Id.* at 159:4-5. Under the HCAS model, the costs for a bridge designed for cars are allocated across all users but the incremental costs to fortify the bridge for trucks, including Class 8 and above, get allocated specifically to those classes of vehicles.[12] *Id.* at 196:10-20.

However, for bridges, there are other costs to maintaining or rehabilitating a bridge that are not attributable to use or load impact. For example, damage may be attributable to environmental causes such as: erosion due to water flowing around a bridge, freezing and thawing causing cracks, salt and sand use causing cracks, and water entering a crack and causing rusting of the rebar. *Id.* at 197:2-12. These are considered shared costs. There may be other costs such as adding lanes or conductor-distributor roads to accommodate the heavy *volume* of users,

---

[12] These incremental costs for a bridge cover items like making the piers bigger and the pile caps, beams, and deck a little thicker, as necessary to accommodate trucks in addition to passenger vehicles.

which are predominantly passenger vehicles. *Id.* at 197:14-22. These are considered incremental costs caused by the heavy volume of cars and should be attributed to that class of vehicles. *Id.* at 198:2-7.

A report commissioned by Australia's National Transport Commission sets forth the economics behind a cost allocation approach. Adrian Kemp et. al., *Review of the Parameters Used to Allocate Road Infrastructure Costs to Heavy Vehicles*, (Mar. 2017) (https://www.ntc.gov.au/sites/default/files/assets/files/HoustonKemp%20Cost%20Allocation%20Review%20Report%20-2017_0.pdf) (last visited May 30, 2023). The authors examined methods to allocate the total road infrastructure cost base to the costs of providing road infrastructure to heavy vehicles. Illustrating application of the framework, the authors suggested there is an incremental cost for heavy vehicle road use, an incremental cost for other vehicle road use, and costs that are independent of use, e.g., due to environmental factors. *Id.* at 13. In their view, the allocation of those costs that are independent of use should be allocated to groups paying heed to, among other things, "whether it is equitable for one class of user to bear a disproportionately large share of

those costs and, in so doing, afford other users a disproportionately large share of the cost-advantages of shared road use." *Id.* at 14.

Examining bridge maintenance and rehabilitation costs specifically, the study suggested that 33% of costs could be considered the load- or impact-related share of such costs, which should be allocated based on average gross mass kilometers (a weight-based measure where heavier vehicles measure higher), and 67% of costs could be considered other non load-related costs, which should be allocated based on vehicle kilometer traveled (measuring all vehicle use).[13] *Id.* at 39. In contrast, RhodeWorks, at least with respect to toll revenue for bridge repair and maintenance, allocates all of the costs based on vehicle configuration (not weight) and exempts the overwhelming majority of vehicle use.

Returning to the United States, the FHWA HCAS attributes an estimated 21.4% of bridge costs to tractor-trailers. Add. 62. Adjusting for the low, actual Class 8 and above traffic volume in Rhode Island, American Trucking Associations' expert estimated the cost allocation for Rhode Island bridges to be 11% of total costs. *Id.* No HCAS in the

---

[13] With respect to allocation based on the metric equivalent of vehicle miles traveled, the study said the allocation "reflects equitable principles and the extent of road use." *Id.*

record approaches anywhere close to the 70% allocation the General Assembly attributed to tractor trailers.

### B. RHODE ISLAND ALSO IGNORES REGISTRATION AND FUEL TAX FEES PAID BY OUT-OF-STATE TRUCKS UNDER INTERSTATE COMPACTS, LEADING TO "DOUBLE TAXATION."

The State wrongly claims the fair approximation analysis should consider non-toll funding sources. As the district court correctly concluded and as ATA explains, the toll for the bridge must be evaluated on its own. Add. 51. Nevertheless, the Court may find it helpful to understand the extent to which *out-of-state trucks* contribute to Rhode Island's transportation funding, despite the State's claim that Rhode Island covers its portion of bridge repair costs remaining after toll funding through "sources like registration fees and gas taxes assessed *only on residents*." State Br. at 53 (emphasis added).

*First*, Rhode Island is a "donee state" meaning it receives more money from the federal Highway Trust Fund ("HTF") than it pays in. The HTF consists, in large part, of payments of federal diesel tax, heavy vehicle use fees, an excise tax on heavy vehicles, and large tire taxes – primarily paid by Class 8 and above trucks throughout the country. May 26 Tr. at 93:13-17 (Peters). The most recent statistics show that in

Fiscal Year 2019, Rhode Island paid roughly $85.7 million into the HTF but received $246.7 million. *Federal Highway Administration*, *Table FE-221*, Highway Statistics 2019, FHWA (available at https://www.fhwa.dot.gov/policyinformation/statistics/2019/fe221.cfm) (last visited May 17, 2023). Federal funds pay for 80% of Rhode Island's bridge reconstruction and repairs that remain after toll funding is expended. Add. 51, n.33.

