# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

No. 22-1795

AMERICAN TRUCKING ASSOCIATIONS, INC.; CUMBERLAND FARMS, INC.; M&M TRANSPORT SERVICES, INC.,

*Plaintiffs-Appellees*,

NEW ENGLAND MOTOR FREIGHT, INC.,

*Plaintiff*,

*v.*

RHODE ISLAND TURNPIKE AND BRIDGE AUTHORITY,

*Defendant-Appellant*,

PETER ALVITI, JR., in his official capacity as Director of the Rhode Island Department of Transportation,

*Defendant*.

No. 22-1796

AMERICAN TRUCKING ASSOCIATIONS, INC.; CUMBERLAND FARMS, INC.; M&M TRANSPORT SERVICES, INC.,

*Plaintiffs-Appellees*,

NEW ENGLAND MOTOR FREIGHT, INC.,

*Plaintiff*,

*v.*

PETER ALVITI, JR., in his official capacity as Director of the Rhode Island Department of Transportation,

*Defendant-Appellant*,

RHODE ISLAND TURNPIKE AND BRIDGE AUTHORITY,

*Defendant*.

On Appeal from the United States District Court for the District of Rhode Island, No. 1:18-cv-00378-WES, Judge William E. Smith.

**BRIEF FOR AMICUS CURIAE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF APPELLEES AND AFFIRMANCE**

May 31, 2023                    *Counsel listed on inside cover*

TYLER S. BADGLEY
JONATHAN D. URICK
U.S. CHAMBER OF COMMERCE
   LITIGATION CENTER
1615 H Street, NW
Washington, D.C.  20062
(202) 463-5337

MARK C. FLEMING
SHARON K. HOGUE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Mark.Fleming@wilmerhale.com
Sharon.Hogue@wilmerhale.com

*Attorneys for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

The Chamber of Commerce of the United States of America states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia.  The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF INTEREST OF AMICUS CURIAE ...........................................1

SUMMARY OF ARGUMENT ................................................................2

ARGUMENT ..............................................................................3

I.    RHODEWORKS VIOLATES THE COMMERCE CLAUSE .......................................3

     A.    State Laws That Discriminate Against Interstate Commerce Are Virtually Always Invalid ..............................7

     B.    RhodeWorks Discriminates Against Interstate Commerce .................8

          1.    RhodeWorks has a discriminatory purpose ...............................9

          2.    RhodeWorks discriminates in practice ....................................12

     C.    *National Pork Producers* Confirms The Correctness Of The District Court's Analysis ...............................14

     D.    RhodeWorks Also Fails Under The Fair Approximation Test ...............16

II.   UPHOLDING RHODEWORKS WOULD EMBOLDEN OTHER STATES TO MIMIC RHODE ISLAND'S DISCRIMINATION AGAINST INTERSTATE COMMERCE ........................18

CONCLUSION ...........................................................................20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alliance of Automobile Manufacturers v. Gwadosky*,
430 F.3d 30 (1st Cir. 2005)................................................................3, 7

*American Trucking Associations, Inc. v. Scheiner*,
483 U.S. 266 (1987)..........................................................................13, 14

*Bibb v. Navajo Freight Lines, Inc.*,
359 U.S. 520 (1959).................................................................................16

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
520 U.S. 564 (1997)...................................................................................7

*Chemical Waste Management, Inc. v. Hunt*,
504 U.S. 334 (1992)...................................................................................7

*Comptroller of Treasury of Maryland v. Wynne*,
575 U.S. 542 (2015)...................................................................................3

*Department of Revenue of Kentucky v. Davis*,
553 U.S. 328 (2008).................................................................................15

*Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.*,
405 U.S. 707 (1972).................................................................................17

*Family Winemakers of California v. Jenkins*,
592 F.3d 1 (1st Cir. 2010)..............................................................9, 11, 12

*Fulton Corp. v. Faulkner*,
516 U.S. 325 (1996)................................................................................7, 8

*Granholm v. Heald*,
544 U.S. 460 (2005)..........................................................................3, 4, 7

*Guy v. Baltimore*,
100 U.S. 434 (1879)...................................................................................6