*Second*, out-of-state trucks contribute apportioned registration fees to Rhode Island under the IRP. IRP is a reciprocity agreement among 48 states, D.C., and 10 Canadian provinces that allows motor carriers to register commercial motor vehicles in one state and receive apportioned plates to travel through all IRP member jurisdictions. The motor carrier pays one jurisdiction, but the registration fees are apportioned and paid to other member jurisdictions based on the total mileage the carrier's equipment operated in that jurisdiction according to that jurisdiction's fee schedule. The IRP's fundamental principle "is to promote and encourage the fullest possible use of the highway system." International Registration Plan, Art. 105. Although it began as a voluntary reciprocity agreement among a handful of states, with passage of

the Intermodal Surface Transportation Efficiency Act ("ISTEA"), federal law required the State to establish a uniform approach to vehicle registration and collection of motor fuel taxes. Pub. L. No. 102-240, § 4008 (Dec. 18, 1991).

*Third*, out-of-state trucks contribute apportioned state diesel taxes to Rhode Island under IFTA. IFTA is a reciprocity agreement between 48 states, D.C., and 10 Canadian Provinces that allows motor carriers to reconcile the fuel taxes paid at the pump with gallons attributable to each member jurisdiction (estimated based on mileage traveled in the jurisdiction). Therefore, even if an out-of-state truck never purchased diesel in Rhode Island but operated in Rhode Island, an apportioned amount of state fuel taxes paid would go to Rhode Island. As with IRP, IFTA's purpose is to "promote and encourage the fullest and most efficient possible use of the highway system." International Fuel Tax Agreement, Art. R130. And as with IRP, the ISTEA legislation mandated participation in IFTA.

Estimates based on RIDOT's budget demonstrate that Class 8 and above trucks contribute: (1) about $103 million of about $350 million in total federal funds (HTF and other federal funds) received by Rhode Is-

27

land; (2) roughly $18.8 million in fuel taxes; and (3) about $4.6 million from registration fees for a total of $126 million. May 26 Tr. at 99:11-17 (Peters). That is without counting any contributions from RhodeWorks tolls. That represents just over 21% of RIDOT's overall 2019 budget. *Id.* at 99:22-100:4. On top of that funding contribution, Class 8 and above vehicles pay 100% of RhodeWorks tolls.

## CONCLUSION

The Court should affirm the district court's order enjoining the collection of RhodeWorks tolls.

Dated:  June 1, 2023                     Respectfully submitted,

                                          *s/ Prasad Sharma*
                                          _____
                                          Prasad Sharma
                                          Scopelitis, Garvin, Light,
                                          Hanson & Feary, P.C.
                                          4601 North Fairfax Drive,
                                          Suite 220
                                          Arlington, VA 22203
                                          (202) 551.9030

                                          *Attorney for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 5,282 words, excluding the parts of the motion exempted by Rule 32(f).

I further certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook 14-point font, a proportionally spaced typeface.

Dated:  June 1, 2023                    Respectfully submitted,

*s/ Prasad Sharma*
Prasad Sharma
Scopelitis, Garvin, Light,
Hanson & Feary, P.C.
4601 North Fairfax Drive,
Suite 220
Arlington, VA 22203
(202) 551.9030

*Attorney for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that that on June 1, 2023, I electronically filed the foregoing with the Clerk of the Court using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished via CM/ECF.

Dated:   June 1, 2023

Respectfully submitted,

*s/ Prasad Sharma*

Prasad Sharma
Scopelitis, Garvin, Light,
Hanson & Feary, P.C.
4601 North Fairfax Drive,
Suite 220
Arlington, VA 22203
(202) 551.9030

*Attorney for Amici Curiae*

# APPENDIX

**(List of State Trucking Association *amici*)**

# State Trucking Associations

Maine Motor Transport Association, Inc.
Maryland Motor Truck Association, Inc.
Trucking Association of Massachusetts
Motor Transport Association of CT, Inc.
New Hampshire Motor Transport Assoc.
Trucking Association of New York
Pennsylvania Motor Truck Association
Rhode Island Trucking Association, Inc.
Vermont Truck and Bus Association, Inc.
Alabama Trucking Association, Inc.
Georgia Motor Trucking Association, Inc.
Arkansas Trucking Association
Florida Trucking Association, Inc.
Louisiana Motor Transport Association, Inc.
North Carolina Trucking Assoc., Inc.
South Carolina Trucking Assoc., Inc.
Mississippi Trucking Association
Virginia Trucking Association
Tennessee Trucking Association
Kentucky Trucking Association, Inc.
West Virginia Trucking Association, Inc.
Indiana Motor Truck Association, Inc.
Ohio Trucking Association
Illinois Trucking Association, Inc.
Missouri Trucking Association
Minnesota Trucking Association
Texas Trucking Association
Michigan Trucking Association, Inc.
Iowa Motor Truck Association, Inc.
Nebraska Trucking Association
Oklahoma Trucking Association
Wisconsin Motor Carriers Association
Idaho Trucking Association
Nevada Trucking Association, Inc.
South Dakota Trucking Association
Washington Trucking Associations
Arizona Trucking Association

Hawaii Transportation Association
New Mexico Trucking Association
North Dakota Motor Carriers Assoc., Inc.
Colorado Motor Carriers Association
Montana Trucking Association
Oregon Trucking Associations, Inc.
Utah Trucking Association
California Trucking Association
Wyoming Trucking Association, Inc.
Alaska Trucking Association, Inc.

4884-0497-5463, v. 7