*H.P. Hood & Sons, Inc. v. Du Mond*,
336 U.S. 525 (1949)...................................................................................3

*Hughes v. Oklahoma*,
441 U.S. 322 (1979)......................................................................4

*Hunt v. Washington State Apple Advertising Commission*,
432 U.S. 333 (1977)............................................................8, 12, 13

*Industria y Distribution de Alimentos v. Trailer Bridge*,
797 F.3d 141 (1st Cir. 2015)......................................................16

*Island Silver & Spice, Inc. v. Islamorada*,
542 F.3d 844 (11th Cir. 2008) ...................................................18

*Maine v. Taylor*,
477 U.S. 131 (1986)..................................................................7, 8

*National Pork Producers Council v. Ross*,
143 S. Ct. 1142 (2023)........................................................*passim*

*New Energy Co. of Indiana v. Limbach*,
486 U.S. 269 (1988)....................................................................3

*Oregon Waste Systems, Inc. v. Department of Environmental Quality of Oregon*,
511 U.S. 93 (1994)......................................................................4

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970)..................................................................15

*Southern Pacific Co. v. Arizona ex rel. Sullivan*,
325 U.S. 761 (1945)...............................................................6, 20

*Tennessee Wine & Spirits Retailers Association v. Thomas*,
139 S. Ct. 2449 (2019)...........................................................3, 12

*Trailer Marine Transport Corp. v. Rivera Vazquez*,
977 F.2d 1 (1st Cir. 1992)..........................................................13

*United Haulers Association, Inc. v. Oneida-Herkimer Solid Waste Management Authority*,
550 U.S. 330 (2007)..................................................................20

*Western Live Stock v. Bureau of Revenue*,
303 U.S. 250 (1938)..................................................................19

- iv -

*Willson v. Black-Bird Creek Marsh Co.*,
    27 U.S. 245 (1829)...............................................................................3

## CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES

U.S. Const. art. I, § 8, cl. 3.................................................................3, 13

Fed. R. App. P. 29(c)(5)..........................................................................1

R.I. Gen. Laws § 42-13.1-1.....................................................................1

## OTHER AUTHORITIES

Collins, Richard B., *Economic Union As A Constitutional Value*, 63
    N.Y.U. L. Rev. 43 (1988) ...................................................................19

Denning, Brannon P., *Confederation-Era Discrimination Against
    Interstate Commerce and the Legitimacy of the Dormant
    Commerce Clause Doctrine*, 94 Ky. L.J. 37 (2006)............................4

Fallon, Richard H., *The Dynamic Constitution* (2d ed. 2013)............9, 15

The Federalist Papers (C. Rossiter ed. 1961), *available at*
    https://tinyurl.com/46j2bz78..............................................................5

Friedman, Barry & Daniel T. Deacon, *A Course Unbroken: The
    Constitutional Legitimacy of the Dormant Commerce Clause*, 97
    Va. L. Rev. 1877 (2011) ......................................................................4

Highway Use Fee Tax Information, Connecticut State Department of
    Revenue Services, *available here*
    https://portal.ct.gov/DRS/Businesses/Highway-Use-Fee/HUF.........18

Madison, James, "Vices of the Political System of the U. States," *in
    The Writings of James Madison* (Gaillard Hunt ed., 1901),
    *available at* https://tinyurl.com/32ttsfh7 .........................................5, 6

Regan, Donald H., *The Supreme Court and State Protectionism:
    Making Sense of the Dormant Commerce Clause*, 84 Mich. L. Rev.
    1091 (1986)..........................................................................................9

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

The Chamber of Commerce of the United States of America (the Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases of concern to the Nation's business community.

This is such a case. The Chamber has a strong interest in preventing states and municipalities from discriminating against and obstructing interstate commerce. The district court properly held that the Commerce Clause proscribes the RhodeWorks[2] tolling system, which in purpose and effect imposes an unfair and uneven burden on out-of-state commercial trucks engaged in interstate

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person or entity, aside from amicus curiae, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

[2] "RhodeWorks" is shorthand for The Rhode Island Bridge Replacement, Reconstruction, and Maintenance Fund Act of 2016. *See* R.I. Gen. Laws § 42-13.1-1.

commerce.  This issue is critical to the Chamber's business members, which engage in commerce across the country and rely on interstate trucking.

## SUMMARY OF ARGUMENT

Rhode Island's tolling system, RhodeWorks, was designed for the express unconstitutional purpose of forcing out-of-state trucks engaged in interstate commerce to finance repair of Rhode Island's bridges.  The system has achieved that purpose.  This Court should affirm the district court's proper determination that RhodeWorks violates the long-settled rule that the U.S. Constitution's Commerce Clause prohibits states from enacting such laws with the impermissible intent and effect of discriminating against and obstructing interstate commerce.

There is no denying that out-of-state trucks pay more in RhodeWorks tolls than do local trucks in Rhode Island—and they pay more *because* they are engaging in interstate commerce.  The district court correctly concluded as much.  Upholding Rhode Island's discriminatory toll scheme would invite other states to adopt similar protectionist tolling regimes.  Moreover, states could use purportedly neutral proxies (*e.g.*, vehicle class) to disguise their unconstitutional discriminatory motives for imposing other barriers on interstate commerce across myriad industries.

The Court should affirm the district court's decision that RhodeWorks is unconstitutional.

- 2 -

**ARGUMENT**

## I.    RHODEWORKS VIOLATES THE COMMERCE CLAUSE

The Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Although framed as a positive grant of power to Congress, the Commerce Clause "also prohibits state laws that unduly restrict interstate commerce." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019); *see, e.g., Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 534-535 (1949); *Willson v. Black-Bird Creek Marsh Co.*, 27 U.S. 245, 252 (1829). "This 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988); *see also Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 35 (1st Cir. 2005) ("the dormant Commerce Clause prohibits protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors" (internal quotation marks omitted)).

It is essential to our constitutional structure that states may not enact laws that "mandate 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Granholm v. Heald*, 544 U.S.

460, 472 (2005) (quoting *Oregon Waste Sys., Inc. v. Department of Envtl. Quality of Ore.*, 511 U.S. 93, 99 (1994)).  Indeed, "[t]his mandate 'reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'"  *Granholm*, 544 U.S. at 472 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325-326 (1979)).

Many Framers viewed such protectionist state laws as detrimental to the Union, believing that unifying American policy as to domestic and foreign commerce was essential to the Nation's economic health.  *See* Friedman & Deacon, *A Course Unbroken: The Constitutional Legitimacy of the Dormant Commerce Clause*, 97 Va. L. Rev. 1877, 1888 (2011) (in mid-1780s, "growing numbers of influential Americans became convinced that the very survival of the state republics hinged on thinking and acting continentally, that is, by adopting a uniform trade policy" (internal quotation marks omitted)); *see also* Denning, *Confederation-Era Discrimination Against Interstate Commerce and the Legitimacy of the Dormant Commerce Clause Doctrine*, 94 Ky. L.J. 37, 39 (2006) ("fears of present and future disputes among states over interstate commerce

occupied the minds of the Framers, who saw the need for locating the power to regulate interstate commerce in Congress").

Hamilton wrote that state protectionism could lead to conflict among the States, noting that "[e]ach State, or separate confederacy, would pursue a system of commercial policy peculiar to itself.  This would occasion distinctions, preferences, and exclusions, which would beget discontent."  The Federalist No. 7, at 62-63 (Hamilton) (C. Rossiter ed. 1961), *available at* https://tinyurl.com/46j2bz78; *see also id.* at 63 ("regulations of trade by which particular States might endeavor to secure exclusive benefits to their own citizens … naturally lead to outrages, and these to reprisals and wars").

Madison reiterated the same notion:

> A very material object of this power was the relief of the States which import and export through other States from the improper contributions levied on them by the latter.  Were these at liberty to regulate the trade between State and State, it must be foreseen that ways would be found out to load the articles of import and export, during the passage through their jurisdiction, with duties which would fall on the makers of the latter and the consumers of the former.  We may be assured by past experience that such a practice would be introduced by future contrivances; and both by that and a common knowledge of human affairs that it would nourish unceasing animosities, and not improbably terminate in serious interruptions of the public tranquillity.

The Federalist No. 42, at 267-268 (Madison) (C. Rossiter ed. 1961), *available at* https://tinyurl.com/46j2bz78; *see also* Madison, "Vices of the Political System of the U. States," *in The Writings of James Madison* at 363 (Gaillard Hunt ed., 1901),

*available at* https://tinyurl.com/32ttsfh7 ("The practice of many States in restricting the commercial intercourse with other States … is certainly adverse to the spirit of the Union, and tends to beget retaliating regulations, not less expensive and vexatious in themselves than they are destructive of the general harmony.").

The Framers' concerns about state protectionism have underpinned dormant Commerce Clause jurisprudence for more than a century.  For instance, in 1879, the Supreme Court in *Guy v. Baltimore*, which dealt with wharfage, wrote that state protectionist measures, "if maintained by this court, would ultimately bring our commerce to that 'oppressed and degraded state,' existing at the adoption of the present Constitution, when the helpless, inadequate Confederation was abandoned and a national government instituted."  100 U.S. 434, 440 (1879).  The Supreme Court recently reiterated that "[t]oday, this antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence."  *National Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1144 (2023).  And this makes sense.  When discriminatory burdens are placed on interstate commerce, the burden "is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected."  *Southern Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 768 n.2 (1945) (citations omitted).

**A.** **State Laws That Discriminate Against Interstate Commerce Are Virtually Always Invalid**

A finding that a state statute affirmatively discriminates against interstate commerce "may be made on the basis of either discriminatory purpose or discriminatory effect." *Gwadosky*, 430 F.3d at 36 (internal quotation marks omitted); *see also Chemical Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 344 n.6 (1992) ("legislation constitutes economic protectionism" if it has "either discriminatory purpose … or discriminatory effect"). In a situation where a state statute "discriminates against interstate commerce on its face, in purpose, or in effect [it] receives a form of strict scrutiny so rigorous that it is usually fatal." *Gwadosky*, 430 F.3d at 35; *see also Granholm*, 544 U.S. at 476 (where state legislation constitutes economic protectionism on the basis of either discriminatory purpose or discriminatory effect, legislation is "virtually per se" invalid); *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (where statute affirmatively discriminates against transactions in interstate commerce, it is "subject to more demanding scrutiny"). Moreover, state regulations that penalize companies for "'participat[ing] in interstate commerce'" are facially discriminatory and thus per se unconstitutional—even if they do not directly target out-of-state firms or goods. *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 578 (1997) (citing *Fulton Corp. v. Faulkner*, 516 U.S. 325, 333 (1996)). Thus, for example, a state cannot tax corporate stock based on "the degree that [the stock's] issuing

corporation participates in interstate commerce." *Fulton*, 516 U.S. at 333. That

type of regulation would "favor[] domestic corporations over their foreign

competitors in raising capital among" the taxing state's "residents and tends, at

least, to discourage domestic corporations from plying their trades in interstate

commerce." *Id.* The Supreme Court has not hesitated to invalidate "facial[ly]

neutral[]" state laws that have real-world "discriminatory impact[s] on interstate

commerce." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333,

352-353 (1977). To avoid invalidation, "the burden falls on the State to

demonstrate both that the statute 'serves a legitimate local purpose,' and that this

purpose could not be served as well by available nondiscriminatory means."

*Maine*, 477 U.S. at 138.

### B.  RhodeWorks Discriminates Against Interstate Commerce

RhodeWorks has both a discriminatory purpose and effect. Rhode Island's

toll system is the "first and only of its kind in the United States … to toll only large

commercial trucks … at various bridge locations along" Rhode Island's major

interstate and state highway corridors. Add.3.[3] Although it is not unusual to toll

vehicles to generate revenues to repair roads and bridges, it is highly unusual for

the toll to be triggered based on a vehicle's classification. Where, as here, "lower-

classed trucks are more likely to be Rhode Island-plated than Class 8+ trucks" and

---

[3] "Add." refers to the addendum to Appellants' opening brief.

"80% of the tolled vehicles are from out of state," a vehicle's classification is nothing more than a thinly-veiled proxy for whether that vehicle is local or out-of-state. Add.71. As the district court acknowledged, "[t]his plan had the obvious appeal of raising tens of millions of needed dollars from tractor trailers while leaving locals largely unaffected." Add.3.

### 1. RhodeWorks has a discriminatory purpose

To determine whether a state statute purposefully discriminates against interstate commerce, this Court looks to "the statute as a whole"—including text, context, and legislative history—as well as means-ends fit, that is whether the statute was "closely tailored to achieve the legislative purpose" that the state asserted. *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 13 (1st Cir. 2010) (citations omitted). The Commerce Clause is particularly concerned with *deliberate* discrimination, and Supreme Court cases invalidating state statutes frequently involve discriminatory effects in combination with, and as evidence of, discriminatory purpose. *See National Pork Producers*, 143 S. Ct. at 1144 (a law's "practical effects may disclose the presence of a discriminatory purpose"); *see also* Fallon, *supra*, at 1927; Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause*, 84 Mich. L. Rev. 1091, 1144-1147, 1206-1245 (1986).

Here, in response to local objections, the Rhode Island General Assembly explicitly stated that RhodeWorks was designed to favor in-state interests over out-of-state interests. The original version of RhodeWorks would have tolled all Class 6+ vehicles at the suggestion of a Rhode Island Department of Transportation (RIDOT) consultant. Add.69-70. Only weeks later, however, did lawmakers introduce a new version of RhodeWorks. *Id.* The new version proposed "two important changes: (1) Class 6 and 7 vehicles were exempted from tolling and (2) a limitation was added to address repeat per-day visits to a single gantry. … Lawmakers and state officials alike specified at the time that these changes were made to address concerns raised by *local businesses* and that both changes would reduce the impact of the tolls on *local industries*." Add.69 (emphasis added). Moreover, "[t]he trial evidence showed that lower-classed trucks are more likely to be Rhode Island-plated than Class 8+ trucks. … This means that approximately 80% of the tolled vehicles are from out of state. And the less than 20% of tolled Class 8+ trucks from Rhode Island disproportionally receive the benefit of the toll caps." Add.71.

Notably, Rhode Island does not deny that an earlier draft of RhodeWorks would have tolled Class 6+ vehicles but that the final version tolled only Class 8+ vehicles in response to feedback from local stakeholders. *See* Appellants' Br. 24-25. Moreover, Rhode Island does not deny that the then-Senate Majority Leader

stated that "the revised bill takes several important steps to improve upon the

original bill to address the concerns of the local trucking industry." Add.69-70; *see*

Appellants' Br. 23-26. Rhode Island also does not deny that the RIDOT Director

said that "[i]t's important for you to know that these changes came as a result of us

listening to the various stakeholders and transportation industries in Rhode Island.

There were – there was some criticism as to the impact that this legislation, our

original legislation, might impose on various industries, we listened to those

industries, we've met with them and we've changed our legislation to improve it.

But not only improve it, to actually provide economic incentives to those industries

to do business in Rhode Island." Add.70; *see* Appellants' Br. 23-26.

It is hard to think of a clearer case of intentional discrimination: a state

agency proposed a tolling regime already designed to disproportionately burden

interstate commerce, but politicians expressly reacted to protectionist concerns

even more precisely to tailor the regime to narrowly target interstate commerce. It

is eminently apparent that, in changing course following local outcry, Rhode Island

lawmakers *intended* to protect local business interests at the expense of out-of-state

business interests. This is unconstitutional. *Jenkins*, 592 F.3d at 8, 13-17

(Massachusetts law had discriminatory purpose where it imposed restrictions on

eligibility for direct shipping licenses for "large" wineries, because legislators

acknowledged in floor debates the benefits to in-state, small wineries, and Massachusetts had no "large" wineries as defined by the law).

### 2. RhodeWorks discriminates in practice

The dormant Commerce Clause independently prohibits laws that have a "discriminatory *impact* on interstate commerce." *Hunt*, 432 U.S. at 352 (emphasis added); *see also Thomas*, 139 S. Ct. at 2461 (as "the primary safeguard against state protectionism," the Commerce Clause prohibits state laws that have the effect of discriminating against interstate commerce). "A state law is discriminatory in effect when, in practice, it affects similarly situated entities in a market by imposing disproportionate burdens on out-of-state interests and conferring advantages upon in-state interests." *Jenkins*, 592 F.3d at 10.

In addition to its overt discriminatory intent, RhodeWorks actually places disproportionate burdens on out-of-state trucks, a quintessential "instrumentalit[y] of interstate transportation," in order to confer advantages upon in-state interests. *See National Pork Producers*, 143 S. Ct. at 1158 n.2. The discriminatory impact of RhodeWorks is manifest in its imposition of higher costs to travel through—rather than travel within—Rhode Island *and* imposition of a toll only on Class 8+ trucks, which places the bulk of the burden on out-of-state trucks. Together, these effects impermissibly "rais[e] the costs of doing business" in Rhode Island for out-of-state

- 12 -

trucks compared to in-state trucks.  *See Hunt*, 432 U.S. at 351.  The Constitution does not allow such an intrusive and targeted attack on interstate commerce.

*First*, the toll cap in the RhodeWorks tolling system, in practice, creates an "impermissible interference with free trade" because it "exerts an inexorable hydraulic pressure on interstate businesses to ply their trade within the State that enacted the measure rather than 'among the several States.'"  *American Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 267, 286-287 (1987) (quoting U.S. Const., Art. I, § 8, cl. 3).  Under a capped toll system like RhodeWorks, in-state trucks benefit to a significantly greater degree based on their traffic share than out-of-state trucks.  Specifically, "less than 20% of tolled Class 8+ trucks from Rhode Island disproportionally receive the benefit of the toll caps."  Add.71.  This is because, where two trucks travel the same number of miles and cross the same bridges per day, the per-day cap, in effect, means that the truck that remains exclusively in Rhode Island will receive "the privilege of using Rhode Island's roads at a lower effective rate per mile and per bridge-crossing than will the interstate truck."  Add.77 (citing Plaintiffs-Appellees' Post-Trial Br. 27).  "Such an imbalance in favor of local interests … over similarly situated non-resident interests … is a proper concern of the Commerce Clause."  *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 11 (1st Cir. 1992).  It is a "system [that] does not permit a vehicle to 'pass among the States as freely as it may roam the State in

which it is based,' and neither does it 'maintain state boundaries as a neutral factor in economic decisionmaking.'" Add.79 (citations omitted).

*Second*, by exempting Class 4-7 vehicles, which are also trucks, RhodeWorks deliberately shifts the toll burden to out-of-state commercial trucks conducting interstate commerce and exempts similarly situated local vehicles. The district court explained that Class 8+ "trucks are used more often on 'long-haul' trips, whereas lower-classed trucks are used more (but not exclusively) for local, intrastate trips, *e.g.*, delivery, garbage service, or cement mixing." Add.86. In tolling only Class 8+ trucks, therefore, RhodeWorks prioritizes local interests and trucks that travel more frequently intrastate—*i.e.*, the Class 4-7 trucks—even though Class 6-7 trucks "may well cause a similar damage impact as a Class 8+ vehicle." Add.58-59; *see also Scheiner*, 483 U.S. at 296 ("The great constitutional purpose of the Fathers cannot be defeated by using an apparently neutral guise of taxation which produces the excluding or discriminatory effect." (internal quotation marks omitted)).

## C. *National Pork Producers* Confirms The Correctness Of The District Court's Analysis

As the Supreme Court recently reaffirmed in *National Pork Producers*, the Commerce Clause is broadly concerned with preventing undue burdens on commerce and smoking out hidden protectionism, especially including obstructions to the instrumentalities of commerce. 143 S. Ct. at 1158 (citing

Fallon, *supra*, at 311); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 145

(1970) (holding that the dormant Commerce Clause prevented enforcement of a

state order that, even if fairly characterized as facially neutral, had practical effects

revealing a discriminatory purpose where "business operations to be performed in

[state] that could more efficiently be performed elsewhere").

Both "core" categories of dormant Commerce Clause violations are present

here: (1) challenges to laws with disparate burdens on out-of-state and interstate

commerce that reveal discriminatory, protectionist purposes; and (2) challenges to

laws regulating, burdening, or obstructing the instrumentalities of interstate

transportation. *See National Pork Producers*, 143 S. Ct. at 1157-1159 & n.2.

First, for the reasons described above, the "practical effects" of RhodeWorks

"disclose the presence of a discriminatory purpose" and economic protectionism to

favor Rhode Island trucks and businesses over out-of-state trucks. *See id.* at 1144.

Second, RhodeWorks burdens and obstructs the "instrumentalities of interstate

transportation" (*i.e.,* bridges, roads, and trucks). *See id.* at 1159.

Moreover, the Supreme Court "has left the 'courtroom door open' to

challenges premised on 'even nondiscriminatory burdens.'" *National Pork

Producers*, 143 S. Ct. at 1158 (quoting *Department of Revenue of Ky. v. Davis*, 553

U.S. 328, 353 (2008)). Even if RhodeWorks were "genuinely nondiscriminatory,"

*id.*, it would still fail because its purported local benefits—raising revenue for the

- 15 -

maintenance of Rhode Island bridges—do not outweigh "the national interest in keeping interstate commerce free from interferences which seriously impede it." *Bibb v. Navajo Freight Lines, Inc*., 359 U.S. 520, 524 (1959) (Illinois statute requiring the use of contour rear fender mudguards on trucks and trailers operating on state highways placed an unconstitutional burden on interstate commerce, even though the statute was a non-discriminatory local safety measure).[4]

### D.    RhodeWorks Also Fails Under The Fair Approximation Test

RhodeWorks also violates the dormant Commerce Clause because it is not "based on some fair approximation of use of the facilities." *Industria y Distribuction de Alimentos v. Trailer Bridge*, 797 F.3d 141, 145 (1st Cir. 2015). To pass constitutional muster, a fee must be "reasonably proportional to [each individual] entity's use" and a line must be "reasonably drawn … between those [the government] is charging and those it is not." *Id.* That a state must reasonably apportion fees to individual use and draw reasonable lines regarding who bears economic burdens is essential to addressing the Framers' original concerns

---

[4] In *National Pork Producers*, six Supreme Court justices agreed that "courts generally are able to weigh disparate burdens and benefits against each other" and that a state regulation whose burdens on interstate commerce clearly outweigh its benefits would violate the dormant Commerce Clause. *See* 143 S. Ct. at 1166 (Sotomayor, J., joined by Kagan, J., concurring in part); *see also id.* at 1167 (Roberts, C.J., joined by Alito, Kavanaugh, & Jackson, JJ., concurring in part and dissenting in part); *id.* at 1179 (Kavanaugh, J., concurring in part and dissenting in part).

regarding economic protectionism behind the Commerce Clause. The fair approximation test serves as a tool to smoke out covert discrimination against interstate commerce. *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 717 (1972) (assessing whether toll was based on some fair approximation of use or privilege for use as evidence of whether toll was "discriminatory against interstate commerce"). In the field of highway tolls, the Supreme Court has been clear that such fees must be "uniform, fair and practical." *Id.* at 715.

Here, Rhode Island's decision to only toll Class 8+ trucks places a burden exclusively on this group of vehicles to generate revenue to maintain Rhode Island's bridges for the benefit of all users. As the district court found, this is hardly "fair approximation" because it "exempts users who consume 30% of the bridge life from paying any charge at all for use of the tolled facilities," including users that "may well cause a similar damage impact as a Class 8+ vehicle." Add.58-59. Against the background of the Framers' concerns of national economic instability, it is anything but "uniform, fair, and practical" to except from tolls users, including Class 6 and 7 trucks, that have a sizeable impact on the tolled facilities.

## II.    UPHOLDING RHODEWORKS WOULD EMBOLDEN OTHER STATES TO MIMIC RHODE ISLAND'S DISCRIMINATION AGAINST INTERSTATE COMMERCE

If RhodeWorks were allowed to stand, its discriminatory toll system would become a dangerous blueprint for other states to fund in-state projects by extracting revenue from out-of-state commercial interests.  Such a holding would greatly undermine and disrupt the national free trade arena created by the Commerce Clause.

*First*, upholding RhodeWorks would embolden other states to mimic RhodeWorks by enacting retaliatory laws against interstate commerce and out-of-staters, under the guise of neutral proxies.[5]  Courts should apply exacting scrutiny to state laws with discriminatory effects, regardless of whether the laws discriminate on their face, because it is all too easy for states to use clever strategies to disguise their discrimination favoring in-state interests.  For instance, states could impose higher taxes or outright exclusion from the market based on whether a store is part of a chain.  *See, e.g., Island Silver & Spice, Inc. v. Islamorada*, 542 F.3d 844, 846 (11th Cir. 2008) (striking down zoning ordinance imposing size requirement on chain stores as a proxy for discrimination).  Facially-

---

[5] Indeed, as of January 1, 2023, Connecticut imposed a "Highway Use Fee" on large commercial trucks—Class 8 to Class 13—travelling on state highways.  *See* Highway Use Fee Tax Information, Connecticut State Department of Revenue Services, *available here* https://portal.ct.gov/DRS/Businesses/Highway-Use-Fee/HUF.

neutral proxies "renew the barriers to interstate trade which it was the object of the commerce clause to remove." *Western Live Stock v. Bureau of Revenue*, 303 U.S. 250, 256 (1938).

*Second*, allowing RhodeWorks to remain in place would greatly disrupt interstate commerce and harm the national economy. The immediate effect of Rhode Island's approach is to make it more costly to engage in interstate commerce along one of the country's most significant commercial corridors. But when other states mimic Rhode Island's discriminatory strategy for raising revenue with little political cost, the deleterious effects of that approach will compound and further increase the costs of doing business across state lines. *See* Collins, *Economic Union As A Constitutional Value*, 63 N.Y.U. L. Rev. 43, 77-78 (1988) ("Protectionist politics invite retaliatory protectionism by other states, until protectionists dominate in all states at great cost to both interstate commercial harmony and allocational efficiency.").

*Third*, the political process would not be able to fix the problems posed by RhodeWorks (and similar laws), because such laws impose disproportionate burdens on unrepresented entities with no potential political reprieve. States will be politically incentivized to pass protectionist laws in exchange for political goodwill. Courts "often find discrimination when a State shifts the costs of regulation to other States, because when 'the burden of state regulation falls on

- 19 -

interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected.'" *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007). Upholding RhodeWorks would gut essential constitutional limitations given the inability of those burdened by protectionist policies (*i.e.,* trucking companies from outside Rhode Island) to effect political change in Rhode Island. State politicians will be able to campaign on and legislate based exclusively and wholeheartedly on local constituents' concerns, with no account for how statutes affect those doing business in their jurisdiction who may be from another state. In the aggregate, this would make protectionist policies the accepted norm, contrary to the Constitution's intended plan. *Southern Pac. Co.*, 325 U.S. at 768.

## CONCLUSION

The Court should affirm the district court's judgment.

Respectfully submitted,

/s/ Mark C. Fleming

TYLER S. BADGLEY                    MARK C. FLEMING
JONATHAN D. URICK                  SHARON K. HOGUE
U.S. CHAMBER OF COMMERCE            WILMER CUTLER PICKERING
    LITIGATION CENTER                   HALE AND DORR LLP
1615 H Street, NW                  60 State Street
Washington, D.C.  20062            Boston, MA 02109
(202) 463-5337                     (617) 526-6000
                                   Mark.Fleming@wilmerhale.com
                                   Sharon.Hogue@wilmerhale.com

                                   *Attorneys for Amicus Curiae*

May 31, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 4,655 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

*/s/ Mark C. Fleming*
MARK C. FLEMING
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Mark.Fleming@wilmerhale.com

May 31, 2023

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the United States Court of Appeals for the First Circuit via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users this 31st day of May, 2023.

/s/ Mark C. Fleming
MARK C. FLEMING
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Mark.Fleming@wilmerhale.com

May 31, 2023